**E-FILED**

Monday, 26 September, 2016  04:18:00 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

**FILED**

SEP 2 6 2016

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

Morris Tyson_____ )
_____ )
_____ )      CIVIL ACTION
(Name of the plaintiff or plaintiffs)  )
                                       )
                v.                     )      NO. 15 cv.2290
                                       )
KENCO LOGISTIC SERVICES, LLC, a __    )
                                       )
Tennessee Limited Liability Company, ___ )
                                       )
Mars, Inc, Kelvin Walsh, Tammi Fowler __ )
                                       )

## AMENDED COMPLAINT OF EMPLOYMENT DISCRIMINATION

1.  Plaintiff [ X ] DOES ☐DOES NOT demand a jury trial.

### I. PARTIES

2.  The plaintiff is Mary Madison_____,

whose street address is 9758 S. Charles_____ _ ,

(city) Chicago,_____ (state) IL_____ _____ (ZIP) 60643_

(Plaintiff's telephone number)  (773) 297-9569

3.  The defendant is KENCO LOGISTICS, a Tennessee Limited Liability Company, Mars, Inc.,

Kelvin Walsh, Tammi Fowler_____,whose

street address is 2001 Riverside Dr,  and 6885 Elm and 1045 Crossroads PKWY and 400
Birmingham Hwy_____.

(city) Chattanooga/McLean/Romeoville/Chattanooga (state) TN/VA/IL/TN____ (ZIP)
37406/22101/60446/37419__

(Defendant's telephone number)     (423) –756-5552/(703)827-4900___

4.  The alleged discrimination occurred at Mars-Manteno Facility 1125 W. Sycamore, Rd

(city)Manteno_____ (state) Il___ (ZIP) 60950___

5. The plaintiff [**check one box**]

   (a)    ❑    was denied employment by the defendant.

   (b)    ❑    was hired and is still employed by the defendant.

   (c) X   ❑    was employed but is no longer employed by the defendant.

6. The defendant discriminated against the plaintiff on or about, or beginning on or about, (month) __May__, (day) _13_, (year) __2013__.

## II. JURISDICTION

7. Jurisdiction over this claim is based on 28 U.S.C. § 1331. Plaintiff alleges that the defendant(s) discriminated against Plaintiff because of Plaintiff's:

   ❑ Age (The Age Discrimination in Employment Act, 29 U.S.C. § 621)

   ❑ Color (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

   ❑ Disability (The Americans with Disabilities Act, 42 U.S.C. § 12101 and/or
        The Rehabilitation Act, 29 U.S.C. § 701)

   ❑ National Origin (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

   X Race (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)-KENCO

   X Race (42 U.S.C. § 1981)-ALL DEFENDANTS

   ❑ Religion (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

   X Sex/Gender (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e) -
        KENCO

   ❑ Sex/Gender (Equal Pay Act, 29 U.S.C. § 206)

   ❑ Use of Leave (Family and Medical Leave Act, 29 U.S.C. § 2611)

   X Other (list): _42 U.S.C. § 1985(3)-Conspiracy to interfere with civil rights-_ ALL
        DEFENDANTS

8. Plaintiff X HAS ❑ HAS NOT filed a charge before the United States Equal Employment Opportunity Commission (EEOC) relating to this claim of employment discrimination. **[Attach a copy of charge to this complaint.]**

9. Plaintiff X HAS ❑ HAS NOT filed a charge before the Illinois Department of Human Rights (IDHR) relating to this claim of employment discrimination. **[Attach a copy of charge to this complaint.]**

10. Plaintiff ☑ HAS ☐ HAS NOT received a Right to Sue Notice. If yes, Plaintiff's Right to Sue

Notice was received on or about (date) <u>September 8, 2015</u>  _____  .

**[Attach copy of Notice of Right to Sue to this complaint.]**

## III. FACTS IN SUPPORT OF CLAIM

11. The defendant intentionally discriminated against Plaintiff [*check only those that apply*]:

(a) ☐     by failing to hire the plaintiff.

(b) ☑     by terminating the plaintiff's employment.

(c) ☐     by failing to promote the plaintiff.

(d) ☑     by failing to stop harassment;

(e) ☐     by failing to reasonably accommodate the plaintiff's disabilities.

(f) ☐     by failing to reasonably accommodate the plaintiff's religion.

(g) ☑     by retaliating against the plaintiff because the plaintiff did something to assert rights protected by the laws;

(h) ☑     by coercing, intimidating, threatening or interfering with the plaintiff's exercise or enjoyment of rights;

(i) ☑     with respect to the compensation, terms, conditions, or privileges of employment;

(j) ☑     other (specify):  Hostile and Animus Work Environment Based on Race, Misrepresentation, Intentional Infliction of Emotional Distress

_____

_____

_____

3

12. State here briefly and as clearly as possible the essential facts of your claim. Describe precisely how each defendant in this action is involved. Give dates and places. Concentrate on describing as clearly and simply as possible what employment action or situation you allege to have been illegal and how it violated your rights. It is not necessary to make legal arguments or cite any cases or statutes.

See Attached

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

13. THEREFORE, the plaintiff asks that the court grant the following relief to the plaintiff [*check only those that apply*]

(a) ❑    Direct the defendant to hire the plaintiff.

(b) ❑    Direct the defendant to re-employ the plaintiff.

(c) ❑    Direct the defendant to promote the plaintiff.

(d) ❑    Direct the defendant to reasonably accommodate the plaintiff's religion.

(e) ❑    Direct the defendant to reasonably accommodate the plaintiff's disabilities.

(f) ❑    Direct the defendant to (specify): _____

_____

_____

_____

_____

_____

(g) ☒  If available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/double damages, front pay, back pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees.

(h) ☒  Grant such other relief as the Court may find appropriate.

_____
(Plaintiff's signature)


Mary Madison
_____
(Plaintiff's name)


_____

9758 South Charles
_____

(Plaintiff's street address)

(City) Chicago_____    (State) IL    (ZIP)  60643_____

 (Plaintiff's telephone number) (773) –297-9569____


Date: September 26, 2016

5

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served on all counsel of record through a Notice of Electronic Filing generated by the Court's CM/ECF system on this, the 19th day of September, 2016.

Mary Madison
9758 S. Charles
Chicago, IL 60643

## **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

Madison has complied with the administrative prerequisites of §506 of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5 as follows:

1.      On or about, August 29, 2013, MADISON timely filed a formal Charge of discrimination with the Illinois Department of Human Rights (hereafter the "IDHR") which was cross-filed with the Equal Employment Opportunity Commission (hereafter "EEOC") as Charge Numbers 2014CF0475 and 21B-2013-02440 respectively.

2.      Madison promptly and diligently accommodated all IDHR and EEOC requests for information and fully cooperated in the agency's investigation of this matter.

3.      MADISON has exhausted all available administrative remedies in accord with the aforementioned statutes prior to instituting this Civil Action, and RINGO formally requested a Notice of Right to Sue from EEOC on January 4, 2016.   No administrative prerequisites are required before a plaintiff files a complaint pursuant to the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981.

## FACTUAL ALLEGATIONS

4.      MADISON was employed with KENCO on or about May 13, 2013 as a Quality Engineer, for a 3rd party management company whom at all times acted as agents of Mars, Inc., beginning on April 21, 2013.

5.      At all relevant times, Defendants KENCO and MARS, Inc., employed in excess of fifteen (15) employees for at least twenty (20) calendar weeks in 2013, 2014 and 2015.

6.      At all relevant times, all matters regarding compensation, terms, conditions, rights and privileges of MADISON's employment were governed and controlled by Defendant(s) MARS and KENCO.

7.      At all relevant times MADISON possessed the skills, experience and qualifications necessary to work in her employment position and adequately and completely performed all of the functions, duties and responsibilities of his employment with Defendant KENCO & MARS.

8.      KENCO, upon information and belief was acting as the agent of Mars and in its conduct and actions as alleged herein and was acting in a capacity within the scope of its authority, or, if said conduct was outside the scope of its authority, said conduct was known; authorized and ratified by Mars.

9.      Plaintiff filed charges that were dually filed at the Illinois Department of Human Rights and EEOC.

10.     MARS, Inc., and 4T's management through ingenuity and family alliance collaborated, championed, and implemented the vertical startup of the MARS Manteno facility.

11.     The MARS Manteno facility is a co-pack, warehouse and distribution center for Mars, Inc.

12.     The MARS Manteno facility has been in operation since 1999.

13.     The MARS Manteno facility was managed by 4T's, a thru put, from 1999 until 2013.

14.     The Mars-Manteno facility, since its inception in 1999, has been a fully functional facility comprised of a General Manager, Operations Manager, Accounting and Human Resource Department, supervisors, and workers.

15.     MARS, Inc. specifically provided on a daily basis:

    a.     On site Regional District Manager herein referred to as "RDM;"
    b.     Morning meetings regarding the daily "Plan ;"
    c.     Fulfillment orders generated by Mars, Inc. through the Warehouse Management System-SAP;
        i. Through put of a Billion pounds or more annually of candy at the Mars Manteno facility
    d.     Mars, Inc. Warehouse Quality Manual; and
    e.     Cross-functional collaboration between departments

16.     MARS, Inc. routinely and regularly provided incentives to the Mars Manteno employees.

17.    MARS, Inc. issued a Request for Proposal (RFP) in late 2012 or early 2013 to bid on the upcoming management vacancy at the MARS Manteno warehouse and distribution facility in Manteno, IL.

18.    Kenco Logistics is a 3rd party logistics company that manages warehouse and distribution centers for other companies.

19.    Kenco Logistics responded to the RFP issued by MARS, Inc.

20.    MARS, Inc. identified and retained the management services of Kenco Logistics in early 2013.

21.    On or about February 15, 2013, 4T's notified the Mars Manteno employees in writing that the owner was retiring, that another distributor would be taking over the MARS account, that it was expected that most employees would be hired to essentially perform the same work, and that technically the plant was being closing under 4T's management.

22.    Kenco Logistics replaced the services of 4T's Management.

23.    Kenco Logistics stated to the Illinois Department of Human Rights and the EEOC in its Position Statement beginning on or about November 2014 in case number 2014CF0475, and subsequently again in case number 2014CF2858, 2014CF2992, 2014CF3057, 2014CF3161, 2015CF0310, 2015CF0811, 2015CF1145, 2015CF0342, 2015CF0990, 2015CF1315, 2015CA1464, 2014CF3162, 2015CF0003, 2015CF0006, 2015CF0515, 2015CF0516, 2051CF0699, 2015CA1054, 2015CA1590 and others that

"Kenco is a third-party logistics company ("3PL") that operates and manages warehouses and order fulfillment operations for other companies."

24.     On April 21, 2013, Kenco began managing such a warehouse in Manteno, Illinois for Mars, Inc.

25.     Kenco Logistics is a privately held company in the state of Tennessee.

26.     Kenco Logistics corporate structure and MARS, Inc. are two (2) separate and distinct companies.

27.     Kenco Logistics is part of the Kenco Group.

28.     Kenco Group current Chairman & CEO is Jane Kennedy Greene.

29.     Kenco Group President and COO David Caines

30.     Kenco Logistics was hired to Manage the Mars, Inc. Warehouse and Distribution portion of the Mars Manteno facility in Manteno, IL

31.     Mars, Inc. is a privately held company in Virginia.

32.     Mars, Inc. paid Kenco Logistics a management fee to manage the Mars Manteno facility.

33.     Mars, Inc. passed thru their costs through Kenco Logistics with the exception of the lease, taxes, fire protection, insurance, rack expense/amortization, management fee, material handling fee were direct pays.

34.     Specifically, Mars, Inc. passed expenses thru Kenco Logistics, the salaries of all the employees (temporary, part & full time employees), as well as, any other expenses, including legal fees, and invoices of the Mars Manteno facility back to MARS, Inc.

35.     This function performed was similar to that of the services provided by ADP, LLC.

36.     Mars, Inc. managed Kenco Logistics.

37.     Mars Manteno was a part of the network of Mars distribution centers.

38.     Mars Manteno was the Midwest distribution center.

39.     Mars Manteno serviced twelve (12) Midwestern states and Canada.

40.     Mars Manteno facility distribution center infrastructure was organized similar to four (4) other distribution centers in the network.  For example, but not limited to:
    a.     General Manager
    b.     Operations Manger
    c.     Accounting/Human Resources
    d.     And the like….

41.     Organizationally the Mars Manteno General Manager answered to and conferred with the onsite RDM of Mars, Inc., as a matter of the course of ordinary business operations.

42.     *Black's Law Dictionary* defines "employee" as "a person in the service of another under any contract of hire, express or implied, oral or written, where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed.

43.    Mars, Inc. provided and stipulated such terms and conditions of employment, to Kenco Logistics, the Mars Manteno employees, as well as, compliance; specifically with the mandates of Mars outlined in the **Mars US Warehouse Quality Manual** and public policy, including but not limited to FSMA (Food safety and Modernization Act), 2002 Bioterrorism Act, CFR Title 21, and any other applicable public policy, just as it would with any employee and as it had done with the previous management company at the Mars Manteno Facility and its various other warehouses.

44.    Mars, Inc. required Kenco Logistics and Kenco Logistics agreed to be compliant with public policy, as it relates to the codified laws of the land, just as it would with any employee.

45.    Specifically, Mars, Inc. provided Kenco Logistics with company policies, procedures, manuals and the like, just as it would with any employee.  In addition, Mars, Inc. provided the necessary tools to perform the assigned job functions, such as but not limited to: Leasing the facility, the equipment (warehouse and office), the computers, the software, as well as, the maintenance, upkeep and repairs of such, just as it would for any employee.

46.    Specifically, Mars, Inc. provided to Kenco Logistics, just as it had its former management company on a regular and ongoing basis, a comprehensive standard to safeguard the Quality and Food Safety of its products in the outbound pipeline. The document was developed in conjunction with "Global Quality and Food Safety Requirements."

47.    Specifically, Mars, Inc. set the performance management standards and goals for Kenco Logistics, just as it would with any employee.

48.    Kenco Logistics because of its multifunctional and multilayers of management types can be coined as a "Super Manager."

49.    Specifically, Mars, Inc. provided it's "Super Manager" Kenco Logistics with ongoing guidance, support and management continually.

50.    Specifically, Mars, Inc. provided this support, guidance and management to its "Super Manager" Kenco logistics and the Mars Manteno Facility, by way of an in-house Regional Distribution Manager (RDM).

51.    Daily meetings occurred between MARS and its manager, Kenco.

52.    Kenco Logistics, it's "Super Manager" just as any employee would, on an ongoing regular and regimented basis conferred with, Mars, Inc. for directives and goals, while conforming to these directives, and reporting the results of such to Mars, Inc.

53.    Just as any manager would, Kenco Logistics a type of "Super Manager" dovetailed their management styles to synergize the mandates of it employer, Mars, Inc. and public policy to meet the performance management goals set by Mars, Inc.

54.    The "Eggleston Exception" is being invoked due the agency relationship of Kenco and Mars.

55.    Mars had the opportunity to participate in the conciliation process afforded by the IDHR and EEOC.

56.    Pointedly, Public policy drives industry standards that drive company policy. Specifically, in this case the Food, Drug and Cosmetic Act (FD&C Act), Food Safety and Modernization Act (FSMA), the 2002 Bioterrorism Act and other Acts, as well as, The World Health Organization (WHO), Codex Alimentarius, FAO and other organizations, shape and form the various recognized Global Food Safety Initiative (GFSI) benchmarks; which include but are not limited to: FSSC 22000, ISO22000, BRC, IFS, SQF and other food safety standards.

57.    Specifically, Kenco Logistics was assigned the task of implementing a written Quality Management System based upon the current non-documented procedures and protocols being performed at the Mars Manteno facility.  This standard was based upon ISO, the International Standard of Organization.

58.    This quality system was to dovetail and interface with the existing Quality Management System of MARS that is based on (Food Safety System Certification) FSSC22000.

59.    Kenco Logistics Quality Management System is based on an ISO, the International Standard of Organization; the specific ISO standard is 9001:2008.

60.    Specifically, Kenco Logistics implemented a written Quality Management System at the Mars Manteno Facility.

61.    This written Quality Management System at the Mars Manteno Facility was spearheaded, championed and initiated by Madison.

62.    Mars, Inc. and Kenco Logistics are both certified to some Global Food Safety Initiative standard and or benchmark.

63.    Mars, Inc. opened a Global Food Safety Center in China n 2015, as Mars recognized its responsibility in ensuring the safety of the global food supply chain.

64.    Yearly external audits are required to remain compliant to the Quality Management System, along with internal audits.

65.    Furthermore, the Federal Government under the 2002 Bioterrorism Act and the 2011 Food Safety Modernization Act, require all august body participants along the food supply chain to be complaint from farm to fork.

66.    Kenco Logistics publicly purports to "ensure all requirements are documented according to the ISO-9001:2008 structure and are incorporated into the sites' standard operating procedures. Through regular internal audits and program development, Kenco's quality team provides support and industry expertise in FDA, OSHA, EPA, DEA, DOT, and numerous other compliance agencies."

67.    Specifically, the system implemented at the Mars Manteno facility was to be a standardization of all policies, procedures, mandates and the like.    This included, but was not limited to job analysis, job descriptions and the corresponding operating procedures for each job.

68.    Job descriptions and operating procedures for each job were authored by Plaintiff and vetted with Kenco Corporate Regulatory Affairs Specialist.

69.    GAP Analysis, Corrective and Preventative Actions, and Root Cause Analysis, as well as, other Continuous Improvement tools were also utilized.  These and all-encompassing documents were authored, vetted and catalogued according to Defendant's policies, procedures, and protocols.

70.    All Quality Management systems, including but not limited to this Mars Manteno Quality Management System, mandate that all documents are to be catalogued, controlled, maintained, and stored amongst other requirements.

71.    Plaintiff developed an Appendix A for the Mars Manteno Facility that catalogued the corresponding standardized documents for the Mars Manteno Facility.  This included but was not limited to Job descriptions, Standard Operating Procedures, policies, and forms.

72.    Kenco Logistics also maintained an Appendix F, a higher matrix of Appendix A, top tier documents, that catalogued the corresponding standardized documents for the Kenco Logistics as a whole, inclusive of the Manteno Facility, as well as, other managed

facilities. This included but was not limited to Job functions by titles, Standard Operating Procedures, policies, forms and the like.

73.    The documents itemized in Appendix A for the site super ruled those documents in Appendix F because they were customized to the specific employer's and site requirements.

74.    To ensure proper dissemination and training, each policy and or procedure are to be signed off by each employee and a record retained of such.

75.    According to Defendant's policy, no deviation from any policy and procedure is to occur, without following the procedure of the exception procedure and an approval of such on any level.

76.    President, David Caines, of the Kenco Group referred to the employees of the Mars Manteno site specifically as Mars, Inc. employees.

77.    The "Super Manager's" role was to manage and enforce the directives and mandates of Mars, Inc. at the Mars Manteno facility that was owned, leased and operated by Mars, Inc. since the Mars, Inc. Manteno inception in 1999.

78.    Title VII provides that it is "an unlawful employment practice for an employer to fail or refuse to hire or discharge any person or otherwise … to discriminate against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, age or natural origin."

79.    Kenco, Mars, Inc., "Super Manager" provided back office support to the accounting and human resource department, as well as, the implantation of Kenco management styles, including but not limited to: Kenco Quality Management System (KQMS), an ISO 9001:2008 based system, Operational Excellence and Continuous Improvement based upon Lean and Six Sigma principles.

80.    Operational Excellence, Quality Systems, and Continuous Improvement reduce defects, delays, and negative goodwill; while simultaneously, increasing efficiency, profitability, compliance, as well as, goodwill and stakeholder satisfaction.

81.    The specific back office support provided by Kenco entailed passing on the invoices/bills of the Mars Manteno facility to Mars, Inc. after they were receipted, reconciled and the like at the Mars Manteno Facility combined HR and Accounting Department.  In addition to the invoice pass thru to Mars, Inc., Kenco also passed thru the Mars Manteno payroll by issuing the payroll checks, after the payroll had been processed, verified and submitted by the Mars Manteno Accounting Department for the five (5) different payrolls that comprised the Mars Manteno Facility to Kenco's payroll department.

82.    Ultimately, Mars, Inc. bore all the cost of the facility.

83.    The only cost that was not passed through Kenco was its management fee and a few other direct cost to Mars, Inc.

84.    The additional specific back office support provided by Kenco was the recruitment and hiring of salaried personnel for the Mars Manteno facility, as well as, other Human Resource support, such as but not limited to: training, benefit administration, and the like.

85.    The onsite Human Resource reported both to Walsh and Corporate HR, specifically, Tammi Fowler.

86.    The KQMS style was to standardize the facility to bring compliance to 21CFR110, Food Safety and Modernization Act, 2002 Bioterrorism Act, as well as, any other applicable Global Food Safety Initiative (**GFSI**) benchmarked schemes; in addition to, streamlining business process, increase efficiency, profitability and accountability.

87.    The claims of disparate treatment and disparate impact by Madison and others were reported to the site Human Resource Personnel-Leonard Szplett and Edith McCurry,

Kelvin Walsh-General Manager, Paula Hise V.P. of Operations, and other corporate persons, by email, mail, phone, fax, and in-person on numerous occasions.

88.    Specifically these claims by Madison were made in beginning in June of 2013.

89.    At all times, Kelvin Walsh, ("Walsh"), a White, American male, held the position of General Manager. Walsh was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of MADISON's employment with Defendant KENCO.

90.    At all relevant times, Walsh, acting on behalf of Kenco the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

91.    Plaintiff is informed and believes, and on that basis alleges that, at all times relevant to this action, Plaintiff and Defendants had a fiduciary relationship upon which Plaintiff justifiably relied to her detriment.

92.    By virtue of the relationship between Plaintiff and Defendants, a fiduciary duty existed.

93.    Plaintiff believes that Defendants breached its fiduciary obligation to Madison.

94.    Pursuant to said duty, Defendants owed the utmost good faith and fairness to Plaintiff in all matters pertaining to Defendant's conduct with respect to Plaintiff's' employment and all the terms and conditions imposed upon Plaintiff, including, but not limited to: equal terms and conditions of employment, as it related to progressive

disciplinary actions, investigations and the like, as well as, the compliance to public policies.

95.    Immediately upon MADISON's hire, on or about May 13, 2013, without reason, MADISON was subjected to Unequal terms and conditions of employment through the withholding of relevant and germane information needed to perform MADISON' job. Specifically, MADISON asked Walsh for all Mars Audit findings and other pertinent information.  Walsh denied having such information.

96.    In addition, MADISON was never given any specific Work Instructions (WI), assignments benchmarks, goals or plans of action by Walsh.  Upon information and belief, when persons are on boarded at any workplace, expectations and information are disseminated to the hirees.

97.    MADISON relied upon the information given to her during her interviews with Corporate Quality and Paula Hise, VP of Operations, as well as, the information cited on the job posting and the signed job description by Walsh, to bring compliance to the Mars Manteno Facility.

98.    Defendant understood that there was no written infrastructure and line balance to compliance at the Mars Manteno facility; nor did anyone at the facility have any foreknowledge about such.

99.     There are specific guidelines for compliance which include, but are not limited to: 21 CFR110, Bioterrorism Act of 2002, Sanitary Transportation Act of 2005, as well as, other relevant CFR's, industry standards, customer and product specific guidelines and the like.

100.    Over the next several days from May 14-17, 2013, MADISON implemented audits and developed various policies to identify gaps, bring correction, as well as, ultimately compliance to the FDA mandates.

101.    These audits and policies were submitted to Walsh for review and meeting requests were made for review and final approval, as well as, for the impending audit.

102.    Walsh would not comply with the meeting request for review and final approval.

103.    During the audit, it was discovered that the sanitation was non-compliant for the following reasons: Cleanliness was a major factor.  For example, the bathrooms had fecal matter on the floors; were untidy and unsightly and that the cleaning service, Service Master, used the same mops to clean the facility as they used in the bathrooms.  These action spread disease and germs throughout the warehouse (cross-contamination); as well as, potentially causing a potential public health crisis.

104.    In addition, the bathrooms did not have signs mandating that employees wash their hands.

105.     Sanitation is essential, especially in food grade facilities, and is a mandate of the FDA, FSMA, Code of Federal Regulations, and other Public Health and Safety laws, as it is a matter of public safety and health.  Failure to follow proper food sanitation can result in the spread of disease, public health crisis and outbreaks, as well as, causing severe illness or even death.

106.     A corporate regulatory affairs, specialist, was at the facility and a meeting was conducted on or about May 21, 2013 with Service Master in regards to the lack of Sanitation.  A Memorandum of Understanding (MOU) was set forth regarding the meeting and the expectations set in regards to the sanitation of the facility and the current FDA mandates, as well as, opportunities for improvement on both sides.

107.     Only after the corporate regulatory affairs specialist contacted Walsh, on or about May 27, 2013, did he finally agreed to set up and commence meetings.

108.     On or about May 29, 2013, a meeting was held, but did not address the mandated and impending issues.

109.     Walsh vehemently denied on at least six (6) documented occasions, from May 13 through July 17, 2013,  of not having the relevant information needed to prepare for the upcoming and impending 90 day audit, as well as, refusing to review, meet and approve the policies and procedures set forth for federal compliance.

110.    On or about July 19, 2013, MADISON was again subjected to unequal terms and conditions of employment, harassed, minimalized and reprimanded for corresponding with her quality counterpart, Matt Chick at Mars, regarding the information that had been sought by MADISON from Walsh and by Tracie Clifford from Matt Chick.   Walsh stated the following:

> "As covered during your performance review, you need to engage in dialog with your follow site managers. Specifically your site GM. If asked, I could have provided you detailed answers to your inquires below. By going directly to the customer it gives an appearance that Defendant KENCO does not have an understanding of the business. And or it raises questions as to what measures may be lacking. In addition, it is Defendant KENCO's responsibility to ensure we are utilizing the resources provided by MARS. In final, to question the customer that their QA manual is dated was completely inappropriate."

111.    Chick contacted Madison initially with the audit report on Friday, July 19, 2013, without Madison's initiation or prompting.

112.    Madison replied to Chick's email with an introduction of herself; a follow up question to the information received; and a thank you for supplying the information.

113.    Madison's failure to respond to Chick's communication would have been irresponsible and reckless, akin to professional malfeasance.  Mars and Kenco were in a principal agent relationship and Madison was in relationship with them both; consequently, some acknowledgement was necessitated and warranted.

114.    Failure to respond could have caused a strain and/or breach in the business relationships.

115.    It was Madison's fiduciary obligation to respond.

116.    This type of malfeasance would have been a breach of Madison's fiduciary obligation to MARS and Kenco and ultimately public policy.

117.    It was Madison's job to work cross-functionally with MARS regarding quality and compliance.

118.    Furthermore, to simply ignore a person's communication, especially in a business and employment context, is disrespectful, as well as, plain ignorant and uncouth.

119.    Chick indicated that the site should be in possession of the information since on or about August 2012; Chick readily supplied it to MADISON.

120.    Chick was the Distribution Quality Manager for Mars Chocolate North America.

121.    Chick should have always been Madison's point of contact regarding quality compliance for MARS.

122.    Walsh intentionally, willfully and wantonly obstructed this business relationship between Chick and Madison.

123.    MADISON opposed such treatment by responding on or about July 20, 2013:

> "On (6) six known separate occasions, in various open forums, you have denied having any foreknowledge of CAPA's {Corrective and Preventative Action}: Please see below:……"

> In addition, since this information is available and can it be provided by you; please forward this information, as we have been in need of it for some time now.

> Last, but not least the most important factor in this query was Ms. Tracie, who asked in the July 17, 2013 meeting the disposition of the records and the likes.  Whereby the existence of the records were denied. As a direct result of the denial of such records, Ms. Tracie initiated this request for information and clarification prior to her departure.  As a direct result of this query, Matt Chick forwarded some information, but it did not resolve the questions at hand; therefore, prompting a re-request of Ms. Tracie's original request."

124.    MADISON was further again subjected to unequal terms and conditions of employment, harassment, minimalization, retaliation, ostracizing and harsher scrutiny in that Walsh forbade MADISON not to communicate with Chick again.

125.    Moreover, under normal circumstances the Quality person would be in contact with the corresponding Quality Person.

126.    Contrarily, there was a reckless, wanton, malicious, willful and intentional interference by Walsh purposely obstructed the business relationships of Madison with Kenco, as well as, Mars.

127.    Walsh did not possess the qualities, attributes or acumen experientially or educationally to be liaison, a corresponder, a corroborator, or any appreciable influence on and of the statutes necessary to bring compliance to the Mars Manteno facility.

128.    If Walsh had of possessed the necessary skills to perform the duties and tasks at hand; then there would have not been a legitimate business need that dictated hiring a Quality Engineer or person to oversee the compliance of such.

129.    After MADISON's opposition, unbeknownst to MADISON, Walsh conspired in an email against MADISON to say that he had provided and supplied that information requested from Chick to Tracie Clifford, a third (3rd) party consultant.

130.    The requested and sought information from Chick was crucial to the remediation of deficiencies of the immediate past audit of Mars, as well as, compliance to the various federal mandates.

131.    Madison continued to be the victim of unequal terms and conditions of employment, harassed, minimization, retaliation, and harsher scrutiny.  The oversight of Quality, including, but not limited to sanitation, the facility, policies, and procedures were under MADISON's governance.  On or about June 24, 2013, Madison was instructed by Hise to place Service Master on a ten (10) day remediation plan due to their continued non-compliance, as well as, to take Request for Proposals (RFP's), in the event Service Master did not comply.

132.    On or about June 25, 2013, Walsh asked MADISON to "relax her standards" in regards to Service Master, as this is the way it had been done with the previous owner and that he knew what Mars wanted and to not be concerned.

133.    MADISON refused and it was explained to him the seriousness and gravity of the matter at hand; that people could become ill and even die, that it was against the law, and that we could lose our jobs, as well as, that the standards being implemented are federal guidelines and in order to be in compliance at all times with these mandate, as well as, with the customer requirements, the standards must be adhered to; failure to do so would be unlawful; not to mention that the willful and intentional misconduct would be egregious and negligent.  It was also conveyed that Paula Hise had stated that Service Master should be placed on a ten (10) day remediation plan.

134.    Mr. Walsh went on to say that Service Master did not understand and that he would be willing to accept the responsibility for any adverse circumstance surrounding this relaxation of standard.

135.    Madison indicated to Walsh that even if he would take such a responsibility, she could not engage in violating public policy and the terms and conditions of her job duties and responsibilities.

136.    MADISON reported this misconduct to the corporate regulatory affairs specialist; who in turn reported it to Paula Hise.

137.    MADISON also reported this to the onsite Human Resource Personnel on or about June 25, 2013, along with how she felt as though she was being treated differently because of her sex and race.

138.    Defendant's failed to investigate Madison's allegations misconduct or acknowledge receipt information or material facts regarding the improprieties.

139.    As directed by Hise MADISON set a meeting with Service Master for on or about June 27, 2013 to place them on a ten (10) day remediation plan.

140.    Immediately prior to the meeting, Walsh cancelled the meeting; with no explanation.  Consequently, the ten (10) day remediation plan was not implemented.

141.    Shortly thereafter, on or about July 2, 2013, an employee had reported that the sanitation had degraded to point where the bathrooms and the break room had become a breeding ground for flies.

142.    Walsh called a meeting on or about July 5, 2013 with Service Master, MADISON and Mike Manzello.  Walsh began to chastise, berate holler and humiliate MADISON in the meeting, accusing MADISON of being hostile and insensitive towards Service Master.  MADISON was mandated by Walsh to devise a plan of action to help them become compliant.  This was not within the scope of MADISON's job to manage vendor businesses.

143.    In May of 2013 Service Master was given a MOU (Memorandum of Understanding) outlining the discussions points from the meeting and the expectations.

144.    Service Master signed and returned the May 2013 MOU to Madison via email.

145.    Several days later, on or about July 8, 2013, after working hours, MADISON was called into a meeting with Walsh and Leonard Szplett, Human Resource Manager.

146.    MADISON was presented with an alleged Performance Improvement Plan (PIP). The justification given was that MADISON was not audit compliant as to why the plan was being administered.

147.    The PIP discussion continued for two (2) days until the late afternoon of July 9, 2013.

148.    Madison refused to sign the PIP, on July 9, 2013, but acknowledged that the signature was to only constitute acknowledgement of receipt, but not to agree to the contents ascribe therein.

149.    Madison was never given a signed copy of the PIP; although a copy was requested.

150.    Madison again requested a sign copy when she submitted her response and follow letter on July 22, 2013 by email.

151.    Madison's letter and response of July 22, 2013, was emailed to Walsh, Hise and Szplett.

152.    MADISON had never been given any specific Work Instructions (WI), assignments benchmarks, goals or plans of action by Walsh, nor had he reviewed the work that had been submitted by MADISON to that date.

153.    The PIP was subjective in nature.

154.    The PIP did not meet the company's standards or burden of being a legitimized document or the performance management compliance standards of the company or SHRM.

155.    The PIP as allegedly presented to MADISON was to represent a legitimate non-discriminatory pretext for plaintiffs discipline and termination.

156.    However, the PIP as presented failed not only to meet the minimum standards outlined by Defendant or the Society of Human Resources (SHRM) Performance Management Standard, it did not meet Defendant's standards either.

157.    PIP's are part of a Performance Management system and are typically used in a progressive discipline process and is usually part of a (3) three part phase to correct *persistent performance problems in accordance with a documented procedure* according to SHRM's Performance Management Standard.

158.    No previous disciplinary actions, coaching, or mentoring had occurred or been taken by respondent nor was it part of a progressive discipline process.

159.   More specifically, it lacked and/or was deficient in 7 of the 9 components to meet the minimum standards according to SHRM's Performance Management Standard.

***The plan as presented did not contain:***

1.   Official Company logo, address, etc…;

2.   Form, document, or control number (Control Procedure-(CP)-KQMS) QMS Documentation CP-BP-4.2.1.001;

3.   Associated policies, procedures, or protocols that support the use of this form (ISO)-KQMS) Controlled Documents-ISO-BP-4.2.3.001 or is it referenced in the Control of Records-ISO-QE-4.2.4.001 or the Index of Quality Records-ISO-QE-4.2.4.001-1, as well as, being catalogued in Appendix F that references all procedures, policies, and forms for the KENCO group;

4.   Reference to previously discussed issues, discrepancies, or gaps;

5.   Missed deadlines;

6.   Cited company policy/procedural violations;

7.   Quantifiable, factual, or accurate information of accounts and events;

8.   Adequate remediation of allege allegations in terms of remedy or time allotted;

9.   Examples or notations of work incompetency's, errors, omissions, deficiencies, and discrepancies;

10.   Factual or creditable occurrences or instances.

160.   As a matter of fact, the PIP was riddled and comprised of subjective criteria and lacked any substantial, creditable, tangible, or quantifiable instances to legitimize its

fundamental existence. To further affirm and support this subjectivity the plan contained

and cited competencies, which is not a part of a PIP, but are indicative of a Performance

Management Review.  Competencies are not part of a PIP according to SHRM.


161.    Furthermore, a significant amount of competencies cited were not relevant to the

performance requirements, duties, or execution of plaintiff's position as a Quality

Engineer that were to be used as benchmarks for the sustainability of employment that

exceeded and were outside the expected area of employed expertise; for example,

Financial Management-EIP, Performance Management, Employment Law, and Systems

Capability of Desktop Systems.


162.    Pointedly, Defendant's, Tammi Fowler, Senior Employee Relations Manager is a

Certified Human Resource professional whose:

> "Responsibilities include management of the Employee Relations function for the
> five Kenco Companies; providing interpretation and advice to HR Managers and
> Site Managers on employment law, organization policy and overall employee
> relations issues; conducting investigations related to claims of harassment or
> discrimination and recommending steps for resolution; reviewing termination
> requests and providing management with appropriate action plans; and educating
> Managers regarding the spirit and intent of laws, regulations and company
> policies."


163.    Defendant's Fowler knew the PIP did not meet industry standards nor company

policy.


164.    Pointedly, Fowler authored a number of company policies.

165.   Defendant KENCO follows the ISO 9001:2008 modeling according to the Defendant KENCO Corporate Responsibility report.  Therefore, the Defendant KENCO QMS documentation policy governs all documentation CP.BP.4.2.1.001.  Consequently, each policy, procedure and form are document controlled and subject to a document number, titling, date, revision number, indexing, and cataloguing.   They are catalogued in detail in Appendix F.  Forms are designated with a hyphen after the corresponding procedure number.

166.   To prevent and circumvent deviations such as the use of the legitimate non-discriminatory PIP, any deviation from the standardized process, procedure, or protocol requires an approved exception.  The Exception Form CP. QE. 4.2.1.001-2 requires a valid business reason and case to deviate from the established procedure for approval consideration according to the QMS Documentation procedure CP.BP.4.2.1.001.

167.   The Pip issued did not follow the Defendant KENCO Quality Management System-KQMS.  The form is not listed in Appendix F and therefore is not a valid recognized procedural form by Defendant KENCO.  Mr. Walsh affirmed that he knew Defendant KENCO forms were only to be used.

168.   Consequently,  due to the lack of alleged policies and procedures related to the PIP it becomes inherently obvious that based upon the PIP's fundamental basis to meet the minimum requirements of SHRM this allege legitimate non-discriminatory PIP was then specifically created for plaintiff, as there is no traceable evidence of its existence in the documented, indexed, catalogued inventory of cross-referenced documents , Appendix F;

once again, illegitimatizing the legitimate non-discriminatory non-pretext PIP to termination theories.

169.    Upon information and belief, the use of a PIP with these benchmarks has not been used with similarly situated employees including but not limited to white, non-black and non-African Americans. These intimidating and coercive antics are an abuse of power, authority, rank, and discretion.

170.    Defendant was aware that Defendants' Walsh had engaged in a number of misconducts prior to the dissemination of the alleged PIP.

171.    Plaintiff believes that Defendant breached its own policies and procedures when it failed to afford Madison an unbiased investigation, acceptance of witness statements and material facts to support the allegations of misconduct.

172.    Furthermore, Defendant's disciplinary action policy is progressive in nature and relegated to related areas of concentration. For example, attendance and behavioral issues are individual disciplinary actions and are not constituted the same; therefore, in tandem they would not be progressive in nature each infraction would be unto itself.

173.    As a direct and proximate result of defendants' action, plaintiff suffered serious injury, including but not limited to extreme embarrassment, humiliation, anxiety, fear, ridicule, physical upset and emotional distress, as well as, economic loss.

174.   Plaintiff is informed and believes and thereon alleges that Defendants' conduct was intentional and malicious and done for the purpose of causing Plaintiff to suffer humiliation, mental anguish, and emotional distress, as well as, to avoid culpability and offer a legitimate non-discriminatory reason for termination.

175.   Defendants' conduct in confirming and ratifying that conduct was done with knowledge that Plaintiff's emotional distress would thereby increase, and was done with a willful, wanton, reckless and indifferent disregard of the consequences to Plaintiff.

176.   MADISON was never given a plan of action to become complaint; this is a subsequent measure to a PIP; despite her having to devise one for Service Master on or about July 8, 2013.

177.   Madison was not afforded the thirty (30) day time period after Madison's response of July 22, 2013.

178.   At no time was Madison given a follow up or progress status to the PIP.

179.   Madison was terminated on August 9, 2013; eighteen (18) days into the (30) thirty day remediation plan.

180.   Again Defendant failed to follow its own policy as outlined in the PIP.

181.   Defendant did not follow its own Performance Management Policy.

182.    Madison objected to such treatment on or about July 22, 2013, when Madison wrote a written response to Defendant's Walsh's PIP and indicated that she felt as though she had been being treated differently than others.  Hise and Szplett were carbon copied on the email correspondence.

183.    Further subjugation, harassment and retaliation occurred from Defendants Walsh, as Defendants continued to purport this legitimate non-discriminatory pretext for plaintiffs discipline and termination by following up with an email reprimand as an intimidation tactic through the abusive of his authority on or about July 19, 2013 for requesting information from Mars Quality, after being contacted by the Mars Quality Manager Matt Chick.

184.    Ironically, according, to Mr. Walsh's harassing reprimand, Mr. Walsh acknowledges and admits to having had the needed information and that it could have been supplied if only asked for. However, the reality is that Mr. Walsh intentionally obstructed, withheld and refused to disseminate this information as to be burdensome, as well as, a tortious interference within the confines of the business scope of work to be performed.  Thereby, maliciously causing intentional strain, conflict and damage to the business relationships at hand by preventing or impeding the implementation and/or execution of the terms of contractual agreement between MADISON and Defendants KENCO and MARS in delivering a Regulatory compliant, audit ready facility for the impending customer audit and performance review; which ultimately and directly affects Defendant KENCO's contractual agreement of having an Regulatory complaint facility towards MARS, as well as, other housed customers, through the unconscionable willful

and intentional stifling dissemination of information that in reality obstructed not only the contractual obligations, as well as, impeding or preventing the compliance of legal mandates, which is illegal and unethical at best.

185.    Defendants, in breach of the duty described above, negligently and carelessly handled Plaintiff's employment status, causing Plaintiff to incur unnecessary costs and expenses, otherwise burdening Plaintiff with unnecessary and excessive debts, as well as, defaming and diminishing Madison's professional standing by purporting a contrived scheme riddled with flaws that Madison had not been informing/consulting Walsh; that Madison had made the company look bad in front of the customer, Mars; that Madison was performing work not relevant to the job at hand; and that Madison had not meet the established goals.

186.    It should be noted that although Walsh physically had the information in question and refused to give it to Madison; Walsh lacked the head, theoretical, and practical knowledge to implicitly or explicitly direct or disseminate any information to Madison in a useful or lawful manner to bring compliance to the Mars Manteno Facility.

187.    It should also be noted that Defendants' Walsh subjectivity in the PIP and of the entire process of compliancy was relegated to Walsh's educational background at the time, of a High School education; effectively rendering him woefully and wantonly lacking in knowledge to rate or grade the compliance process, to objectively rate or grade Madison's work product for substance, interpretation and sustainability; while

simultaneously benchmarking it for accuracy against the current mandates and regulations, as well as, the inferring and co-existing regulations that shape the framework compliance.

188.   Other examples of Mr. Walsh's intimidating, abusive, and offensive behavior, was during a meeting on or about June 12, 2013, with Ms. Hise, Mr. Marquez, Mr. Walsh and MADISON, a handout was presented regarding GMP's for the facility.  During the presentation, Mr. Walsh interrupts very abruptly stating that there is a misspelled word, actually a malapropism; that it should be ensure instead of insure, on the GMP document.

189.   In an another open forum with the HACCP Team, while the meeting was being conducted regarding HACCP implementation on July 26, 2013, when it was stated that there would be monthly meetings, Mr. Walsh again, abruptly interrupted and stated although we were having this meeting, don't look to have any other meetings and it would be at least some months before the issue would be revisited again, as time did not permit.

190.   In addition, Mr. Walsh's intentional and constant refusal to host meetings, as well as, declining and cancellation of meetings was also abusive, discriminative, humiliating, harassive, minimalizing, ostracizing and undermining, as well as, the creation of and fostering of an animus and hostile work environment.  For example, ISO Training meeting request was sent out, Mr. Walsh declined the meeting at 9:42 am due to having meetings all day with Mars.  Then ironically within 9 minutes and a series of email exchanges he was able to now attend at the same exact time, when the email request came from a white, non-black, non-African American.

191.    Matter of fact, from May 31, 2013 Mr. Walsh did not conduct any meetings for the upcoming audit and declined a number of meetings, as well as, having not reviewed numerous policies and procedures presented that were needed for the upcoming audit.

192.    More specifically, on or about July 9, 2013, Mr. Walsh stated in an email, that the business scope had changed and that training would have to be tabled, another prime example of the continue disparate treatment and impact imposed upon MADISON.

193.    Defendant knew that its actions would cause harm to Madison.

194.    Paula Hise VP of Operations had instructed Madison to default to the regulations in the event of a discrepancy.

195.    Another notable instance, was whereby, there was an intentional exclusion of and ostracizing from the Traceability Processes and Audit, which an integral part of Food Safety and Defense, especially in the event of product recall for various reasons, such as, but not limited to: adulteration, contamination, and/or spoilage, as well as, lost or stolen pallets of product.

196.    Upon information and belief Walsh continued his disparate and disparaging treatment of MADISON, as he continued to defame her to others by stating that MADISON had done nothing while she was employed, but caused trouble.

197.    Upon information and belief, Walsh sequestered MADISON's computer and locked it away in his office.

198.    Defendant KENCO, Kelvin Walsh, and its attorney Miller & Martin knowingly and willfully obstructed and impeded the administration of justice with respect to the investigation(s) by making statement(s) of position to IDHR, EEOC and OSHA that were riddled with false, misleading, materially deceptive, fraudulent, and highly pervasive statements. This is in direct violation of Obstruction of Justice: OBSTRUCTION OF PROCEEDINGS BEFORE DEPARTMENTS, AGENCIES, AND COMMITTEES.

199.    Defendant KENCO, Tammi Fowler, Corporate HR and its attorney Miller & Martin knowingly demonstrated a reckless disregard for the truth through Edith McCurry's, an African American, female, role reduction and minimization to a clerk, as opposed to her HR Administrator role, with a conscientious purpose to avoid the truth being learned to circumvent culpability through providing highly pervasive mistruths to IDHR, EEOC and OSHA; all government regulatory agencies.


200.    Upon information and belief, McCurry spoke with Karen Smith of Miller & Martin and reported that Madison had reported the disparate and disparaging treatment.

201.    Upon information and belief, McCurry also paralleled Madison's disparate and disparaging treatment to that of her own.

202.    Defendant KENCO, Kelvin Walsh, Paula Hise, and its attorney Miller & Martin stated that they we unaware of direct evidence and protected class activity being presented to them.

203.    Madison on 25 documented times presented direct evidence and protected class activity to Defendant.

204.    Defendant KENCO, Tammi Fowler, Corporate HR and its attorney Miller & Martin knowingly, maliciously, intentionally, recklessly, and willfully presented information that was not noted in the PIP, as an example of poor work performance; the instances presented to the regulatory agencies, IDHR, EEOC and OSHA were never addressed in the PIP; consequently plaintiff was never apprised of any work performance issues.

205.    Nor was Plaintiff afforded the opportunity to correct such allege deficiencies.

206.    One of the instances cited as a poor work performance was the project plan.

207.    This same alleged maladjusted project plan that Plaintiff created was used by another engineer at the Mars Manteno facility.

208.    Upon information and belief this project plan when used by the Industrial Engineer was found to be compliant.

209.    The other highlighted performance issue presented, to the IDHR AND EEOC, that had never been discussed with Madison as deficient was the Business Continuity Plan (BCP) developed by Madison.

210.    The    Business    Continuity    Plan    was    templated    off    the www.ready.gov/business/implementation/continuity  website.

211.    This template was chosen for this federally regulated facility to bring cohesiveness and efficacy to governmental rules and regulations in the event of a disaster.

212.    Defendant KENCO, Kelvin Walsh, and its attorney Miller & Martin knowingly, intentionally and willfully continued to conspire through the minimization and marginalization of Edith McCurry's responsibilities and role to a clerk, knowingly, intentionally and willfully omitting her from the witness list and replacing her with a HR representative, Leonard Szplett, non-black, whom that they believed would not oppose disparate and disparate treatment and impact and presenting mistruths to intentionally avoid culpability, as well as, conspiring on what to say/response in regards to Kelvin Walsh's admonishment/admission of being in possession of information, since August 2012, sought by plaintiff since 5.13.13 that was needed to perform the essential job duties that he had denied having until 7.19.13.

213.    Defendant KENCO, Tammi Fowler, Corporate HR and its attorney Miller & Martin made perjurious and prevaricated statements regarding policies and procedures

stating that the PIP was a form used consistently for years and given by corporate HR, Tammi Fowler to Kelvin Walsh; all forms are documented, listed and numbered on appendix F from corporate.

214.    In addition, Defendant KENCO intentionally, willfully, and knowingly stated to the IDHR and EEOC that they do not have a termination process, as well as, a PIP policy while presenting a general disciplinary policy, as the only governing policy relating to the matter at hand for non-exempt employees; when in fact there is a termination process policy is CP-HR-6.1.002 and the associated form is CP-HR-6.1.002-1.

215.    Policies, procedures and forms are not independent of one another.

216.    Consequently, a PIP could not exist without a policy or procedure under Defendants, Mars and Kenco's, quality management systems.

217.    These management systems are driven by public policy.

218.    PIP is a metric of a Performance Management; the Performance Management Policy for Exempt employees is CP-HR-6.2.2.009 and its associated forms are CP-HR-6.2.2.009-1 thru 4 and 6.  Moreover, under the standardization of ISO a form cannot exist without a corresponding policy or procedure.

219.    Therefore, this PIP as presented does not exist, is not a valid and approved form used by Defendant KENCO and cannot and should not have been used as it violates the company policy as it relates to the Quality Management System (QMS) Documentation

Control Procedure-CP-BP-4.2.1.001 and the exception form CP-BP-4.2.1.001-2 associated with the procedure. Consequently, the statements made are in direct violation of the False Statement Accountability Act and Perjury, as polices and forms exist that directly correlate to the request that was made with by the IDHR; these policies are indexed in Appendix F.

220.    Defendant KENCO, Kelvin Walsh, and its attorney Miller & Martin knowingly, intentionally and willfully slandering , maligning, and subjugating Plaintiff to harsher scrutiny to relieve culpability of the situation, as well as, conspiring to interfere against one's civil rights.

221.    Defendant KENCO and it's attorney's Miller & Martin continue to knowingly, intentionally and willfully obstructed and imped the administration of justice through a number of things that have not been correct, or disingenuous, or outright lies a number of times, and it is been shown by submitted emails and written documentation, such as, but not limited to: The Respondents opposition to plaintiffs motion for additional time to the Human Rights Commission, Conspiracy between Kelvin Walsh and Tracie Clifford to redress the retort to Mr. Walsh's admittance of having the necessary information as requested several months prior, as well as, outright lying and saying that the company does not have a termination policy, that "Defendant KENCO does not have a performance plan policy for exempt employees; it has a general disciplinary policy that it follows for non-exempt employees, but this policy does not apply to exempt employees and would not have applied to Ms. Madison. Indeed, the form that was given to Mr. Walsh to use with Ms. Madison was provided by Ms. Fowler, who confirms that this the

for,/process that Defendant KENCO has utilized for several years in order to address performance issues with exempt employees."   The termination and performance management policies can be located on Appendix F. Furthermore, there is no general disciplinary policy for non-exempt employees.

222.    Defendant KENCO, Kelvin Walsh, and its attorney Miller & Martin knowingly and willfully engaged in pretextual and prevaricated occurrences, when Edith McCurry, HR Administrator, was willfully and intentionally left off the Defendant KENCO's witness list for the fact finding conference in regards to the charges filed.

223.    In addition, Defendant KENCO continued to subjugate Ms. McCurry to unequal terms and conditions of employment, as they continued  to degenerate, degrade, dehumanize, marginalize and discriminate against Ms. McCurry by willfully and intentionally characterizing her as a Clerk a substantially lower position in functionality and skill than her current position, as well as, retorting case law in the November 22, 2013 correspondence to the IDHR and EEOC to support the fact that Ms. McCurry was not in a position of authority to accept and be apprised of such information in an official capacity, but merely in a mode of friendship.

224.    However, according to Kenco Connection's Website Kenco Group HR Contact List, as well as, other numerous correspondences, Mrs. McCurry was listed as the HR Administrator.

225.    Mrs. McCurry's job description that was developed by Plaintiff and signed by Leonard Spzlett in July 2013, her immediate supervisor, has Mrs. McCurry job title as HR Administrator, as opposed to the job posting presented by respondent to the IDHR, EEOC and perhaps other regulatory agencies.

226.    Defendant intentionally, willfully and disingenuously with the intent to deceive presented job postings to the regulatory agencies, instead of the requested job descriptions.

227.    As a Federal Mandate written job descriptions are required for each position at any facility.

228.    Defendant had vetted and signed job descriptions by Walsh and the respective managers for each position at the Mars Manteno facility.

229.    McCurry signed in at the fact finding for the IDHR and EEOC conference on April 2, 2014 as the HR Administrator for the respondent.

230.    Szplett signed in at the fact finding conference for the IDHR and EEOC on April 2, 2014 as the HR/Accounting/Office Manager.

231.    Defendant KENCO intentionally and willfully conspired to prevaricate the omission, minimization and characterization of Ms. McCurry in this investigation; which

is an obstruction of justice, as well as, conspiring to circumvent culpability, predicated on a non-pretext basis to cover-up the discrimination, retaliation, and continued victimization endured by the plaintiff by willfully and intentionally stating in the company's position of statement, that even if Mrs. McCurry was told of this disparate and disparaging treatment it was in a comradery capacity and context, coupled with Mrs. McCurry's allege positionality and functionality within the company would relieve the company of any fiduciary or legal responsibility or accountability.

232.    Conflictingly, respondent also stated in this same position of statement that complainant specifically instructed Mrs. McCurry not to do anything at all about what was being reported.  If in fact Ms. McCurry was unable, incapable, or positionally defunct to carry out this task or endeavor, it would be materially apparent, given and understood that Ms. McCurry had no authority to act.  Therefore, to purport such as a defense or matter of fact is a shear absurdity and an insult.

233.    Furthermore, plaintiff and defendant's HR Administrator never had a conversation whereby plaintiff instructed Mrs. McCurry to not do anything about what was being reported and such a statement is a flat out lie.

234.    Pointedly, Plaintiff gave copies of the correspondence written to corporate regarding the misconduct and improprieties initiated, instigated and/or incited by Walsh to McCurry.

235.    Plaintiff documented each occurrence of disparate and disparaging treatment, meeting request, cancellation and disposition of task by written log.

236.    After MADISON began questioning, complaining and reporting the matters to HR and corporate, Walsh, Defendant KENCO's then General Manager at the Manteno facility, and in turn KENCO, became more openly hostile, retaliatory and discriminatory towards MADISON. In addition, MADISON continued to be the victim of unequal terms and condition of employment in that he was subjected to ostracisms and public humiliation, relative to similarly situated white, non-black, non-African American male managers and co-workers.

237.    Defendant KENCO sought every opportunity to treat MADISON unfairly in relation to her similarly situated, white, non-black, non-African American coworkers and to diminish her authority and expertise.

238.    On or about June 25, 2013, MADISON took action again against the hostile and discriminatory treatment that was being directed toward her by Defendant KENCO. MADISON contacted the Manteno onsite Human Resources personnel complaining about the hostile, discriminatory; disparate treatment, as well as, writing to Here, the then VP of Operations.

239.    Upon information and belief, MADISON's alteration of performance management standards was against the normal practices of the Defendant KENCO with respect to such alleged discrepancies and as such, violated Defendants normal due process afforded to affected parties. Defendant's KENCO punitive actions directed toward MADISON was motivated by a racial animus, discrimination and retaliation, and was unjustified and violative of her rights under Federal and the state of Illinois antidiscrimination laws.

240.    Upon information and belief, MADISON's similarly situated, white, non-black, non-African American co-workers were not subjected to humiliation, harassed, and punished in such a manner. Additionally, upon information and belief, Plaintiff was the only staff in her Department affected by the humiliation, harassment and punitive measures directed toward her. None of MADISON's similarly situated, white, non-black, non-African American co-workers were humiliated, harassed and subjected to such punitive measures.

241.    Defendant KENCO's policies dictate that when such infractions and discrepancies occur within the facility, proper company protocol and procedure is to be followed as it relates to the Standard Operating Procedure.

242. Such pervasive and blatant discriminatory, hostile and disparate treatment by Defendant KENCO, gave rise to a rash of harassment from other employees and subordinates.

243. On or about July 5, 2014 MADISON was verbally harassed and publicly humiliated by Walsh.

244. MADISON, along with those who opposed such treatment, were subjected to discriminatory treatment, bullying and adverse employment decisions.

245.    MADISON was paid a salary and at times eligible bonuses. As part of her employment compensation package, she also received or was entitled to medical benefits, insurance, Paid Time Off as well as other benefits.

246.    MADISON was continually harassed and retaliated against throughout her tenure of employment with Defendant KENCO.

247.    While employed by Defendant KENCO, MADISON was the victim of race discrimination, harassment and retaliation. MADISON is an African American female. Due to her race he was treated differently from other similarly situated non-black, non-African American employees in the terms and conditions of her employment. Upon information and belief, MADISON alleges that he and other African American co-workers belonging to protected classes pursuant to the federal and the state of Illinois anti-Employment Discrimination laws were held to different standards than other employees of Defendant.

248.    MADISON upon information and belief, alleges that African Americans and other employees that are members of the protected class have substantially lower employment and retention rates at KENCO, due to unfavorable terms, conditions and privileges of employment, such as: (1) lack of equal opportunity; (2) unfair and poor treatment; and (3) less tolerance and leniency when making adverse employment decisions, amongst other things. MADISON believes KENCO has a disproportionately lower number of African American employees in various management level positions.

MADISON, upon information and belief, alleges that there were substantially more non-African American employees, especially in management level positions, at the Manteno facility, as well as, other facilities. The non-African American employees at the Manteno facility were treated much more favorably than MADISON and other African American employees.

249.    In 2013, MADISON was unfairly singled out and treated differently from her non-African American colleagues due to her race. MADISON's employment eventually ended on August 9, 2013. The reason given by Defendant KENCO for MADISON's discharge was due to not meeting the expectations of the PIP.

In fact, Defendant KENCO knew that it had no just cause to harass, impose pay disparities; economic sanctions; retaliate against and deny MADISON of opportunities for employment when it: (1) falsely accused MADISON of not being audit complaint; (2) misrepresented her ability and skills in the performance of her job; and (3) misrepresented to her and misled her to believe that KENCO had conducted an unbiased investigation, when she had reported the various misconducts.

250.    Defendant KENCO failed to completely and fairly investigate the disparate and disparaging treatment and impact in an unbiased manner, and instead, chose to completely ignore MADISON and failed to remediate and mitigate the situations at hand. Defendant KENCO maliciously and intentionally failed to follow up with any of MADISON's witnesses and follow company policy with respect to the incident while intentionally misrepresenting to MADISON that a fair and unbiased investigation had been conducted. This caused substantial damage to MADISON. MADISON, upon information and belief, alleges that her race; her waging complaints and retaliation were substantial motivating, factors in Defendant KENCO's:

251.    (1) Refusal to properly investigate the facts and information provided by MADISON;

(2) Failure to treat MADISON and other similarly situated non-white employees of Defendant KENCO fairly with respect to any adverse employment decisions;

(3) Defendant's failure to follow its policies, custom and past practice, as it related to the investigation of alleged misconduct;

(4) Defendant's failure to follow its policies, custom and past practice as it relates to anti-harassment and ethics; and

(5) its decision to continue to subject MADISON to hostile and discriminatory treatment and environment.

252.    On or about November 22, 2013, Defendant KENCO willfully submitted false and inconsistent information to Regulatory and Public Policy agencies. Such as, but not limited to Illinois Department of Human Rights, EEOC and OSHA.

253.    Defendant KENCO's actions toward MADISON were unlawful, malicious, deceptive, defamatory, slanderous, fraudulent and contrary to principles of fairness and common decency. Defendant intentionally misrepresented that they had conducted a fair and impartial investigation. This was not the case. Moreover, MADISON, upon information and belief, alleges that other similarly situated, non-black, non-African American coworkers were not subjected to such treatment.

254.    Defendant KENCO has a history and predisposition of falsifying documents, deception, fraud, coercion, retaliation, adverse employment decisions, unequal terms and conditions of employment, discriminant, disparaging and disparate treatment and impact, systemic discrimination, disproportionate assignment of harder work assignments, lack of opportunities for training and advancement, as well as, more frequent and severe discipline for minorities.

255.    Defendant KENCO has an admitted and documented pattern and practice of disparate treatment towards African Americans.

256.    This type of blatant systemic discrimination is a precursor to the disparate, discriminant, and retaliatory treatment imposed upon Defendants protected class.

257.    In continuum of Defendant's aggregate aforementioned behaviour, Defendant continued to subjugate Madison and others to other forms of unlawfulness.

258.    Plaintiff also believes that Defendant also intentionally and willfully interfered with her right to enjoy his protected rights of a fair due process of law.

259.    Plaintiff also alleges and believes that Defendant committed obstruction by deception.

        Defendant knowingly and willingly engaged in misleading conduct by altering Plaintiff's personnel file, as well as, supplying misleading witnesses, information and documentation to hinder the administration of justice at the Illinois Department of Human Rights, Illinois Department of Labor, and EEOC, as well as, the pending judicial proceedings that would make Madison whole.

260.    Plaintiff also alleges and believes that Defendant committed obstruction by destruction of evidence.

Defendant knowingly and willingly engaged in unlawful conduct by altering Plaintiff's personnel file to impede the administration of justice at the Illinois Department of Human Rights, Illinois Department of Labor and EEOC, as well as, the pending judicial proceedings that would make Madison whole.

261.  Plaintiff also alleges and believes that Defendant committed obstruction of justice by destruction of evidence.

Defendant knowingly and willingly engaged in unlawful conduct by altering Plaintiff's personnel file, as well as, statements of account on Madison' behalf to obstruct the administration of justice at the Illinois Department of Human Rights, Illinois Department of Labor and EEOC, as well as, the pending judicial proceedings that would make Henry whole.

262.    Plaintiff also alleges and believes that Defendant committed obstruction of investigations by destruction of evidence.

Defendant knowingly and willingly engaged in unlawful conduct by altering Plaintiff's personnel file, inclusive of the investigation file and other relevant parts of Madison' file commensurate to the company's  to personnel file keeping policies and practices, to impede the administration of justice at the EEOC, as well as, the pending judicial proceedings that would make Madison whole.

263.    Plaintiff also alleges and believes that Defendant committed obstruction of an administrative proceeding.

Defendant knowingly and willingly engaged in unlawful conduct by altering Plaintiff's personnel file, as well as, supplying misleading witnesses, information and documentation, including, but not limited: the verified response and position statements, as well as, company policies, procedures and the like, to impede the administration of justice at the Illinois Department of Human Rights and EEOC, as well as, the pending judicial proceedings that would make Madison whole.

264.   Plaintiff also alleges and believes that Defendant committed perjury.

Defendant knowingly and willingly and contrary to oath engaged in unlawful conduct by deliberately supplying misleading witnesses, witnesses without firsthand information, false statements, verifications, position statements and documentation as material facts to impede the administration of justice at the Illinois Department of Human Rights and Employment Security and EEOC, as well as, the pending judicial proceedings under oath, as well as, verification, and certification that would make Madison whole.

265.   Plaintiff also alleges and believes that Defendant committed a conspiracy to obstruct and commit fraud against the court.

  A.   Defendant was informed with every filed charged that charges were cross filed with the IDHR and EEOC.

  B.   Defendant was informed of the EEEOC's recordkeeping and reporting requirements.

  C.   Defendant was also informed the participation requirements for participating in a Fact  Finding Conference

266.   Plaintiff also alleges and believes that Defendant committed obstruction by mail.

      A.     Defendant knowingly and willingly used the United States Mail to further its scheme of fraud by mailing Plaintiff's altered personnel file, as well as, supplying misleading witnesses, information and documentation to impede the administration of justice at the Illinois Department of Human Rights and EEOC, as well as, the pending judicial proceedings that would make Madison whole.

For example:

      i.  Mailing to the IDHR and EEOC non-effectuated and irrelevant policies.

     ii.  Mailing to the IDHR and EEOC verified responses and positions statements under oath and/or perjury that contained deceptive, fraudulent, misleading and disingenuous information that reference policies and procedures that were not relevant to Madison to commit fraud against the administration of justice and Madison.

267.  As an officer of the court and subject matter experts Defendant and Defendants agents knew better.

268.  Defendant continues to materially alter documents in a continued effort to defraud the court and conspire against Madison.

a.  Defendant altered a series of email chains and offered it into discovery as Exhibit C

269.  Upon information and belief racial slurs, epithets, degrading and demeaning remarks were made about Madison and others by Defendant's and Defendant's Walsh such as that Madison was a "Black Bitch coming here stirring up trouble," amongst other things.