E-FILED
Friday, 30 June, 2017  01:58:50 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

I, James W. Kolka, declare as follows:

1. My name is James W. Kolka, Ph.D., J.D. I am over eighteen (18) years of age and am fully competent to make this Declaration. I have personal knowledge of the facts stated in this Declaration, and those facts are true and correct.

2. I earned my J.D. from the University of Wisconsin-Madison Law School with a background in product liability and environmental law. I am an active Emeritus Member of the State Bar of Wisconsin, my Member No. is 1009295. Following Law School and becoming a member of the Bar, I attended the University of Kansas and earned a Ph.D. in Political Science and International Affairs from the University of Kansas.

3. I first began to work with the ISO 9000 series of standards while serving as Visiting Scholar of International Studies at Georgia Institute of Technology (Georgia Tech) in Atlanta, GA in 1990. Dr. Donald Grace, the Director of the Georgia Tech Research Institute (GTRI) asked me to help develop funding for special research initiatives. One of those initiatives was the creation of the Center for International Standards & Quality (CISQ) at Georgia Tech. This included Quality Management Standards (ISO 9000) as well as International Standards such as European Norms (EN) and Japanese Industrial Standards (JIS). At that time I was introduced to ISO 9000 by Dr. Harry Wadsworth, a faculty member at Georgia Tech and a member of the original international committee that drafted the First version of the ISO 9000 Series of Standards of Standards, ISO 9001:1987.

4. I have taught and continue to teach courses on ISO 9000 for different universities and consulting firms, most recently a lead auditor course for Excel Partnership Inc. (an SAI Global Company of Sydney Australia). I have taught ISO 9001 workshops at Georgia Tech, Clemson University, the University of Wisconsin-Madison and a Masters Degree Program in Quality Management at Loyola University in New Orleans as well as numerous public venue training sessions. I also conduct GAP Analyses for companies to identify where they stand in regard to the current version of ISO 9001 (ISO 9001:2000, ISO 90001:2008 and now ISO 9001:2015) as well as train and help them conduct internal audits and supplier audits.

5. For the past twenty-seven (27) years I have worked with companies preparing to satisfy the European Union's CE marking requirements for the Machinery Safety, Medical Devices, Pressure Equipment and related 28 EU Directives as well as ISO 9001 & ISO 13485 when quality management standards also are required. In addition I work with medical device companies required to comply with FDA's Quality Management Regulation (QSR) in order to manufacture and sell medical devices in the US. I have developed a comprehensive loss prevention program that incorporates elements of both ISO 9001 Quality Management Systems and ISO 14000 Environmental Management Systems, as well as sector specific quality management systems for automobiles (QS 9000 & ISO/TS 16949), aircraft (AS

9000), maritime (IS 9002/ISM Code), telecommunications (TS 9000) and finance (FS 9000) to reduce company liability exposure in the US and EU markets.

6. I work as an international legal consultant, and specialize in several areas, including conducting litigation evaluations in the US and EU (including product risk analyses/risk evaluations) for manufacturers. I also conduct forensic legal evaluations of company Quality Management Systems such as ISO 9001. I am compensated with at an hourly rate of $375.00 for preparation of this report and all other related work. I have conducted more than 450 seminars and workshops for North American, European, Asian and Latin American companies and universities and have written more than 300 articles and five (5) books on topics including ISO 9001, including "ISO 9001...A Legal Perspective" co-published by INFORM and ASQ Press in 1998. (More recently I published a series of blogs on these topics, including ISO 9001 on *jameskolka.typepad.com*.) Attached hereto as **Exhibit A** is a copy of my current Bio and a List of Publications and Presentations from 1993 to date and a pre-publication copy of a copy of a book chapter, *"ISO 9000 and Legal Liability"* in *"Managing for Product Liability Avoidance, 3rd Edition, CCH Incorporated, Chicago, 2004.*

7. In the Summer of 2006 I worked with attorneys from Susman Godfrey Houston & Dallas representing an Austin TX marine testing mineral & petroleum company deposing the CEO & senior officers of a British Marine Machinery Company in Birmingham UK on their ISO 9001: 2000 Quality Management System concerning a contract dispute.

In April 2008 I was deposed in a contract dispute lawsuit in the Law Office of Defendant's Attorney in Towson, MD. Defendant also was represented by a Los Angeles, CA Law Firm. The focus of the lawsuit centered on ISO 9001: 2000. Plaintiff's Attorney, also from a Los Angeles Law Firm conducted the deposition.

In January 2011 I worked with a Detroit MI Law Firm in an employee injury lawsuit with an American New York Machinery Manufacturer that built a Vertical Lathe in their Taiwan Plant and placed a legally required CE Mark (European Conformity) on the machines and sold the machines in the EU & US. The lathes did not meet the safety requirements of the EU Machinery Directive and their ISO 9001: 2008 QMS. One worker was killed by a projectile that went through a 1/2 inch thickness plastic shield in Wales UK and another worker was injured in Detroit, MI requiring 24/7 medical care for the rest of his life (the legally required thickness was 1inch). I worked extensively with the Detroit, MI Law Firm preparing them for their deposition administered in the UK. The machinery company representative admitted that they failed to follow EU requirements in constructing the lathes.

I have also been involved in several national and international law matters involving ISO over the decades.

8. I am very familiar with the contents, scope and requirements of ISO 9001, the process with which a company must comply to obtain and maintain certification

2

under ISO 9001 and the documents that an ISO 9001 certified company must develop and maintain in order to retain such certification. In December 2002, I conducted a Training Course for FDA (CDRH) Division Directors comparing the European Union's new application of ISO 9001: 2000 Quality Management System to the EU Medical Devices Directive and FDA's application of its new Quality System Regulation (QSR) 21 CFR Part 820 for Medical Devices at the FDA Center for Devices Radiological Health (CDRH) at FDA Headquarters in Rockville, MD. Both FDA & the EU have worked well coordinating their regulatory efforts. Attached hereto as **Exhibit B** is a copy of ISO 9001: 2008

9. The creation of ISO 9001:1987 was followed by ISO 9001:1994. ISO 9001:2000 followed by ISO 9001:2008 were a departure from the first two ISO 9001 Quality Management Standards placing greater emphasis on the role of **Management Responsibility**. The greater emphasis on management responsibility also was underscored by FDA in its Quality System Regulation 21 CFR Part 820 published in the Federal Register. The QSR was first published in the Federal Register on October 7, 1996 and went into effect the following year.

10. The **ISO 9001: 2008 Quality Management System** focus on Top Management emphasizes that management understands the nature and responsibility of their business. In organizations responsible for public health and the safety of their products, management must make health and safety their primary responsibility. In addition, it tethers transparency and accountability; as each policy, procedure, protocol and document (form) are meticulously documented in an accurate and reproducible fashion. 1st, 2nd and 3rd party audits[1] ensure compliance to the mandates and laws; that essentially whatever standard, policy, procedure, protocol and document (form) an entity alleges that is being used during the course of its operation it must exactly adhere to that standard, policy, procedure, protocol and document (form) each and every time. Failure to do so would be considered a non-conformity and all non-conformities are to be documented and logged as such. The ultimate purpose of this system is to line balance and standardize all of the processes of the operation to reduce defects and delays through uniformity and compliance. More specifically, each document is dated, authored, signed, catalogued, numbered, controlled and appendicized amongst other attributes. All Documents and records are controlled by a designated individual and retained, according to the standard operating procedures of ISO, in accordance with compliance to the Federal Food Drug and Cosmetic Act herein interchangeably referred to as "**FFDCA, FDCA, or FD&C**" and FSMA the Food Safety and Modernization Act.

---

[1] Audits- As defined in *ISO 19011:2011—Guidelines for auditing management systems,* an audit is a "systematic, independent and documented process for obtaining audit evidence [records, statements of fact or other information which are relevant and verifiable] and evaluating it objectively to determine the extent to which the audit criteria [set of policies, procedures or requirements] are fulfilled." Audits also are a tool or a means of notice of deficiencies or compliance to an auditee.

3

11. *5 Management responsibility*[2]
    *Top management **shall** provide evidence of its commitment to the development and implementation of the quality management system and continually improving its effectiveness by:*
    *a) communicating to the organization the importance of meeting customer as well as statutory and regulatory requirements,*
    *b) establishing the quality policy,*
    *c) ensuring that quality objectives are established,*
    *d) conducting management reviews,*
    *e) ensuring the availability of resources.*

Section 5.1 of the ISO 9001:2008 standard requires a written, well defined quality policy that is communicated and understood within an organization.

Section 5.2 also sets out some of the requirements for quality policies. This requirement clearly stated top management must fulfill both requirements related to ISO clause 7.2.1 "Determination of requirements related to the product" and ISO clause 8.2.1 "customer satisfaction

*5.2 Customer focus*

*Top management **shall** ensure that customer requirements are determined and are met with the aim of enhancing customer satisfaction (see ISO clause 7.2.1 and 8.2.1).*

*5.3 Quality policy*

In the quality management system, a quality policy is a document developed by management to express the directive of the top management with respect to quality. Quality policy management is a strategic item.[3]

*Top management **shall** ensure that the quality policy*
*a) is appropriate to the purpose of the organization,*
*b) includes a commitment to comply with requirements and continually improve the effectiveness of the quality management system,*

---

[2] *5 Management responsibility* is a Section of ISO 9001:2008

[3] The quality policy is a written commitment from top management to all stakeholders relative to the standard of care to be exercised with regards to compliance to industry and food safety legislation. The quality policy is not a self-imposed policy or standard of care, but a requisite to compliance to food safety legislation. Therefore, the quality policy, the entire quality management system and the food safety management system establish the prerequisites and requisites for compliance to food safety legislation. Another requisite of the system is that the system is validated, verified and continually improved. The system unequivocally, affirms that the written standards and maximums are adhered to as cited, as well as, documenting and logging any deviations from the written standards for continual improvement.

4

*c) provides a framework for establishing and reviewing quality objectives,*
*d) is communicated and understood within the organization.*
*e) is reviewed for continuing suitability.*
*>Following Quality Policy are clauses assigning management responsibility for*
**5.4 Planning**
**5.4.1 Quality objectives**
**5.4.2 Quality management system planning**
**5.5 Responsibility and authority**
**5.5.2 Management representative**
**5.5.3 Internal communication**
*>Finally Management responsibility concludes with*
**5.6 Management review**
**5.6.1 General**

*Top management **shall** review the organization's quality management system at planned intervals to ensure its continuing suitability, adequacy and effectiveness. This review **shall** include assessing opportunities for improvement and the need for changes to the quality management system,*

*Records from management reviews shall be maintained (see ISO clause 4.2.4)*

**5.6.2 Review input**

*The input to management review **shall** include information on*

*a.) results of audits,*

*b.) customer feedback,*

*c.) process performance and product conformity,*

*d.) status of preventive and corrective actions,*

*e.) follow-up actions from previous management reviews,*

*f.) changes that could affect the quality management system, and*

*g.) recommendations for improvement.*

**5.6.3 Review output**

*The output from the management review **shall** include any decisions and actions related to*

*a.) improvement of the effectiveness of the quality management system and its processes*

5

12. The new emphasis on the role and responsibility of Top Management also is emphasized in FDA's Medical Device **"Guide To Inspections of Quality Systems" better known as "Quality System Inspection Technique" (QSIT) published in August 1999.**

Attached hereto as **Exhibit C** is a copy of FDA's Code of Federal Regulation Title 21 CFR Part 820 Quality System Regulation and a copy of FDA's "Guide To Inspection of Quality Systems "Quality System Inspection Technique" (QSIT) published in August 1999.

**Management Controls Subsytem**
*Management Controls*
*Inspectional Objectives*

1. *Verify that a quality policy, management review and quality audit procedures, quality plan, and quality system procedures and instructions have been defined and documented.*
2. *Verify that a quality policy and objectives have been implemented.*
3. *Review the firm's established organizational structure to confirm that it includes provisions for responsibilities, authorities and necessary resources.*
4. *Confirm that a management representative has been appointed. Evaluate the purview of the management representative.*
5. *Verify that management reviews, including a review of the suitability and effectiveness of the quality system, are being conducted.*
6. *Verify that quality audits, including re-audits of deficient matters of the quality system are being conducted.*
*At the conclusion of the inspection…*
7. *Evaluate whether management with executive responsibility ensures that an adequate and effective quality system has been established and maintained.*

13. The other key inspection elements of a QSIT inspection are the critical subsystems. In addition to a Management Controls these subsystems are *Design Controls, Corrective and Preventive Actions (CAPA) and Production and Process Controls (P&PC).*

14. QSIT provides a guide for FDA auditors when they visit a Medical Device Manufacturer. Management is visited at the beginning and end of each FDA visit and is considered to be the key to safe and effective device manufacturing. Any manufacturer with a grain of wisdom would use QSIT to conduct internal audits to spot problems and make corrections before being visited by FDA auditors.

15. The food safety is dovetailed to the current drug and medical device standards and safety schemes, as it is all relative to some form of human consumption.

16. Personnel problems first should appear in ISO 9001: 2008 Corrective and Preventive Actions and are to be identified as nonconformities to be resolved in an orderly meaningful manner. Employee concerns should be addressed and resolved following an internal audit and if problems persist they should appear in *5.6 Management Review*.

6

Among the items for consideration could be *6.1 Provision of Resources, 6.2 Human resources, 6.2.2 Competence, training and awareness, 6.3 Infrastructure and 6.4 Work Environment.* Typically, because Human Resources (capital) is a key performing index to success in any business; this area is well developed in terms of infrastructure as it relates to employer/employee expectations, job requirements, company and regulatory compliance, coupled with a management scheme to govern performance.

According to the FD&C it is a prerequisite for a person to be qualified to perform activities under 21 CFR Chapter I Subchapter B part 121. Consequently, this person would be a subject matter expert relative to food safety and compliance. Since Food Safety and Sanitation are critical issues getting angry with workers and imposing adverse employment decisions because they identify problems is neither a competent or useful response. It also punishes workers who deserve adequate training and consideration given to their input and concerns. This is a violation of the Food Safety Modernization Act whistleblower provision that was legislated to protect employees from this very thing.

17. Allowing personnel issues devolve into employee concerns about discrimination and employee apprehension that complaints will be resolved by "killing the messenger" instead of trying to address food and safety in a facility preparing food for public consumption is both pathetic and should be illegal. I like Richard Branson's Quote, *"Clients do not come first, employees come first. If you take care of your employees, they will take care of your clients."*

18. I have reviewed Defendant Responses to Plaintiff's Request for Production of Documents and Interrogatories. The Interrogatories and Request for Production are not vague and ambiguous, but are very specific to the operation and compliance of Defendant to the mandated codes and legislation of food safety. In general I find their responses to be cryptic, non-responsive, evasive and dismissive. Basically, a "we should not have to be bothered with these details attitude." It is the type of response I would pursue as a 3rd party auditor to see what might be hidden and why is it being hidden? When I train employees on how to conduct 3rd Party Audits and Internal Audits, it is the type of response I suggest they pursue to see if anyone is hiding something and why. This is particularly important when health and safety issues are a critical concern and the consequences could create public health risks as well as risks to the health of employees exposed to unsanitary and hazardous working conditions.

I also reviewed the warehouse audit that was performed by complainant, as a GAP analysis for compliance, the food defense plan, the Memorandum of Understanding with regards to sanitation and other emails regarding noncompliance found in Defendant's Bate Stamped documents provided to Complainant.

19. I did not see evidence of product or production nonconformities and product or production corrective and preventive action stipulated for product or production nonconformities. In a manufacturing operation of this size it isn't possible nonconformities did not exist. I also didn't see checklists for stipulated internal audits and

7

the recommended steps to address nonconformities as well as a timeline for closing out nonconformities.

I also did not see evidence that the Performance Improvement Plan ("PIP") given to complainant was approved to be issued to Complainant because it did not adhere to defendant's documentation policy or the ISO standards, which is a requisite to compliance to FSMA. It had no identifying statements associating the document with the company nor was it styled in a fashion that resembled any of the Defendants other documents that have been reviewed or stipulated as compliant to the standards. Also the PIP was subjective in nature and contained no quantitative or qualitative aspects, such as poor quality of work or missed deadlines. In addition, upon information and belief and in my opinion Defendant Walsh was not a qualified person as defined by FSMA to make an assessment of any application of the applicable law or the work product of Complainant.

I also did not see evidence of any investigations relative to safety and hazard violations that complainant notified defendant of. This would include but not be limited to: the spread of human fecal[4] matter throughout the warehouse, pest infestation(s)[5], sanitation document falsification[6], fire drill, ammonia alarm (spill/ventilation), leaking dock doors and other instances.

I also did not see evidence of logs or investigations for incidents reported by complainant to defendant such as but not limited to: complainant being asked to not fully implement the standards for compliance, billing for services not rendered, overbilling, discriminant treatment, unlawful termination and other instances.

Also in reviewing Defendant's Bate Stamped copy of complainant's personnel file, hereto attached as **Exhibit D,** I did not see evidence that Defendant followed its own

---

[4] The spread of human fecal matter is an imminent hazard to the public health, as human fecal matter is a source of the spread of Bacterial, Viral or Pathogenic disease; such as but not limited to: dysentery, E. Coli, Hepatitis, and other blood borne diseases. Failure to remediate the spread of disease is an intentional adulteration of food and is a violation of 21 U.S. Code § 342, as well as, in violation of 21 CFR Chapter I: Subchapter A General Part 2 Subpart A, Subchapter B Part 121 Subpart A & E, Subchapter A part 1 Subpart O, Subchapter B Part 117 Subpart A & B amongst a number of other regulations and laws. The Codex Alimentarius also have guidelines on the application of General Principles of Food Hygiene to the Control of Foodborne Parasites. CAC/GL 88-2016

[5] Pest spread disease and adulterate food. For example, according to the CDC Worldwide, rats and mice spread over 35 diseases. These diseases can be spread to humans directly, through handling of rodents, through contact with rodent feces, urine, or saliva, or through rodent bites. Diseases carried by rodents can also be spread to humans indirectly, through ticks, mites or fleas that have fed on an infected rodent. These diseases include: *Hantavirus Pulmonary Syndrome, Leptospirosis, Rat-bite Fever, Salmonellosis, Plague, Colorado Tick Fever and Cutaneous Leishmaniasis.* In addition, Bats harbor more viruses than rodents and are capable of spreading disease over a wider geographic area owing to their ability to fly and their migration and roosting patterns.

[6] "The FDA has instituted Judicial Enforcement of criminal prosecution for falsifying records, lying to FDA, knowingly putting customers at risk, or in other appropriate cases or instances. "~ FDA Operational Strategy for Implementing the FDA Food Safety and Modernization Act May 2014.

8

Document Retention Personnel Files Policy-BP-HR-4.2.4.002 that ties into the record keeping requirements of the state and federal law, as well as, the ISO standards of FD&C and FSMA. Specifically, complainant's response to the Performance Improvement Plan indicated there was additional documentation submitted that is not found in complainant's personnel file.

20. ISO (the International Organization for Standardization) is a worldwide federation of national standards bodies (ISO member bodies). The work of preparing International Standards is normally carried out through ISO technical committees. For the purpose of this discussion ISO 22000 was prepared by Technical Committee ISO/TC 34, Food products.

Attached hereto as **Exhibit E** is a copy of an article, *"Understanding the "Other" Clauses of ISO 22000"* By F. Stier and John G. Surak, PH.D." published in *Process Control, June/July 2013. Dr. Surak and* I both spoke on the *ISO 9000 Standards* at a Conference sponsored by Clemson University in July 1993. I have great respect for his knowledge on ISO 22000.

The aim of this International Standard is to harmonize on a global level the requirements for food safety management for businesses within the food chain. It is particularly intended for application by organizations that seek a more focused, coherent and integrated food safety management system than is normally required by law. It requires an organization to meet any applicable food safety related statutory and regulatory requirements through its food safety management system.

ISO 22000 is composed of several other building blocks including:

1. Hazard Analysis and Critical Control Points (HACCP) as defined in the Codex Food Hygiene document;

2. Prerequisite programs that define the basic conditions to maintain an hygienic environment;

3. The components that are needed to have an effective management system;

4. The final building block is based on ISO 9001:2000 and ISO 9001:2008 "Quality management systems – Requirements."

The ISO 22000 was issued in 2005 and the scheme is relegated for food safety; attached hereto as **Exhibit F** is a copy of the ISO 22000 standard. This is a scientific risk based auditable approach to food safety. This food safety matrix is derived from the international standards developed by the Codex Alimentarius Commission that is governed by The WHO (The World Health Organization) and FAO (Food and Agriculture Organization of the United Nations). The Codex Alimentarius is the international standard for food safety and the benchmark for food safety standards. [7]

---

[7] 21 CFR Chapter I Subchapter B Part 130 Subpart A

There are a number of other governmental agencies in the United States that regulate food safety; they include but are not limited to: FSIS-Food Safety Inspection Services and the CDC-Center for Disease Control.

The FDA models its food safety standards in accordance with the Codex Alimentarius. In addition to that the FDA has long adopted the ISO-International Organization of Standardization as their scheme for standardization and compliance. For example, the FDA modeled the quality management system, 21 CFR 820, after the ISO scheme with regards to human devices as mentioned earlier in paragraph 11.

Seamlessly, the FDA continued to administer the same standardization scheme to the governance of food for human and animal consumption. The term *used for human consumption*[8] means either:

(i) Ingested orally or

(ii) Applied by any means such that it enters the human body.

(4) The term *intended for use for human consumption* means any of the following:

(i) Designed by the manufacturer for human consumption;

(ii) Marketed for human consumption; or

(iii) Distributed, exported, or imported, with the intent that it be used for human consumption.

The **Food Safety Modernization Act** (**FSMA**) was signed into law by President Barack Obama on January 4, 2011, which was the nation's first major overhaul of our food safety practices since 1938. The FSMA has given the Food and Drug Administration (FDA) new authorities to regulate the way foods are grown, harvested and processed; essentially farm to fork governing every aspect of the food supply chain extrapolating interchangeably from the owner, operator, or agent in charge of such facility.

The FDA mandated in 21 CFR Chapter I Subchapter M that the appropriate International Standards of Organization be used for compliance of all certifying bodies relative to Any Organization in the Food Chain" With respect to this discussion we will be focused on the "Quality Management Systems" requirements of FSSC 22000 (Food Safety Certification System 22000). FSSC 22000 is ISO 22000 plus ISO 22002-1:2009

The certifying bodies under 21 CFR Chapter I Subchapter M ensure that all organizations along the food supply chain are compliant to the federal mandates and meet the Global Food Safety Initiatives benchmarks.

---

[8] The definition of Human Consumption with respect to food is the same definition relative to drugs.

The quality management system requires that a comprehensive written documented plan be implemented; this should include but not be limited to: quality plan, corporate and any relevant site policies and organizational charts, independent quality unit QA Manager/Sanitarian, responsibilities/authorities, documented signed and up-to-date SOP (Standard Operating Procedures)/WI (Work Instructions), Job descriptions, Human Resources, designated food safety responsibilities, as well as, a documented facility self-inspection/audit procedure, supplier program, incoming and outgoing trailer/material inspection program. In addition to a written and documented sanitation/cleaning program, preventative maintenance, comprehensive product recall, training program and the facility amongst other requirements.

The quality management system follows a cataloguing scheme where each policy, procedure, protocol and form is controlled and has a document number (relative to the issuing department), title, date, effective date, revision information, author and approval information amongst other identifying markers.    These documents are correlated to one another, as well as, being comprehensively indexed in an appendix.

Each policy, procedure, protocol and associated form are vetted and verified for accuracy before approval and implementation. Each policy, procedure, protocol and form always has an associated chain of command to govern them through its life cycle.

According to the standard updates to the policies, procedures, protocols and forms are made based upon a qualifying event, such as but not limited to: changes in materials, methods, procedures, regulations and the like. Updates typically occur on a routinely scheduled basis, unless some special circumstance prevails.

With regards to the quality management system there are to be no deviations within the system.    Deviations from the documented Standard Operating procedures, protocols or policies would be deemed as a non-conformity.  All non-conformities are documented in accordance to the standards of Continual Improvement; Continual Improvement (CI) is facilitated with the help of other tools such as Lean[9] and Six

---

[9] Henry Ford defined the lean concept in one sentence: "We will not put into our establishment anything that is useless."

Lean manufacturing is a system of techniques and activities for running a manufacturing or service operation. The techniques and activities differ according to the application at hand but they have the same underlying principle: the elimination of all non-value-adding activities and waste from the business.

Lean enterprise extends this concept through the entire value stream or supply chain: The leanest factory cannot achieve its full potential if it has to work with non-lean suppliers and subcontractors.

Excerpted from William A. Levinson and Raymond A. Rerick, *Lean Enterprise: A Synergistic Approach to Minimizing Waste,* ASQ Quality Press, 2002, pages xiii-xiv, 38.

11

Sigma[10] or Lean Six Sigma[11], an analysis of this non-conformity or defect is performed. This is called a root cause analysis. The root cause analysis is a precursor to the preventative and corrective actions taken to ensure that this non-conformity or defect does not occur again. Intentional deviations from procedures, protocols or policies typically require an exception before this deviation can occur. According to Defendant's QMS Documentation Policy (CP.BP. 4.2.1001) hereto attached as **Exhibit G** the exception request is accompanied with a written business case outlining the reasons and or rationale for the requested deviation. This written request is reviewed by another party who could be the author of the policy, procedure or protocol or a manager of such for written approval. All non-conformities whether foreseeable or unforeseeable are all documented in their respective logs.

Consequently, the standardization of any system under the International Organization of Standardization offers transparency, traceability, accountability, uniformity, and equality. The essence of this scheme is that you must exactly do what you say you are doing. Therefore, the deviation from any policy, procedure, protocol and or form in any way goes against the very essence of standardization.

---

[10] Six Sigma is a method that provides organizations tools to improve the capability of their business processes. This increase in performance and decrease in process variation lead to defect reduction and improvement in profits, employee morale, and quality of products or services. Six Sigma quality is a term generally used to indicate a process is well controlled (within process limits ±3s from the center line in a control chart, and requirements/tolerance limits ±6s from the center line).

**Philosophy—** The philosophical perspective views all work as processes that can be defined, measured, analyzed, improved and controlled. Processes require inputs (x) and produce outputs (y). If you control the inputs, you will control the outputs. This is generally expressed as y = f(x).

**Set of tools—** The Six Sigma expert uses qualitative and quantitative techniques to drive process improvement. A few such tools include statistical process control (SPC), control charts, failure mode and effects analysis, and process mapping. Six Sigma professionals do not totally agree as to exactly which tools constitute the set.

**Methodology—** This view of Six Sigma recognizes the underlying and rigorous approach known as DMAIC (define, measure, analyze, improve and control). DMAIC defines the steps a Six Sigma practitioner is expected to follow, starting with identifying the problem and ending with the implementation of long-adopted and recognized.

**Metrics —** In simple terms, Six Sigma quality performance means 3.4 defects per million opportunities (accounting for a 1.5-sigma shift in the mean).- *ASQ-American Society of Quality*

[11] Lean Six Sigma is a fact-based, data-driven philosophy of improvement that values defect prevention over defect detection. It drives customer satisfaction and bottom-line results by reducing variation, waste, and cycle time, while promoting the use of work standardization and flow, thereby creating a competitive advantage. It applies anywhere variation and waste exist, and every employee should be involved. *ASQ-American Society of Quality*

The implementation of this system must be management driven and requires cross-functional buy-in to be successful as indicated in on page 5 Section 5 of **Exhibit F-** ISO 22000.

The FDA goes on to say in its Operational Strategy for Implementing the FDA Food Safety Modernization Act in the article Protecting Public Health by Strategic Implementation of Prevention-Oriented Food Safety Standards dated May14, 2014:

> Congress enacted FSMA in response to dramatic changes over the last 25 years in the global food system and in our understanding of foodborne illness and its consequences, including the realization that preventable foodborne illness is both a significant public health problem and a threat to the economic well-being of the food system. These food system changes and the new FSMA mandates require transformative change in how FDA does its work.
>
> The central external force driving change is the dramatic expansion in the global scale and complexity of the food system. Hundreds of thousands of growers and processors worldwide are producing food for the U.S. market, using increasingly diverse and complicated processes, managing complex and extended supply chains, and making millions of decisions every day that affect food safety. The burgeoning scale and complexity of the food system make it impossible for FDA on its own, employing our historic approaches, to provide the elevated assurances of food safety envisioned by FSMA and needed to maintain a high level of consumer confidence in the safety of the food supply.
>
> Accompanying this change is the now widely shared understanding that the foundation for reducing the risk of preventable foodborne illness in today's global food system—and providing consumers the assurances of food safety they seek—is action by the food industry. Specifically, food safety depends primarily on the food industry, with top-level management commitment and working in a continuous improvement mode, to: (1) implement science- and risk-based preventive measures at all appropriate points across the farm-to-table spectrum, and (2) manage their operations and supply chains in a manner that provides documented assurances that appropriate preventive measures are being implemented as a matter of routine practice every day. <u>FSMA is grounded in this understanding of how food safety can be protected in today's global food system.</u>
>
> While FSMA reinforces industry's primary role and responsibility for food safety, it also builds on and strengthens FDA's oversight role in providing technical expertise, setting and fostering compliance with food safety standards, and responding to and learning from problems when they do occur. In fact, more so than ever before, FDA is called upon by FSMA to play a central leadership and operational role in the future global food

13

safety system. Meeting this challenge—and successfully implementing FSMA's new prevention-oriented, systems approach to food safety—necessitates a new strategy for how FDA performs its food safety role and meets its new responsibilities.

For the purpose of this discussion here are the following facts:

    a.  FDA governs food and drugs for Human and Animal Consumption.
        i.  Governs those who manufacturer, pack or hold food for human and animal consumption
    b.  FDA governs the supply chain from farm to fork.
    c.  FDA requires record keeping.[12]
    d.  FDA requires the sanitary manufacturing, handling, storage, transportation and distribution of food.
    e.  FDA requires a Hazard Analysis and Risk Based Preventive Controls.[13]
    f.  FDA requires a Supply Chain Program.[14]
    g.  FDA ensures responsible stewardship of the environment.[15]
    h.  FDA has requisites for FDA regulated buildings and facilities.[16]
    i.  FDA has requisites for Current Good Manufacturing Practice in Manufacturing, Packing and Holding Human Food.[17]
    j.  FDA has a requisite for Production and Process Controls.[18]
    k.  FDA has a requisite for Emergency Plans.[19]
    l.  Compliance to FDA mandates is through an International Organization Standard; specifically ISO 22000 and the prerequisites of ISO 22002-1:2009.
    m.  Mars, Inc. is a food manufacturer and subject to the mandates of the FDA.
    n.  As a manufacturer Mars, Inc. is certified to the ISO & FSSC 22000 scheme.

---

[12] 21 CFR Chapter I: Subchapter B Part 117 Subpart F and Part 121 Subpart D; Subchapter A Part 1 Subpart J

[13] 21 CFR Chapter I Subchapter B Part 117 Subpart C

[14] 21 CFR Chapter I Subchapter B Part 117 Subpart G

[15] 21 CFR Chapter I Subchapter A Part 25 Subpart A

[16] 21 CFR Chapter I Subchapter B Part 110 Subpart B

[17] 21 CFR Chapter I Subchapter B Part 110 Subpart A

[18] 21 CFR Chapter I Subchapter B Part 110 Subpart E

[19] An emergency plan is a contingency plan in the event an business impairment. This is equivalent to a Business Continuity Plan (BCP).

o.   Mars Manteno facility is required to have a Food Defense Plan.[20]

p.   Mars, Inc. is certified by Lloyd's Register Quality Assurance.

q.   Mars, Inc. is mandated to provisions of 21 CFR relative to Food for Human Consumption.

r.   Any facilities of Mars, Inc. managed by Mars, Inc. or its agents of or product managed by agents of Mars, Inc. are subject to the applicable provisions of 21 CFR.

s.   Mars, Inc. Quality & Food Safety Standards for Transportation and Storage of Mars NA Semi-Finished Wrapped and Wrapped Goods Manual outlines compliance to 21 CFR.

t.   Mars, Inc. manager Kenco Logistics Services Quality Management System is based on International Organization of Standards 9001:2008 standards.

As mentioned earlier, ISO 22000 integrates the principles of the Hazard Analysis and Critical Control Point (HACCP) system and applicable steps developed by the Codex Alimentarius Commission. Essentially ISO 22000 combines the HACCP plan with prerequisite programmes (PRPs); for audit compliance to the standard is a mandatory requirement. Hazard analysis is a proactive tool and key to an effective food safety management system, as it identifies and undergirds an effective strategy to be utilized in ensuring hazard control through the synergy of PRP(s), operational PRP(s) and the HACCP plan. This analysis identifies all hazards that could reasonably be expected to occur in the food chain that may include but may not be limited to: hazards associated with the process and facilities used, other internal or external factors, as well as, the measures to be used in controlling a particular hazard, in addition, to the person, entity or organization responsible for controlling the hazard. Moreover, the ISO 22000 and PRP(s) are to work in tandem to support public health and safety from a food perspective on a global level.

For example, according to section 7 Planning and realization of safe products of the ISO 22000 Standard beginning on page 9 of **Exhibit F** and more specifically subsection 2.3 on page 10 indicates that:

> "When selecting and/or establishing PRP(s), the organization shall consider and utilize appropriate information [e.g. statutory and regulatory requirements, customer requirements, recognized guidelines, Codex Alimentarius Commission (Codex) principles and codes of practices, national, international or sector standards]."

Sanitation is one of the listed prerequisites of ISO 22000, a requisite (SSOP) under the Food Drug and Cosmetic Act and a requisite of 9 CFR part 416. A written sanitation/cleaning program is required for compliance and is inextricably tied into

---

[20] 21 CFR Chapter I Subchapter B Part 121 Subpart C

the Hazard Analysis and Risk Based Preventive Controls and other ISO 22000 building blocks. Failure to adhere to this maximum violates a number of additional public policies, such as but not limited to 21 U.S.C. § 342, as well as, Defendant Mars' compliance to its own policies relative to quality/sanitation and mandated under FSMA, FFDCA , and other applicable statues. Pest control, cross-contamination prevention, food safety and the facility amongst others are also listed prerequisites of ISO 22000 the compliance mechanism to 21 CFR along with also being prerequisites of Defendant Mars quality management system outlined in its ***QUALITY & FOOD SAFETY STANDARDS FOR TRANSPORT & STORAGE OF MARS NA SEMI-FINISHED WRAPPED AND FINISHED GOODS.*** Food safety and security are also requisites of FSMA and the 2002 Bioterrorism Act.

Specifically, with respect to the PIP (Performance Improvement Plan) that was issued to Complainant, the PIP failed to meet the guidelines of the Defendants own QMS Documentation Policy CP.BP. 4.2.1001 and Control of Documents ISO.BP. 4.23.001, hereto attached as **Exhibit H** and according to ISO standards, as well as, it was not listed in Defendant's appendices, including Appendix F, hereto attached as **Exhibit I**. Moreover, there should have been an accompanying policy to support this PIP; there is no evidence of such policy during the relevant time period.

Deviations (non-conformities) from any company policy, procedure, or protocol, including this one, are to be documented and logged, as well as, subject to an exception review if warranted as cited in Defendant's QMS Documentation Policy CP.BP. 4.2.1001. Furthermore, Defendant had a Performance Management Policy CP.HR. 6.2.2.009 that would have been applicable to complainant. Therefore, in my opinion the PIP as issued was not a legitimate company document and did not conform to the mandated International Organization of Standards 9001:2008 standards of Kenco nor Mars, Inc. Specifically, in my opinion the issuance of this PIP was a contrived and intentional deviation from Defendant's normal practices and can be construed as a retaliatory pretext to complainant's adverse employment actions and decisions. Moreover, in a standardized environment one cannot legitimately support a known non-conformity, as it is contrary to the organizational schemes and methods.

Essentially, Defendant Kenco in tandem along with Defendant Mars had policies, procedures, and protocols relative to documentation, control of documents, index of documents, as well as, the other ISO 9001:2008 and ISO 22000 Standard of requisites and prerequisites for the lawful operation of the Mars Manteno Facility. Therefore, the adherence of the policies, procedures and protocols as presented during a documented relative time is inextricably linked to the compliance of the Federal Mandates of 21 CFR, FSMA, the 2002 Bioterrorism Act, the Codex Alimentarius and other Federal and International prevailing laws.

According to Mars, Inc. website Defendant Mars, Inc. is in compliance with FSSC and ISO 22000 according to the Lloyd's Register Quality Assurance statement hereto attached as **Exhibit J.** Lloyd's Register Quality Assurance is the certifying body outlined in 21 CFR Chapter I Subchapter A Part 1 General Enforcement Regulations

16

Subpart M. Therefore, this same compliance scheme would be superimposed upon any of Defendant Mars agents, including Defendants Kenco and Walsh; ultimately mandating them to be compliant by virtue of an agency relationship.[21]  Provisions for imposition and agency with regard to compliance are found in the FD&C.  Mars, Inc. also states on their website that they have a supplier code of conduct hereto attached as **Exhibit K**, which also holds agents accountable for compliance.

Based upon Mars' compliance to ISO and FSSC 22000 it can be said that Mars had regular, if not daily, governance and interaction with the facility managed by Defendant Kenco, as Defendant Kenco was not certified to the necessary standards to be compliant with 21 CFR, FD&C and FSMA.  Hereto attached as **Exhibit L** is Defendant Mars' **QUALITY & FOOD SAFETY STANDARDS FOR TRANSPORT & STORAGE OF MARS NA SEMI-FINISHED WRAPPED AND FINISHED GOODS** that outlines compliance standards.  In addition, as mentioned earlier the same governing management scheme outlined in ¶8 and ¶9 would have been applicable to the relationship between Defendant Mars and Defendant Kenco.

In keeping with compliance Mars, Inc. would have had to audit the Mars Manteno warehouse for compliance to the standards.  Audit records reflect conformance and non-conformance to the standard; corrective actions are applied in the case of non-conformities; records are kept in a specific place and retained for a specified amount of time in keeping with the record keeping practices of the FD&C, FSMA and other applicable laws.

Specifically, with respect to Defendant Walsh's admission hereto attached as **Exhibit M** that Walsh had the information complainant sought to execute complainant's job can be corroborated by virtue of the ISO and FSSC 22000 standards of compliance and the relative time of the audit being in January of 2012.  Therefore, in my opinion Defendant Walsh intentionally withheld the information from complainant; ultimately interfering with complainant's work and business relationships.

Furthermore, it is correct in stating that after reviewing a number of Defendant Kenco's policies relative to: Safety & Health Philosophy CP-RM-6.4.100, General Employment Policies POL-HR-6.2.001, Anti-Harassment Policy POL-HR-6.2.004, Workplace Violence POL-HR-6.2.003, Prohibited Conduct POL-HR-6.2.002, Fire Prevention Plan CP-RM-6.4.104, Bloodborne Pathogen Exposure Control Plan CP-RM-6.4.106 and the Central Safety/Security File Policy CP-RM-4.2.4.100, hereto attached as **Group Exhibit N** were not evidenced as being executed according to scheme and basis of ISO standardization and compliance requirements of FSMA.

21. The materials considered for this study are referenced in Exhibits O-Q

22.  In 1906 Doubleday, Jabber & Company Published Upton Sinclair's "The Jungle" describing health and safety violations and unsanitary practices in the American

---

[21] 21 CFR Chapter I Subchapter A Part 1 Subpart H

17

meatpacking industry in Chicago in the early 20th Century. The public concern and outcry led to reforms including the creation of "The Meat Inspection Act." 110 years later we are looking at the need to strengthen United States Food Safety Management Systems to improve health and safety conditions for employees in the food industry so they are able to provide food products that are safe for consumers and public consumption. This lawsuit speaks directly to meeting this critical need in our society today!

I, James W. Kolka, declare under penalty of perjury that the foregoing is true and correct.

Executed on April 14, 2017

**James W. Kolka PhD, JD/Attorney-at-Law**
**International Legal Consultant**

2193 Spear Point Drive
North Metro Atlanta
Marietta GA 30062
tel. 770-977-4049

E. jameskolka@gmail.com

www.jameskolka.typepad.com
www.linkedin.com/pub/james-kolka/10/202/37a

18

# EXHIBIT B




ISO 9001:2015



# What is ISO 9001?

ISO 9001 is a standard that sets out the requirements for a quality management system. It helps businesses and organizations to be more efficient and improve customer satisfaction.

A new version of the standard, ISO 9001:2015, has just been launched, replacing the previous version (ISO 9001:2008).



## What is a quality management system?

- A quality management system is a way of defining **how an organization can meet the requirements** of its customers and other stakeholders affected by its work.

- ISO 9001 is based on the idea of **continual improvement**.

- It doesn't specify what the objectives relating to "quality" or "meeting customer needs" should be, but requires organizations to define these objectives themselves and continually improve their processes in order to reach them.





# Who is ISO 9001 for?

- ISO 9001 is suitable for organizations of all types, sizes and sectors.

- In fact, one of the key improvements of the newly revised ISO 9001:2015 was to make it more applicable and accessible to all types of enterprises.

- Smaller companies that do not have staff dedicated to quality can still enjoy the benefits of implementing the standard – ISO has many resources to assist them.



# What benefits will it bring to my business or organization?

Implementing a quality management system will help you:

- Assess the **overall context** of your organization to define who is affected by your work and what they expect from you. This will enable you to clearly **state your objectives and identify new business opportunities**.

- Put your **customers first**, making sure you consistently meet their needs and enhance their satisfaction. This can lead to repeat custom, new clients and increased business for your organization.



# ISO 9001: benefits

- Work in a **more efficient way** as all your processes will be aligned and understood by everyone in the business or organization. This increases productivity and efficiency, bringing internal costs down.

- Meet the necessary **statutory and regulatory requirements**.

- **Expand into new markets**, as some sectors and clients require ISO 9001 before doing business.

- **Identify and address the risks** associated with your organization



# Why was ISO 9001 revised?

- All ISO standards are reviewed and revised regularly to make sure they remain relevant to the marketplace.

- ISO 9001 has been updated to take into account the different challenges that businesses now face.

- For example, increased globalization has changed the way we do business and organizations often operate more complex supply chains, and there are increased expectations from customers.

- ISO 9001 needs to reflect these changes in order to remain relevant.



# What are the key improvements?

**Structure**

ISO 9001:2015 now follows the same overall structure as other ISO management system standards (High-Level Structure), making it easier for anyone using multiple management systems.

See Annex SL of ISO/IEC Directives Part 1 (the rules for developing ISO standards) for further information.

**Focus on risk-based thinking**

This has always been part of the standard, but the new version gives it increased prominence.

More information can be found on the Website run by ISO/TC 176/SC 2, the group of experts behind the standard (www.iso.org/tc176/sc2/public).



# What benefits does the new version bring?

The new version of the standard brings the user a number of benefits. ISO 9001:2015:

- Puts greater emphasis on **leadership engagement**
- Helps **address organizational risks** and opportunities in a structured manner
- Uses **simplified language** and a common structure and terms, particularly helpful to organizations using multiple management systems
- Addresses **supply chain management** more effectively
- Is more **user-friendly** for service and knowledge-based organizations



## Should I be certified to ISO 9001?

- Certification - when an independent certification body audits your practices against the requirements of the standard – is not a requirement of ISO 9001, but is a way of showing stakeholders that you have **implemented the standard properly**.

- For some companies, third- party certification may be a requirement. For example, some governments or public bodies may only contract suppliers that have been certified to ISO 9001.

- ISO does not perform certification. For more information about the certification process, see **www.iso.org** and the publication *ISO 9001:2015 – How to use it*.



# How do I get started with ISO 9001:2015?

## Key tips

Tip 1 – Define your objectives. Why do you want to implement the standard?

Tip 2 – Ensure senior management is on board. It is crucial that everyone is supportive of the initiative and its objectives. The publications *Reaping the benefits of ISO 9001* and *ISO 9001: Debunking the myths* may help with this.

Tip 3 – Identify your organization's key processes for meeting your objectives and customers' needs. Within each of these processes, ensure you understand your customers' requirements and can guarantee that these are met. This will form the basis of your quality management system.



# Examples of success with ISO 9001

ISO 9001 is used successfully all over the world. In 2013 alone, over **one million certificates** to the standard were issued across 187 countries, and many other companies and organizations have used the standard without seeking certification.

Success with ISO 9001 can take many forms. For some enterprises, it is all about attracting new clients, while others see it as the blueprint for internal efficiency.



# Sénégalaise Des Eaux



### One step ahead of customer needs

"We have been using ISO 9001 since 2002 and it helps us **anticipate and meet the needs of our customers**. At the beginning, the most important thing was providing sufficient water for the client. Then, when this was satisfied, the focus turned to the quality of the water and services.

"Now, we meet with consumer associations every six months to ensure we can adapt to our customers' needs. At the moment, for example, it is all about the diversification of payment methods, using mobile phones or other services to make money transfers."

Mamadou Dia
CEO of Sénégalaise Des Eaux

Sénégalaise Des Eaux supplies drinking water to approximately five million citizens in some of the largest towns in Senegal.





## Baltika Breweries

### Optimizing operations

" Using production systems based on ISO 9001, ISO 14001 and ISO 22000 allows us to **optimize operations between factories** and better integrate many of the companies we have acquired.

"In addition, by asking suppliers to implement robust quality management systems, we ensure the ingredients we use are of consistently high quality."

Dr. Isaac Sheps

CEO of Baltika Breweries from 2011 to 2014

Baltika Breweries is a leader in the Russian beer market and part of the Carlsberg Group.



# Other standards in the 9000 family

There are many other standards in the ISO 9000 series that can help you reap the full benefits of a quality management system and put customer satisfaction at the heart of your business.

- ISO 9000 contains detailed explanations of the seven quality management principles with tips on how to ensure these are reflected in the way you work. It also contains many of the terms and definitions used in ISO 9001.

- ISO 9004 provides guidance on how to achieve sustained success with your quality management system.

- ISO 19011 gives guidance for performing both internal and external audits to ISO 9001. This will help ensure your quality management system delivers on promise and will prepare you for an external audit, should you decide to seek third-party certification.





International Organization for Standardization

ISO Central Secretariat Chemin de Blandonnet 8 Case Postale 401

CH – 1214 Vernier, Geneva

Switzerland

## iso.org

© ISO, 2015

All rights reserved ISBN 978-92-67-10648-9

# EXHIBIT C

**From:** Julia P Argentieri <notifier@mail.vault.netvoyage.com>
**To:** mdj123197 <mdj123197@aol.com>
**Subject:** Julia P Argentieri shared these documents with you
**Date:** Tue, Feb 14, 2017 10:03 am

Ms. Madison
Attached please find document production from Kenco Logistic Services, LLC regarding the above-referenced matter - Please let us know if you are agreeable to entering a protective order so that any confidential documents containing sensitive information or non-party information can be marked confidential. We will produce additional documents following agreement regarding a protective order.

Please note that the link to access these documents will expire in 30 days. Please contact me if you have any difficulty opening them.

Regards,
Julie Argentieri

Links expire 2017-03-16

Download all

| | | |
|---|---|---|
| Kenco 000001-000040 - Personnel File.pdf | DOWNLOAD | VIEW |
| Kenco 000041-000059 - EEOC FOIA.pdf | DOWNLOAD | VIEW |
| Kenco 000060- 000559 - IDHR FOIA.pdf | DOWNLOAD | VIEW |

Download all

| | | |
|---|---|---|
| Kenco 000560- 000904 - IDHR FOIA 2.pdf | DOWNLOAD | VIEW |
| Kenco 000905-001159 - IDHR FOIA 3.pdf | DOWNLOAD | VIEW |
| Kenco 001160-001352 - IDHR FOIA 4.pdf | DOWNLOAD | VIEW |

Download all

| | | |
|---|---|---|
| Kenco 001353-001724 - IDHR FOIA 5.pdf | DOWNLOAD | VIEW |
| Kenco 001731-001733 - Quality Engineer Job Description.pdf | DOWNLOAD | VIEW |

**Thank you for using NetDocuments for secure document delivery.**
If you have any questions, contact support or find out more about netdocuments at www.netdocuments.com

# EXHIBIT D

Get breaking news and all your emails instantly. Make AOL your homepage now.     Get Started

SEARCH

COMPOSE

Keep as New | Reply | Reply All | Forward | Delete | Spam | More ▾     **23 of 209 results**

🔍 argen

📻 Today on AOL

📧 New Mail        35388

☁ Old Mail

📝 Drafts        3

▤ Sent

⚠ Spam        3

🗑 Recently Deleted

📇 Contacts

📅 Calendar

**Madison v. Kenco**

**Argentieri, Julia P. (Chicago) (Chicago)**  to you + 4 more    show details

Kenco's Responses and Obje...pdf (6.4 MB)     Kenco's Responses to Plain...pdf (2.8 MB)

Ms. Madison:

Please see the attached discovery responses from Kenco- As I've previously indicated in several communications, any confidentially marked documents will be sent to you upon entry of a protective orde which has been filed and is awaiting the court's approval. All other referenced documents have already bee provided.

Regards,
Julie Argentieri

Julia P. Argentieri
Attorney at Law
**Jackson Lewis P.C.**
150 North Michigan Avenue
Suite 2500
Chicago, IL 60601

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MARY MADISON,                                       )
                                                    )
      Plaintiff,                                )
                                                    )        Case No. 15-cv-2290-CSB-EIL
                                                    )
    v.                                            )
                                                    )
KENCO LOGISTIC SERVICES, et. al.,                   )
                                                    )
      Defendants.                               )

## DEFENDANT KENCO'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure ("Fed R. Civ. P."), Defendant Kenco Logistics Services, LLC ("Defendant"/ "Kenco"), hereby responds and objects to Plaintiff's First Set of Interrogatories ("Interrogatories") as set forth below:

## GENERAL ANSWERS AND OBJECTIONS

Kenco incorporates the following answers and objections into each and every Interrogatory answer set forth below:

1.      In answering the following Interrogatories, Kenco will ascribe to terms the normal definitions given them under the normal rules of English vocabulary, usage, grammar, and syntax.

2.      Kenco objects to Plaintiff's Interrogatories to the extent they purport to impose obligations on Kenco that are broader than required by the Federal Rules of Civil Procedure.

3.      Kenco objects to Plaintiff's Interrogatories to the extent they are overly broad, unduly burdensome, and not proportional to Plaintiff's claims.

4.      Kenco objects to each Interrogatory to the extent it purports to require it to disclose information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, or to the extent it unreasonably invades the privacy of non-parties to this action.

5.      Where, in response to a particular Interrogatory, Kenco identifies specific documents that are responsive, Kenco does not thereby represent or warrant that other documents may not also be responsive to the Interrogatory.

6.      Kenco objects to definition "C" because it is vague and ambiguous as to why "you/your" would refer to Plaintiff Mary Madison.

7.      Kenco's investigation of this matter is ongoing.  Kenco therefore reserves the right to supplement its responses to each and every interrogatory (or part of an interrogatory).

## INTERROGATORIES

1.      For all entities involved and herein defined, identify by name, address, position, title, and responsibility the person answering the below interrogatories and what part each person contributed to the answer.

**RESPONSE: Defendant objects to Interrogatory No. 1 to the extent that it seeks information that is privileged and because it is vague and ambiguous as to "for all entities involved and herein defined." Without waiving objections, answers were prepared by Counsel for Defendant with assistance from Jay Elliot, Vice President of Legal at Kenco, and reviewed/verified by Defendant.**

2.     For all entities involved and herein defined, identify in detail, state and provide the protocol, procedure, or policy that relates to corporate misconduct and how this policy, procedure or protocol was applied when Madison reported allegations of workplace hazards and violations, public safety hazards and violations, document falsification, and corporate fraud/embezzlement.

**RESPONSE: Defendant objects to Interrogatory No. 2 because it is overly broad, vague and ambiguous. Without waiving objections, Madison's job duties are listed on her job description, bates labeled Kenco 001731-001733. Her job duties included providing oversight for the warehouse's compliance with food and safety requirements. Madison received various standard policies from Kenco to use and expand upon in her role as a quality engineer. Kenco is not aware of Madison making any reports of workplace hazards and violations, public safety hazards and violations, document falsification, and corporate fraud/embezzlement.**

3.     For all entities involved and herein defined, identify in detail, state and provide the policies, procedures, protocols, and forms that correlate to the competencies listed, as well as, how these specific competencies were chosen that were listed on the Performance Improvement Plan (PIP) given to Mary Madison and in detail identify how each competency listed on the PIP given to Mary Madison related to the job duties and responsibilities of Madison, as a Quality Engineer, as well as, how each one cited was not met by Madison.

**RESPONSE: Defendant objects to Interrogatory No. 3 because it is overly broad, vague and ambiguous. Without waiving objections, Madison's Performance Improvement Plan was previously produced and is bates labeled Kenco 000021-000024. The competencies involved in her performance improvement plan are listed in detail on the documents, and can be compared to the job duties listed on her job description, bates labeled Kenco 001731-001733.**

4.     For all entities involved and herein defined, specifically in detail, state, identify and provide the specific policy, protocol, or procedure that correlates to the Performance Improvement Plan (PIP) given to Mary Madison, during the relative time, as well as, Defendant's

correlating Appendix F or A cataloguing the policy, protocol, or procedure according to Defendant's policies of QMS Documentation Policy - CPBP4.2.1.001, Document Control Policy-ISOBP4.2.3.001 and Document Change Notice form and log.

**RESPONSE: Defendant objects to Interrogatory No. 4 because it is overly broad, vague and ambiguous. Without waiving objections, Kenco's Policy CP-HR-6.2.2009 governed performance management of Exempt Employees, including Madison, while she was employed. A copy of this policy is bates labeled Kenco 001865-001869 and will be produced upon entry of a protective order.**

5.     For all entities involved and herein defined, specifically identify why the Performance Improvement Plan (PIP) did not conform to Defendant Kenco's Document Control Policy- ISOBP4.2.3.001, QMS Documentation Policy -CPBP4.2.1.001, Document Change Notice form and log- ISOBP4.2.3.00112 and Job Training and Certification Policy CP.QE.6.2.2.001.

**RESPONSE: Defendant objects to Interrogatory No. 5 because it is vague, ambiguous and argumentative. Without waiving objections, Madison's Performance Improvement Plan conformed to Kenco's practices and was not a violation of any policy.**

6.     For all entities involved and herein defined, specifically delineate why Defendant represented to the various regulatory agencies, including the IDHR and EEOC, that Madison's Project Plan and Business Continuity Plan were inferior, inept and/or wasted or dissipated business resources and specifically identify why these issues were not addressed in Madison's PIP.

**RESPONSE: Defendant objects to Interrogatory No. 6 because it is vague and ambiguous. Without waiving objections, the Business Continuity Plan is one of many examples of the performance problems exhibited which were identified in Madison's Performance Improvement Plan, including failing to communicate effectively, poor project management, interpersonal skills and insufficient communication with her**

chain of command. See Kenco 00021-Kenco 000024 for Madison's Performance Improvement Plan as well as Kenco 001746-Kenco 001846 for documents related to the Business Continuity Plan which will be produced upon entry of a protective order.

7.    For all entities involved and herein defined, specifically identify in detail the rules, regulations, protocols, procedures, and policies that Madison was to use as a standard or basis to implement the Quality Management System and bring conformity to the Mars Manteno Facility that Madison was hired to do.

**RESPONSE: Defendant objects to Interrogatory No. 7 because it is overly broad, vague and ambiguous. Without waiving objections, implementation of the Quality Management System, including identifying improvements for new and current operations was one of Madison's basic job duties, as identified on her job description, Kenco 001731-001733. Madison received copies of existing Kenco policies but was expected not only to use them but to improve them, in her role as a Quality Engineer.**

8.    For all entities involved and herein defined, specifically identify in detail what Defendant's Quality Management System was comprised of, why the system was in place, who was responsible for it on a corporate and site level, how it related to the operation and organization of Defendant Kenco and Mars, as well as, how it conformed to FDA compliance and regulations.

**RESPONSE: Defendant objects to Interrogatory No. 8 because it is overly broad, vague and ambiguous. Without waiving objections, see Madison's job description, Kenco 001731-001733.**

9.    For all entities involved and herein defined, specifically identify in detail the corporate and site level policies, procedures, protocols and forms, as well as, the various FDA Mandates and other CFR that were applicable to Madison executing the essential duties and functions of her position as the Quality Engineer.

**RESPONSE:** Defendant objects to Interrogatory No. 9 because it is overly broad, vague, and ambiguous. Without waiving objections, see answer to Interrogatory No. 8.

10.    For all entities involved and herein defined, specifically identify and state in detail why Madison's signed job description of July 2013, letter dated July 23, 2013, in response to Madison's PIP, and other correspondence were not included in Madison's personnel file that Defendant produced by email in February 2017, as well as, why Defendant did not keep Madison's personnel file in accordance with Defendant's Document Retention Personnel Files policy -BP.HR. 4.2.4.002, as well as, State and Federal Record Retention Policies.

**RESPONSE:** Defendant objects to Interrogatory No. 10 because it is overly broad, vague, ambiguous, and seeks information that is not relevant to a party's claims or defenses. Without waiving objections, Kenco retained Madison's personnel records in accordance with its policies. Madison's signed Performance Improvement Plan response is included in her personnel file. See Kenco 000024-000040. The job description in Madison's personnel file does not have a spot for a signature, see Kenco 001731-001733. Kenco 000020 is a signed document where Madison accepted the position of Quality Engineer.

11.    For all entities involved and herein defined, specifically identify and state in detail why Defendant Kenco indicated to the IDHR and EEOC under oath that Leonard Szplett had firsthand knowledge relative to Madison, but has not failed to list him as a witness for Defendant in this ongoing matter.

**RESPONSE:** Defendant objects to Interrogatory No. 11 because it is overly broad, vague and argumentative. Without waiving objections, Kenco has complied with its obligations under Fed. R. Civ. Pro. 26(a) and identified all individuals that Kenco intends to rely upon to support its claims or defenses.

12.    For all entities involved and herein defined, specifically identify, state and provide in detail why Defendant Kenco and its outside legal counsel, Karen Smith, interview Edith McCurry with regards to her firsthand knowledge relative to Madison's allegations, but failed to list her as a witness to the IDHR and EEOC as a witness, but instead listed Tammi Fowler.

**RESPONSE:** **Defendant objects to Interrogatory No. 12 because it is vague and argumentative. Without waiving objections, Kenco has complied with its obligations under Fed. R. Civ. Pro. 26(a) as well any obligations to identify witnesses to the EEOC and IDHR, and identified all individuals that Kenco intends to rely upon to support its claims or defenses.**

13.    For all entities involved and herein defined, specifically identify, state and provide the goals, objectives, competencies and timelines provided to Madison to perform and execute as the Quality Engineer, as well as, who provided these goals, objectives, competencies and timelines to Madison and how they were provided to Madison.

**RESPONSE:** **Defendant objects to Interrogatory No. 13 because it is overly broad, and vague. Without waiving objections, Madison's job goals were communicated to her at the time of her hire in her job description. Goals were reinforced and discussed with Madison frequently in email communications, meetings or via telephone. Madison's Performance Improvement Plan further identified her job objectives, and the areas in which she was not meeting her objectives. In addition, Kenco hired an outside consultant named Tracie Clifford to assist Madison with understanding and completing her job objectives.**

14.    For all entities involved and herein defined, specifically identify, state and provide the goals, objectives, competencies, warranties, covenants and timelines imposed upon Defendant Kenco from Defendant Mars, as it related to the Mars Manteno facilities compliance to annual Mars audit, quality and federal compliance.

**RESPONSE:** Defendant objects to Interrogatory No. 14 because it is overly broad, and vague. Without waiving objections, Madison's job goals were communicated to her by Kenco, not Mars, at the time of her hire and throughout her employment. See Kenco's answer to Interrogatory No. 13.

15.    For all entities involved and herein defined, identify and state in specific detail the overall rationale, infrastructure and reason for the Defendants (Kenco and Mars) quality management systems, individually and collectively, and how they interfaced, govern the employees, directly correlated to the terms and conditions of employee's employment and the operation of the facility.

**RESPONSE:** Defendant objects to Interrogatory No. 15 because it is vague, ambiguous, overly broad and seeks information that is not relevant to any party's claims or defenses. Without waiving objections, Mars did not govern the terms and conditions of employment for Kenco employees.

16.    For all entities involved and herein defined, identify, state in detail and provide the how the policies, procedures, protocols and forms are communicated to employees, who communicates them to the employees and the verification process to ensure that the policies, procedures, protocols were communicated to the employees.

**RESPONSE:** Defendant objects to Interrogatory No. 16 because it is vague, ambiguous, overly broad and seeks information that is not relevant to any party's claims or defenses. Without waiving objections, Kenco employees receive information about key policies at the time of hire, during orientation, as well as through periodic handouts, trainings, or other communications. Additionally, employees have access to Kenco's intranet where policies are maintained.

17.    Identify and state why every functional and operational aspect of the Mars Manteno facility and other Kenco managed facilities have quality management systems that include, but are not limited to: appendices, job descriptions, policies, procedures, protocols,

forms, and standard work associated with every aspect of the facility to address every function and operation within the facility.

**RESPONSE:** Defendant objects to Interrogatory No. 17 because it is vague, ambiguous, overly broad and unintelligible.

18.  Defendant stated under oath, in writing, to the IDHR and EEOC, that McCurry stated to Defendant's counsel that Plaintiff instructed McCurry not to do anything about what Plaintiff had reported. If Defendant's statement is true, explain in detail why Defendant refused to allow McCurry to authenticate her statement to the IDHR *and* EEOC during the investigation by listing McCurry as a witness for Defendant as it had the other non-black employees who were listed as witness with relevant knowledge.

**RESPONSE:** Defendant objects to Interrogatory No. 18 because it is argumentative, vague and ambiguous. Without waiving objections, McCurry did not inform Defendant's counsel that Madison complained about discrimination or harassment at any time. Kenco identified and supplied appropriate information to the IDHR and EEOC.

Dated: April 6, 2017

Respectfully submitted,
KENCO LOGISTIC SERVICES, LLC

By: _____
One of its Attorneys

Jody Wilner Moran
Julia Pearce Argentieri
Jackson Lewis P.C.
150 North Michigan Ave., Suite 2500
Chicago, Illinois  60601
Telephone: (312) 787-4949
moranj@jacksonlewis.com
julia.argentieri@jacksonlewis.com

## VERIFICATION

I, Jay Elliott, do hereby affirm under the penalty of perjury that the foregoing Defendant's answers and objections to Plaintiff's First Set of Interrogatories are true and correct to the best of my knowledge and belief.

Dated: _____4/6/17_____

_____
Jay Elliott
VP of Legal, Kenco

## CERTIFICATE OF SERVICE

I, Julia P. Argentieri, the undersigned certifies that on April 6, 2017, I caused to

be served true and correct copy of the foregoing **RESPONSES TO PLAINTIFF'S**

**FIRST SET OF INTERROGATORIES** by causing a copy to be placed in the U.S. Mail,

first-class postage prepaid, addressed as follows:

Mary Madison
9758 South Charles
Chicago, Illinois 60643

By: _____
One of the Attorneys for Defendant

IN THE UNITED STAPES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MARY MADISON,                          )
                                       )
            Plaintiff,                 )
                                       )     Case No. 15-cv-2290-CSB-EIL
      v.                               )
                                       )
KENCO LOGISTIC SERVICES, et. al.,      )
                                       )
            Defendants.                )

## DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO KENCO

Defendant Kenco Logistic Services, LLC ("Kenco"), by its attorneys, Jackson Lewis P.C., for its responses to Plaintiff's Requests for Production, states as follows:

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure ("Fed R. Civ. P."), Defendant Kenco Logistics Services, LLC ("Defendant"/ "Kenco"), hereby responds and objects to Plaintiff's Requests for Production of Documents as set forth below.

## GENERAL RESPONSES AND OBJECTIONS

Kenco incorporates the following response and objections into each and every REQUEST set forth below:

1.      In answering the following requests, Kenco will ascribe to terms the normal definitions given them under the normal rules of English vocabulary, usage, grammar, and syntax.

2.      Kenco objects to Plaintiff's requests to the extent they purport to impose obligations on Kenco that are broader than required by the Federal Rules of Civil Procedure or applicable local rules.

3.    Kenco objects to Plaintiff's requests to the extent they are overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

4.    Kenco objects to each request to the extent it purports to require it to disclose documents and information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, or to the extent it unreasonably invades the privacy of non-parties to this action.

5.    Where, in response to a particular request, Kenco identifies specific documents that are responsive, Kenco does not thereby represent or warrant that other documents may not also be responsive to the request, or that the documents identified in response to the request are only responsive to the request referenced.

6.    Kenco's investigation of this matter is ongoing.  Kenco therefore reserves the right to supplement its responses to each and every Request for Production (or any portion thereof).

## DOCUMENT REQUESTS

1.    All diaries, journals, logs, or other recordings of events in Defendant's operations from May, 2013 to the present.

**RESPONSE:  Defendant objects to this request because it is overly broad and vague. Without waiving objections, none.**

2.    All documents relating to each and every civil and criminal proceeding, administrative proceeding (including but not limited to OSHA, FDA, and any other governing Regulatory agency), bankruptcy proceeding, and civil suit in which Defendant has been involved.

**RESPONSE: Defendant objects to this request because it is overly broad and not proportional to the needs of this litigation.**

3.    All written or recorded statements of witnesses regarding any of Plaintiff's claims against Defendant.

**RESPONSE: None.**

4.     Any and all commendations, performance management assessments, disciplinary actions, incentives and the like bestowed upon Plaintiff from defendant's records kept as a matter of ordinary business, as well as, in compliance with Defendant's certification and industry standards from May, 2013 to the present.

**RESPONSE: See Madison's personnel file, previously produced and bates labeled Kenco 000001-000040, including her Performance Improvement Plan bates labeled Kenco 000024-000040.**

5.     All documents relating to Plaintiff's job performance with Defendant.

**RESPONSE: See Kenco 00001-00001864, including Plaintiff's personnel file, job description, other documents and communications related to Plaintiff's job performance, and documents received in response to FOIA request from the EEOC related to Madison.**

6.     All documents relating to any action by Defendant took that you contend and legitimizes that there was a lawful employment action taken against Plaintiff.

**RESPONSE:  See Kenco 000001-000040, Madison's personnel file as well as Kenco 001734-001864, performance documents related to Madison.**

7.     All documents relating to Defendant providing and giving training to Plaintiff, including but not limited to: to who provided the training, as well as, the disposition of each training.

**RESPONSE: See Plaintiff's personnel file as well as other performance documents, bates labeled as Kenco 000001-000040 and Kenco 001734-001864.**

8.     Defendant's affirmative action plan

**RESPONSE: Defendant objects to this Request because it is overly broad and seeks information that is irrelevant.**

9.     All documents relating to any action by Defendant deemed necessary to facilitate any employment decision, whether favorable or unfavorable, that was amassed directly or indirectly to any incident, company and public policy infraction and or investigation(s), whether favorable or unfavorable.

**RESPONSE: Defendant objects to this Request because is vague and ambiguous.**

10.     All documents relating to any action by Defendant deemed necessary to facilitate any employment decision, whether favorable or unfavorable, that was amassed directly or indirectly to an incident, company and public policy infraction or investigation(s) Defendant contends that justified and supported a non-pretexted legitimate lawful reason to have placed Plaintiff on a Performance Improvement Plan, as well as, extending to Plaintiff inequitable terms and conditions of employment.

**RESPONSE: Defendant objects to this Request because is vague and ambiguous. Without waiving objections, see Madison's Performance Improvement Plan, bates labeled Kenco 000024-000040.**

11.    All documents relating to any action by Defendant deemed necessary to facilitate any employment decision, whether favorable or unfavorable, that was amassed directly or indirectly to an incident, company and public policy infraction or investigation(s) Defendant contends that justified and supported a non-pretexted legitimate lawful reason to have imposed upon Plaintiff inequitable terms and conditions of employment.

**RESPONSE: Defendant objects to this Request because it is overly broad and vague. Without waiving objections, see all documents produced by Defendant.**

12.    All documents relating to any action by Defendant deemed necessary to facilitate any employment decision, whether favorable or unfavorable, that was amassed directly or indirectly to an incident, company and public policy infraction or investigation(s) Defendant contends that justified and supported a non-pretexted legitimate lawful reason to have terminated Plaintiff.

**RESPONSE: Defendant objects to this Request because it is overly broad and vague. Without waiving objections, see all documents produced by Defendant.**

13.    All documents relating to your Defense that the Performance Improvement Plan (PIP) Plaintiff received was proper.

**RESPONSE: See Madison's Performance Improvement Plan, bates labeled Kenco 000024-000040.**

14.    All documents relating to your Defense that the Performance Improvement Plan (PIP) followed Defendant's policies, procedures, protocols, and forms.

**RESPONSE: See Madison's Performance Improvement Plan, bates labeled Kenco 000024-000040.**

15.    All documents relating to your Defense that the Performance Improvement Plan (PIP) followed Defendant's Quality Management System Documentation Policy- CP.BP.4.2.1.001 and Defendant's Control of Documents Policy- ISOBP4.2.3.001.

**RESPONSE: Madison's Performance Improvement Plan, bates labeled Kenco 000024-000040.**

16.    All documents relating to Plaintiffs allegations that Plaintiff did not complain to Human Resources about not being treated fairly.

**RESPONSE: Defendant objects to this Request because it is overly broad and vague. Without waiving objections, no such documents exist because Plaintiff did not make such a complaint.**

17.    All documents relating to Plaintiffs allegations that Plaintiff did complain to Human Resources about not being treated fairly.

**RESPONSE: Defendant objects to this Request because it is overly broad and vague. Without waiving objections, no such documents exist because Plaintiff did not make such a complaint.**

18.    All documents relating to Plaintiffs allegations that Plaintiff did complain to Corporate about being asked to engage in corporate misconduct.

**RESPONSE: Defendant objects to this Request because it is overly broad and vague. Without waiving objections, no such documents exist because Plaintiff did not make such a complaint.**

19.    All documents related to Plaintiff's allegation that Plaintiff was retaliated against by Defendant.

**RESPONSE: See Madison's personnel file and performance documents bates labeled Kenco 000001-000040 and Kenco 001734-001864 for documents reflecting that Madison's PIP and termination were non-retaliatory.**

20.    All documents related to Plaintiff's allegation that Plaintiff was not retaliated against by Defendant, but sanctioned, or progressively disciplined, or performance managed in a lawful non pretexted and non-discriminant manner according to Defendants company policies, procedures, and protocols listed in Defendant's Appendix F during the relative time.

**RESPONSE: See Madison's personnel file and performance documents bates labeled Kenco 000001-000040 and Kenco 001734-001864 for documents reflecting that Madison's PIP and termination were non-retaliatory.**

21.    Names, contact information, title, position, job function, and geographical location of all persons involved, as well as, the role played by each person in the adverse employment decision affecting Plaintiff, including, but not limited to the protocol, procedure, and policies, relating to the Plaintiff's employment abeyance, return to modified and non-modified work denial, who recommended the adverse employment decision, the metric, matrix, rational or company and public policy used in the recommendation.

**RESPONSE:  Defendant objects to this request because it does not seek documents as required by Fed. R. Civ. Pro. 34.**

22.    All documents provided by you or your agents to any expert witness, psychologist, psychiatrist, and/or physician you and your agents have consulted or retained in connection with this action.

**RESPONSE: Defendant objects to this request because it is vague and ambiguous. Without waiving objections, none.**

23.    All documents received from any expert witness, psychologist, psychiatrist, and/or physician you and your agents have consulted or retained in connection with this action.

**RESPONSE:  None.**

24.    All documents relating to any other employee of Defendants who you contend was/is similarly situated to Plaintiff, that was not a member of Plaintiffs protected classes *(i.e.,* was non-black, or female) and was treated more favorably than Plaintiff

**RESPONSE: None.**

25.    All documents relating to any other employee of Defendants who you contend was/is similarly situated to Plaintiff, that was not a member of Plaintiff's protected classes *(i.e.,* was non-black, or female) and was not treated more favorably than Plaintiff.

**RESPONSE: None.**

26.    All documents relating or in support of your defense against the allegations that Plaintiff was not racially harassed by being subjugated to unequal terms and conditions of employment.

**RESPONSE: See all documents produced by Defendant.**

27.    All documents relating or in support of your defense against the allegations that Plaintiff was not racially harassed by being subjugated to harsher discipline and scrutiny than non-blacks, specifically other non-black mangers or other similarly situated persons at the Mars Manteno Facility.

**RESPONSE: See all documents produced by Defendant.**

28.    All documents relating to any other employee of Defendants who you contend was/is similarly situated to Plaintiff, who did not engage in any protected activity, and was treated more favorably than Plaintiff.

**RESPONSE: None.**

29.    All documents relating to any other employee of Defendants who you contend was/is similarly situated to Plaintiff, who did engage in any protected activity, and was treated more favorably than Plaintiff

**RESPONSE: None.**

30.    All documents relating to whether Defendant's stated reasons for terminating Plaintiff was not a pretext for discrimination or retaliation.

**RESPONSE: See all documents produced by Defendant.**

31.    All documents relating to whether Defendant's stated reasons for taking any action against Plaintiff that Defendant believe was a lawful employment action was not a pretext for discrimination or retaliation.

**RESPONSE:** **See all documents produced by Defendant.**

32.    All documents from Plaintiff or on Plaintiff's behalf to defendant in support of being racially harassed including reports made from co-workers, to HR, management and the like.

**RESPONSE:** **None.**

33.    All documents relating or in support of your defense against the allegations that Plaintiff was not retaliated against by being subjugated to harsher discipline and scrutiny than non-blacks, or non-black managers, or other similarly situated persons at the Mars Manteno Facility.

**RESPONSE:** **See all documents produced by Defendant.**

34.    All documents relating to your defense that Defendant did not engage in willful discrimination or retaliation.

**RESPONSE:** **See all documents produced by Defendant.**

35.    All documents from you relating to Plaintiff's allegations about misconduct, disparate and disparaging treatment made to management, including but not limited to Kelvin Walsh, former General Manager of the Mars Manteno facility, Edith McCurry former HR Administrator of the Mars Manteno facility, Leonard Szplett former HR/Accounting and Office Manager of the Mars Manteno Facility, Corporate, Kevin Moses, and the like.

**RESPONSE:** **None.**

36.    All documents from you relating to or in support of your defense against the allegation that Plaintiff was not placed on a Performance Improvement Plan in retaliation for complaining about disparate treatment, workplace, public safety and compliance issues and hazards.

**RESPONSE:** **See all documents produced by Defendant.**

37.    All policies, procedures, and protocols from Defendant relating to or in support of Defendant's defense against the allegation that Plaintiff was not retaliated against.

**RESPONSE:** **See all documents produced by Defendant.**

38.    All policies, procedures, and protocols from Defendant relating to or in support of Defendant's defense against the allegation that Plaintiff was not discriminated against.

**RESPONSE:** **See all documents produced by Defendant.**

39.    All policies, procedures, and protocols from Defendant relating to or in support of Defendant's defense against the allegation that Plaintiff was not discriminated against because of Plaintiff's race.

**RESPONSE: See all documents produced by Defendant.**

40.    All policies, procedures, and protocols from Defendant relating to or in support of Defendant's defense against the allegation that Plaintiff was not discriminated against because of Plaintiff's gender.

**RESPONSE: See all documents produced by Defendant.**

41.    All documents that support that Defendant's upper management, beginning at Plaintiff's management level, is racially proportioned to blacks and non-blacks.

**RESPONSE:  Defendant objects to this Request because it is vague as Plaintiff was not a manager, and seeks information not relevant to any party's claims or defenses and not proportional to the needs of this litigation.**

42.    All documents that support that Defendant's upper management, beginning at Plaintiff's management level, is proportioned in gender to males and females.

**RESPONSE: Defendant objects to this Request because it is vague as Plaintiff was not a manager, and seeks information not relevant to any party's claims or defenses and not proportional to the needs of this litigation.**

43.    All documents from you relating to or in support of your defense against the allegation that Defendant did follow company or public policy as it performance management policies, equal terms and conditions of employment, investigation and incident reporting policies, procedures, and protocols.

**RESPONSE: Defendant objects to this Request because it is vague and overly broad.**

44.    All covenants, agreements, contracts, work instructions and the like between Kenco Logistics and MARS, Inc., including but not limited to:

    a.   SOW Requirements

    b.   WERC Best Practices Assessment Documents

    c.   Management agreement between Kenco and MARS, Inc.

    d.   MARS, Inc. Warehouse and distribution manual used in the governance of the Mars Manteno facility

    e.   Mars Manteno operating structure and budget

    f.   Mars and Kenco Termination agreement of 2015

**RESPONSE: Defendant objects to this Request because it is vague and overly broad and seeks information not relevant to any party's claims or defenses and not proportional to the needs of this litigation.**

45.     All reporting structures and reporting mechanisms of Kenco Logistics to MARS, Inc. including, but not limited to: organizational charts, as well as, the timeline, the name, contact information and position of persons listed within that scheme.

**RESPONSE: Defendant objects to this Request because it is vague and overly broad and seeks information not relevant to any party's claims or defenses and not proportional to the needs of this litigation.**

46.     The names and types of any and all company certifications, endorsements and/or affiliations, such as, but not limited to ISO Certification.

**RESPONSE: Defendant objects to this Request because it is vague and overly broad and seeks information not relevant to any party's claims or defenses and not proportional to the needs of this litigation. .**

47.     The name, address and telephone of Defendant's ISO 9001 registrar.

**RESPONSE: Defendant objects to this Request because it does not seek documents as required by Fed. R. Civ. Pro. 34 and seeks information not relevant to any party's claims or defenses and not proportional to the needs of this litigation.**

48.     Any and all company policy, procedures, form and the like listed on Appendix F from April 2013 to August 2013, including but not limited to each revision, as well as, the other corresponding Appendices, A, B, C, D, & E, including but not limited to each revision, as it relates to Corporate and Mars Manteno site changes that are properly executed according to company policy.

**RESPONSE: Defendant objects to this Request because it is vague and overly broad and seeks information not relevant to any party's claims or defenses and not proportional to the needs of this litigation.**

49.     All documents relating to Defendant's defense against the allegation that Defendant did not follow company and public policy as it relates to intentional, wanton, willful and woeful discrimination or retaliation.

**RESPONSE: See all documents produced by Defendant.**

50.     All documents Defendant has relating to Plaintiff not being entitled to any claim for damages based on emotional distress.

**RESPONSE: See all documents produced by Defendant.**

51.     All documents relating to Defendant's defense against the allegation that Defendant did not administer harsher discipline and scrutiny to African-Americans and others who opposed disparate and disparaging treatment and impact, including, but not limited to Opportunity for Improvement, Performance Management, Performance Improvement Plans, employment abeyance, suspension, termination and the like.

**RESPONSE: See all documents produced by Defendant.**

52.    Any and all Exception forms *CP-QE-4.2.1.001-2* executed from May of 2013 until September 2103, as well as, the supporting business cases, as it relates to Corporate and Mars Manteno site changes that are properly executed according to company policy.

   a.  Exception forms generated at the Mars Manteno facility from April 2013 through September 2013.

   b.  Approved exception forms generated at the Mars Manteno facility April 2013 through September 2013.

   c.  Business cases associated with the approved exception forms generated at the Mars Manteno facility April 2013 through September 2013.

   d.  Associated logs to policy *CP-QE-4.2. 1.001*

**RESPONSE: Defendant objects to this Request because it is vague and overly broad and seeks information not relevant to any party's claims or defenses and not proportional to the needs of this litigation.**

53.    Any and all Controlled copy distribution forms executed from May of 2013 to September 2013, as it relates to the Mars Manteno Facility that are properly executed according to company policy.

**RESPONSE: Defendant objects to this Request because it is vague and overly broad and seeks information not relevant to any party's claims or defenses and not proportional to the needs of this litigation.**

54.    Any and all incident reports and forms taken, completed and/or effectuated from May of 2013 to September 2013, as it relates to the Mars Manteno Facility.

**RESPONSE: Defendant objects to this Request because it is vague and overly broad and seeks information not relevant to any party's claims or defenses and not proportional to the needs of this litigation.**

55.    The log(s) of all incident reports and forms taken, completed and/or effectuated from December 2013 to September 2013, as it relates to the Mars Manteno Facility.

**RESPONSE: Defendant objects to this Request because it is vague and overly broad and seeks information not relevant to any party's claims or defenses and not proportional to the needs of this litigation.**

56.    My and all complaints filed by other MARS Manteno employees regarding disparate and disparaging treatment and impact.]

**RESPONSE: Defendant objects to this Request because it is vague, overly broad and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of this litigation.**

57.    Any and all exit interviews for Mars Manteno employees.

**RESPONSE: Defendant objects to this Request because it is overly broad and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of this litigation.**

58.    A list of all previous Mars Manteno employees, including name, contact information, title, and the like.

**RESPONSE: Defendant objects to this Request because it does not seek documents as required by Fed. R. Civ. Pro. 34.**

59.    All documents relating to or in support of your defense that Defendant was compliant with Title VII.

**RESPONSE: See all documents produced by Defendant.**

60.    All documents relating to or in support of your defense that Defendant was compliant with 42 U.S.C. 1981 and 1985.

**RESPONSE: See all documents produced by Defendant.**

61.    All documents relating to or in support of your defense that Defendant or Defendant's agents did not in any way conspire against Plaintiff's protected rights.

**RESPONSE: See all documents produced by Defendant.**

62.    All documents relating to Defendant's defense that Plaintiff has not suffered or will not continue to suffer a loss of earnings.

**RESPONSE: See all documents produced by Defendant.**

63.    All documents relating to Defendant's defense that Plaintiff is not entitled to general and compensatory damages in this action.

**RESPONSE: See all documents produced by Defendant.**

64.    All documents relating to Defendant's defense that Plaintiff is not entitled to punitive or exemplary damages in this action.

**RESPONSE: See all documents produced by Defendant.**

65.    All documents relating to Defendant's defense that Plaintiff has not suffered any monetary damages as a result of Defendant's conduct.

**RESPONSE: See all documents produced by Defendant.**

66.    All documents relating to Defendant's defense that Plaintiff has not suffered any non-monetary damages as a result of Defendant's conduct.

**RESPONSE: See all documents produced by Defendant.**

67.    All documents that were identified in or are responsive to Plaintiffs First Set of Interrogatories to Plaintiff

**RESPONSE: None, outside of what has already been produced.**

68.    All documents that were reviewed in preparation of Defendant's responses to Defendant's First Set of Interrogatories to Plaintiff.

**RESPONSE: See all documents produced by Kenco.**

69.    All documents that Defendant believes tend to substantiate Defendant's Defense.

**RESPONSE: See all documents produced by Kenco.**

70.    Any and all written or recorded statements of witnesses regarding any of Plaintiffs claims against Defendant, including, but not limited to those that either support or refute Plaintiff's allegations.

**RESPONSE: None.**

71.    Any and all comparable persons, including temporary and permanent employees, subjected to being denied the opportunity to exercise their protected rights, as well as, the enforcement of company policy after any violation of public and company policy, but not limited to the: date, time, name contact information, title, position, policy effectuated to facility this decision, the decision makers, and the exception form and business case, if applicable, as well as, the terms and conditions imposed.

**RESPONSE: Defendant objects to this request because it does not seek documents as required by Fed. R. Civ. Pro. 34.**

72.    Any and all comparable persons or employees of the Mars Manteno Facility, including temporary and permanent employees, subjected to adverse employment decisions, being punished, sanctioned, reprimanded, terminated for the exercising any of their protected rights in any capacity, as well as, the enforcement of company policy after any violation of public and/or company policy, including but not limited to the: date, time, name contact information, title, position, policy effectuated to facility this decision, the decision makers, and the exception form and business case, if applicable, as well as, the terms and conditions imposed.

**RESPONSE: Defendant objects to this request because it does not seek documents as required by Fed. R. Civ. Pro. 34.**

73.    Any and all company policies related to termination.

**RESPONSE: Defendant objects to this Request because it is overly broad, vague and not proportional to the needs of the litigation. Without waiving objections, policy CP-HR-6.2.2.009, performance management for exempt employees is bates labeled Kenco 001865-Kenco 001869.**

74. Any and all company policies related to performance management of any kind.

**RESPONSE: Defendant objects to this Request because it is overly broad, vague and not proportional to the needs of the litigation. Without waiving objections, policy CP-HR-6.2.2.009, performance management for exempt employees is bates labeled Kenco 001865-Kenco 001869.**

75. Any and all company policies related to training.

**RESPONSE: Defendant objects to this Request because it is overly broad, vague and seeks information not relevant to any party's claims or defenses and not proportional to the needs of this litigation.**

76. Any and all company policies related to Defendant's Quality Management System.

**RESPONSE: Defendant objects to this Request because it is overly broad, vague and seeks information not relevant to any party's claims or defenses and not proportional to the needs of this litigation.**

77. Any and all organizational charts, including, but not limited to names and titles of persons listed by position, timeline and geographical location.

   a. Corporate
   b. Mars Manteno site
   c. MARS, Inc. North America including distribution Network

**RESPONSE: Defendant objects to this Request because it is vague and incomprehensible and seeks information not relevant to any party's claims or defenses and not proportional to the needs of this litigation.**

78. The Index of Quality Records as it relates to Appendix A, B, C, D, E, & F, according to company policy and ISO 9001:2008 standards.

**RESPONSE: Defendant objects to this Request because it is overly broad, vague and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of the litigation.**

79. The Master list of all controlled documents from Appendix A, B, C, D, E, & F, according to company policy and 150 9001:2008 standards.

**RESPONSE: Defendant objects to this Request because it is overly broad, vague and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of the litigation.**

80. The policy relating to the Distribution of Controlled documents according to company policy and ISO 9001:2008 standards.

**RESPONSE: Defendant objects to this Request because it is overly broad, vague and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of the litigation.**

81.     The various Retention times for all Records kept according to ISO 9001:2008 standards and company policy; including but not limited to: policies, procedures, protocols and the like inclusive of titles and document numbers.

**RESPONSE: Defendant objects to this Request because it is overly broad, vague and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of the litigation.**

82.     The archive location of all records kept in compliance to Appendix A, B, C, D, E, & F according to ISO 9001:2008 standards and company policy.

**RESPONSE: Defendant objects to this request because it does not seek documents as required by Fed. R. Civ. Pro. 34 and seeks information that is not relevant to any party's claims or defenses.**

83.     All Kenco connection updates from 2013 through September 2013; including but not limited to the catalogued and documented changes.

**RESPONSE: Defendant objects to this Request because it is overly broad, vague and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of the litigation.**

84.     The required and company mandated signature verification logs correlated to the policies, protocols and procedures Madison was informed and trained on relevant to all related and imposed policies, procedures, and protocols instituted and the Mars Manteno facility, as well as, other Top Tier documents.

**RESPONSE: Defendant objects to this Request because it is overly broad, vague and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of the litigation.**

85.     The policy that relates to the Best Practice Audit assessment of the Mars Manteno Facility from April 2013 through September 2013.

**RESPONSE: Defendant objects to this Request because it is overly broad, vague and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of the litigation.**

86.     Any and all the Audit Findings, root cause and corrective actions for Audits of the Mars Manteno Facility.

**RESPONSE: Defendant objects to this Request because it is overly broad, vague and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of the litigation.**

87.    Roles and responsibilities of each employee of the MARS, Inc. Manteno facility, as it relates to company policy and in accordance with the ISO 9001:2008 standards.

**RESPONSE: Defendant objects to this request because it does not seek documents as required by Fed. R. Civ. Pro. 34 and seeks information that is not relevant to any party's claims or defenses.**

88.    All documents that Defendant believes tend to commemorate, memorialize, reiterate, support, reinforce, or the use of any adjective thereof the allegations asserted in the Complaint.

**RESPONSE: None.**

89.    Any and all persons comparable or not who were given the exception or the opportunity to not be subject to company and public policy, whether temporary or full time employees including, but not limited to the: date, time, name contact information, title, position, policy effectuated to facility this decision, the decision makers, and the exception form and business case, if applicable, as well as, the terms and conditions imposed.

**RESPONSE: Defendant objects to this request because it does not seek documents as required by Fed. R. Civ. Pro. 34.**

90.    Any and all persons comparable or not subjected, relative to not being afforded the opportunity to have an investigation conducted per company policy, that included the alleged participant, take place before an adverse employment decision was effectuated while being either a temporary or full time tenured or non-tenured employee including, but not limited to: date, time, name, gender, contact information, the decision makers, and the exception form and business case, if applicable, and the terms and conditions imposed.

**RESPONSE: Defendant objects to this request because it does not seek documents as required by Fed. R. Civ. Pro. 34.**

91.    Any and all comparable persons subjected to the adverse employment decisions of suspension, for committing egregious violations or any violation of company and/or public policy, including but not limited to life threatening actions while being a full time tenured or non-tenured employee including, but not limited to the: date, time, name, race, gender, contact information, title, position, policy effectuated to facility this decision, the decision makers, and the exception form and business case, if applicable and the terms and conditions imposed.

**RESPONSE: Defendant objects to this request because it does not seek documents as required by Fed. R. Civ. Pro. 34.**

92.    Any and all comparable persons subjected to any adverse employment decision of disciplinary actions, for committing egregious violations or any violation of company and/or public policy, including but not limited to life threatening actions while being a full time tenured or non-tenured employee including, but not limited to the: date,

time, name, race, gender, contact information, title, position, policy effectuated to facility this decision, the decision makers, and the exception form and business case, if applicable and the terms and conditions imposed.

**RESPONSE: Defendant objects to this request because it does not seek documents as required by Fed. R. Civ. Pro. 34.**

93.    Any and all comparable persons who were subjected to deviation of company policy, as it relates to discipline and the escalation thereof while being a temporary or full time tenured or non-tenured employee including, but not limited to the: date, time, name, race, gender, contact information, title, position, policy effectuated to facility this decision, the decision makers, and the exception form and business case, if applicable and the terms and conditions imposed.

**RESPONSE: Defendant objects to this request because it does not seek documents as required by Fed. R. Civ. Pro. 34.**

94.    Any and all other persons having filed informal and formal complaints against Kenco Logistics, MARS, Inc. and/or a combination there of, with any governing agency internally or externally, as well as, the circumstance or bias of each complaint.

**RESPONSE: Defendant objects to this request because it does not seek documents as required by Fed. R. Civ. Pro. 34.**

95.    The policy and the form that directly relates to exception and or deviations from the policy, procedure, protocol and the like according to company policy from including but not limited to: any updates in their entirety.

**RESPONSE: Defendant objects to this Request because it is overly broad, vague and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of the litigation.**

96.    The policy related to human resource/employment law curriculum and training policy.

**RESPONSE: Defendant objects to this Request because it is vague and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of the litigation.**

97.    A copy of Mars Manteno Special Statement of Understanding and any associated policy and documents related to this SSOU.

**RESPONSE: Defendant objects to this Request because it is overly broad, vague and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of the litigation.**

98.    Employment policies, such as but not limited: general employment, harassment, work place violence, performance management, ethics, Opportunity for Improvement, and the like.

**RESPONSE: Defendant objects to this Request because it is overly broad, vague and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of the litigation.**

99.    The name of the responsible person for record keeping during the relevant times specific to each appendix, at site and corporate level, as well as, their contact information; including, but not limited to telephone number, email and address.

**RESPONSE: Defendant objects to this request because it does not seek documents as required by Fed. R. Civ. Pro. 34 and seeks information that is not relevant to any party's claims or defenses.**

100.    The name of the Quality Engineer /Coordinator who replaced Plaintiff.

**RESPONSE:  Defendant objects to this request because it does not seek documents as required by Fed. R. Civ. Pro. 34 and seeks information that is not relevant to any party's claims or defenses.**

101.    Kenco Corporate Responsibility report, including but not limited to: 2010 and any new releases relevant to the years 2013 to 2015.

**RESPONSE: Defendant objects to this Request because it is overly broad, vague and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of the litigation.**

102.    Copies of the employee New Hire book relative to 2013.

**RESPONSE: Defendant objects to this Request because it is overly broad, and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of the litigation.**

103.    Personnel manuals of any sort corporate or site level.

**RESPONSE: Defendant objects to this Request because it is overly broad, vague and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of the litigation.**

104.    Documentation to the geographical location and/or proximity to Mars Manteno of the witnesses proffered by Defendant during the relative times.

**RESPONSE: Defendant objects to this request because it is vague, overly broad and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of the litigation.**

105.    All documents Defendant may offer into evidence or use at trial in this case.

**RESPONSE: See all documents produced by Defendant.**

106.   To the extent not already encompassed within any of the foregoing document requests, all documents that Defendant has provided to third parties that refer or relate to Plaintiffs employment with Defendant, or that otherwise refer or relate to Defendant's defense against Plaintiffs allegations against Defendant.

**RESPONSE: See all documents produced by Kenco.**

107.   To the extent not already encompassed within any of the foregoing document requests, all documents that Defendants has received from third parties that refer or relate to Plaintiffs employment with Defendant, or that otherwise refer or relate to her allegations against Defendant.

**RESPONSE: See documents produced by IDHR and EEOC in response to FOIA, Kenco 000041-001724.**

108.   Any and all documents relating to any communications, including electronic, any digitized, internet or online communication, posting, response to posting, update, response to update, comment, response to comment, e-mail, instant message, text messages, voice mail message, Kenco and Mars Computer Servers, Kenco Connection, MARS, Inc. and any of its agents, emails, word processing files, pictures, databases, data files, and archives files, regardless of whether the information is contained on servers, laptop and desktop computers, back-up tapes, home and personal computers, disks, CDs, zip drives, and handheld devices including but not limited to: cellular phones and/or "smart" phones, iPads, Blackberry devices, or any other form of personal electronic device. It also includes all posts, messages or other communications through any form via social media, including but not limited to: Facebook, Twitter message or tweet, LinkedIn, or Snapchat between Defendant, its agents, and any person, including but not limited to MARS, Inc., its agents, its employees, Kenco Logistics, The Kenco Group, Karen Smith, Tammi Fowler, Matthew Chick, Edith McCurry, Leonard Spzlett, Kelvin Walsh, Mike Manzello, Robert Coffey, Michelle Hisey, Paula Hise, Kevin Moses, Trace Clifford, Jason Pendleton, Laveppia Brown, The Illinois Department of Human Rights, EEOC, current or former coworkers, colleagues, acquaintances, and strangers, that relate to Defendant, Plaintiffs employment with Defendant, or in defense or in support against the allegations of Plaintiff's claims against Defendant.

   a. As well as, other subjects that include, but are not limited to: alleged work place infractions, incidents, inadequacies, ineptness, infractions, misconduct, performance management, policies, procedures, protocols; including but not limited to: Opportunity for Improvement (OFI), disciplinary actions including but not limited to progressive disciplinary steps-verbal, first (1st), second (2nd), Final (P) and termination steps either concert, combination or independently to the aforementioned persons.

   b. In addition, any emails regarding investigation of any work place infractions by any of the aforementioned persons or other persons involved in said investigations relative to any portion of the investigation frocause analysis to the final disposition to the corrective and preventive actions, as well as, emails from Madison or on the behalf of Madison to any of the aforementioned

persons or entities either concert, combination or independently to the aforementioned persons.

c.  Any request for leave of absences of any kind, any correspondence by any agent on behalf of Madison, and/or any complainants or suggestions, implicitly or explicitly, to the various instances of subjugation of disparate and disparaging treatment and impact towards Madison made in either concert, combination or independently to the aforementioned persons.

d.  In addition, any emails, mailings, written correspondence of any kind, facsimiles, logs, quality management systems required documentation, incident reports, corrective and preventative action reports, root cause analysis, OSHA and safety log, Quality Engineer or Coordinator monthly report and the like regarding investigation of any work place infractions by any of the aforementioned persons or other persons involved in said investigations relative to any portion of the investigation from the root cause analysis to the final disposition to the corrective and preventive actions, as well as, emails from Madison or on the behalf of Madison to any of the aforementioned persons or entities.

e.  In addition, any emails, mailings, written correspondence of any kind, facsimiles, logs, quality management systems required documentation, incident reports, corrective and preventative action reports, root cause analysis, OSHA and safety log, Quality Coordinator monthly report and the like regarding drug and diabetic testing relating to Madison or issued by Madison.

**RESPONSE: Defendant objects to this request because it is overly broad, vague and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of the litigation.**

109.    Information forwarded to regulatory agencies regarding Madison complaints

IDHR

1.  Position Statements

2.  Verified Response

3.  Exhibits

4.  All other correspondence regarding complaints including but not limited to eeo report, disciplinary comparables, and the like

5.  Emails

EEOC

1.  Position Statements

2.  Verified Response

3.  Exhibits

    4.      All other correspondence regarding complaints including but not limited to eeo report, disciplinary comparables, and the like

    5.      Emails

**RESPONSE: See Kenco 000079-001724, EEOC and IDHR FOIA response documents.**

110.    Names, addresses, and pertinent information of witnesses relevant to defendant. All documents containing or referencing the profit and loss of Defendant, as well as, the name of Defendant's insurance carrier(s) for Defendant's general liability insurance, umbrella and its directors and officers liability policies.

**RESPONSE: Defendant objects to this request because it does not seek documents as required by Fed. R. Civ. Pro. 34.**

111.    Any proffering's to any agency or person relating to the allegations waged by Madison against Kenco-Mars.

**RESPONSE: Defendant objects to this Request because it is vague and ambiguous.**

112.    Comparable disciplinary measures and actions instituted on non-African Americans or those who did not oppose such disparate and disparaging treatment and impact upon Madison and others.

**RESPONSE: Defendant objects to this Request because it is vague, overly broad and seeks information that is not relevant to any party's claims or defenses and not proportional to the needs of this litigation.**

113.    The specific policy that was used as a weighted measure or metric to rank competencies, offenses, infractions, and violations of company policy against one another, as well as, the policy that also determined the use of the performance improvement plan for Madison.

**RESPONSE: Defendant objects to this Request because it is vague and ambiguous.**

114.    All documents that support that Defendant did not obstruct the administration of justice when Defendant's outside legal counsel made blatant mistruths and misleading statements to the IDHR and EEOC with regard to Edith McCurry.

**RESPONSE: Defendant objects to this Request because it is argumentative seeks information that is not relevant to any party's claims or defenses.**

115.    All documents that support that Defendant did not obstruct the administration of justice when Defendant's outside legal counsel made blatant mistruths and misleading statements to the IDHR and EEOC with regard to alleged performance issues of Madison, including, but not limited to Madison's Project Plan and Business Continuity Plan.

**RESPONSE: Defendant objects to this Request because it is argumentative and seeks information that is not relevant to any party's claims or defenses.**

116.    All documents that support that Defendant did not conspire against to commit fraud the administration of justice when Defendant's outside legal counsel made blatant mistruths and misleading statements to the IDHR and EEOC with regard to Edith McCurry.

**RESPONSE: Defendant objects to this Request because it is argumentative and seeks information that is not relevant to any party's claims or defenses.**

117.    All Documents that support that Defendant did not conspire to commit fraud against the administration of justice when Defendant's outside legal counsel made blatant mistruths and misleading statements to the IDHR and EEOC with regard to alleged performance issues of Madison, including but not limited to Madison's Project Plan and Business Continuity Plain that were not cited or contained in Madison's PIP.

**RESPONSE: Defendant objects to this Request because it is argumentative.**

118.    All documents that support that Defendant did not perjure itself when Defendant's outside legal counsel made blatant mistruths and misleading statements to the IDHR and EEOC with regard to Edith McCurry.

**RESPONSE: Defendant objects to this Request because it is argumentative.**

119.    All documents that support that Defendant did not perjure its self when Defendant's outside legal counsel made blatant mistruths and misleading statements to the IDHR and EEOC with regard to the alleged performance issues of Madison, including, but not limited to Madison's Project Plan and Business Continuity Plan that were not cited or contained in Madison's PIP.

**RESPONSE: Defendant objects to this Request because it is argumentative.**

120.    All documents that support that Defendant did not conspire to obstruct the administration of justice when Defendant's Tammi Fowler appeared as a witness postulating herself as viable material witness, with firsthand knowledge, to the IDIIR and EEOC during the exhaustive Administrative process.

**RESPONSE: Defendant objects to this Request because it is argumentative.**

121.    All documents that support that Defendant did not attempt to commit fraud upon the court when Defendant's outside legal counsel intentionally and willfully made blatant mistruths and misleading statements made to the IDHR and EEOC under oath.

**RESPONSE: Defendant objects to this Request because it is argumentative.**

122.    All documents that support that Defendant did not attempt to commit fraud upon the court when Defendant's outside legal counsel intentionally and willfully materially altered statements from Edith McCurry as it relates to reporting of disparate and disparaging treatment and impact from Madison to McCurry.

**RESPONSE: Defendant objects to this Request because it is argumentative.**

123. All documents that support that Defendant did not attempt to commit fraud upon the court when Defendant's outside legal counsel intentionally and willfully intentionally omitted Edith McCurry as material witness for Defendant relating to reporting of disparate and disparaging treatment and impact from Madison to McCurry.

**RESPONSE: Defendant objects to this Request because it is argumentative.**

124. All documents that support that Defendant did not attempt to commit fraud upon the court when Defendant's outside legal counsel intentionally and willfully intentionally mischaracterized Edith McCurry as a mere clerk that was unable to receive any reports of disparate and disparaging treatment and impact on Defendants behalf from Madison.

**RESPONSE: Defendant objects to this Request because it is argumentative.**

125. All documents that support that Defendant did not tamper or destroy with evidence in the obstruction of the administration of justice when Defendant supplied fraudulent documents to the IDHR and EEOC during the exhaustive Administrative process.

**RESPONSE: Defendant objects to this Request because it is argumentative.**

126. All documents that support that Defendant did not violate the protected rights of Plaintiff.

**RESPONSE: Defendant objects to this Request because it is argumentative.**

127. postulated Defendant's in house attorney to be viable material witness to the IDHR and EEOC during the exhaustive Administrative process.

**RESPONSE: Defendant objects to this Request because it is vague, incomprehensible and argumentative.**

128. All documents and communications gathered and sent by Karen Smith on behalf of Defendant, as it relates to Plaintiffs allegations.

**RESPONSE: Defendant objects to this Request on the grounds that it seeks documents protected by the attorney-client privilege or work product doctrine.**

129. All documents you or your agents have submitted to any federal, state or local government agency relating to any of the allegations in the Complaint.

**RESPONSE: See Kenco 000079-001724, EEOC and IDHR FOIA response documents.**

130. All documents you contend constitute or contain admissions against interest by Defendant.

**RESPONSE: None.**

## CERTIFICATE OF SERVICE

I, Julia P. Argentieri, the undersigned certifies that on April 6, 2017, I caused

to be served true and correct copy of the foregoing **RESPONSE TO PLAINTIFF'S**

**FIRST REQUEST FOR PRODUCTION OF DOCUMENTS** by causing a copy to

be placed in the U.S. Mail, first-class postage prepaid, addressed as follows:

Mary Madison
9758 South Charles
Chicago, Illinois 60643

By: _____

One of the Attorneys for Defendant

131.    All documents you contend constitute or contain admissions against interest by Plaintiff.

**RESPONSE: None.**

132.    All pages of any social media site (e.g., Facebook, MySpace, Linkedin, a blog, etc.) to which you have subscribed and/or maintained from May, 2013 to the present and in which you discuss anything related to Plaintiffs employment with Defendant, or Plaintiff's claims against Defendant or Defendant's Defense against Plaintiff s allegations against Defendant.

**RESPONSE: None.**

133.    All documents relating to any communications, including electronic, internet or online communication, posting, response to posting, update, response to update, comment, response to comment, e-mail, instant message, text message, voice mail message, twitter message or tweet, between you and any person, including but not limited to your friends, family, neighbors, current or former co-workers, colleagues, acquaintances, and strangers, that relate to Defendant, your employment with Defendant, or your claims against Defendant.

**RESPONSE: Defendant objects to this request because it is overly broad and not proportional to the needs of the litigation.**

134.    All other documents (not otherwise produced) identified in, or to be identified in, Plaintiffs disclosures to Defendant under Rule 26(a)(1) of the Federal Rules of Civil Procedure.

**RESPONSE: See all documents produced by Kenco.**

Dated: April 6, 2017

Respectfully submitted,
KENCO LOGISTIC SERVICES, LLC

By: _____
One of its Attorneys

Jody Wilner Moran
Julia Pearce Argentieri
Jackson Lewis P.C.
150 North Michigan Ave., Suite 2500
Chicago, Illinois  60601
Telephone: (312) 787-4949
moranj@jacksonlewis.com
julia.argentieri@jacksonlewis.com

### IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| MARY MADISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15-cv-2290-CSB-EIL |
| v. | ) | |
| | ) | |
| KENCO LOGISTIC SERVICES, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT KELVIN WALSH'S ANSWERS AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant Kevin Walsh ("Walsh"), by his attorneys, Jackson Lewis P.C., for his answers to Plaintiff's First Set of Interrogatories, states as follows:

### GENERAL ANSWERS AND OBJECTIONS

Walsh incorporates the following answers and objections into each and every Interrogatory answer set forth below:

1.    In answering the following Interrogatories, Walsh will ascribe to terms the normal definitions given them under the normal rules of English vocabulary, usage, grammar, and syntax.

2.    Walsh objects to Plaintiff's Interrogatories to the extent they purport to impose obligations on Walsh that are broader than required by the Federal Rules of Civil Procedure.

3.    Walsh objects to Plaintiff's Interrogatories to the extent they are overly broad, unduly burdensome, and not proportional to Plaintiff's claims.

4.     Walsh objects to each Interrogatory to the extent it purports to require it to disclose information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, or to the extent it unreasonably invades the privacy of non-parties to this action.

5.     Where, in response to a particular Interrogatory, Walsh identifies specific documents that are responsive, Walsh does not thereby represent or warrant that other documents may not also be responsive to the Interrogatory.

6.     Walsh's investigation of this matter is ongoing. Walsh therefore reserves the right to supplement its responses to each and every interrogatory (or part of an interrogatory).

## INTERROGATORIES

1.     For all entities involved and herein defined, identify by name, address, position, title, and responsibility the person answering the below interrogatories and what part each person contributed to the answer.

**RESPONSE:** Defendant objects to Interrogatory No. 1 to the extent that it seeks information that is privileged and because it is vague and ambiguous as to "for all entities involved and herein defined." Without waiving objections, answers were prepared by Counsel for Defendant with assistance from Kelvin Walsh, Kenco's former General Manager and were reviewed/verified by Walsh.

2.     Describe in detail your highest level of education completed to date of May 2013 to August of 2013; in addition to: any requisite knowledge relative to quality management and its systems, ISO 9001, Six Sigma, and FDA regulations, as well as, when, where and how you obtained the knowledge the certifying body, along with the specific application of such knowledge.

**RESPONSE:** Defendant objects to Interrogatory No. 2 because it is overly broad, vague and ambiguous. Without waiving objections, Walsh has a high school diploma as well as some college coursework completed. Walsh also worked as a General Manager for Tyson Foods prior to being hired by Kenco and, in that role, gained knowledge of quality management.

3.    Since you stated that Plaintiff was too valuable to loose [sic]; describe in detail when, how and what steps, measures or actions were taken to ensure Plaintiff was successful and remained an employee. This could include, but not be limited to outlining and or providing goals (SMART goals), objectives, expectations, providing resources, resource material, counseling, mentoring, plans of actions and the like.

**RESPONSE:** Defendant objects to Interrogatory No. 3 because it is overly broad, vague and argumentative. Without waiving objections, Kenco provided Plaintiff with a job description which included objectives at the time of her hiring, and later provided Madison with a Performance Improvement Plan (PIP) to outline specific performance problems and provide guidance for how to improve. Kenco also hired an outside consultant, Tracie Clifford, to provide additional quality engineering support and resources to Madison.

4.    Describe in detail how Plaintiff's Project and Business Continuity Plan were deficient according to Defendants standards, as well as, industry standards of project management relative to the Project Plan and the Department of Homeland Security and FEMA relative to the Business Continuity Plan.

**RESPONSE:** Defendant objects to Interrogatory No. 4 because it is overly broad, vague and ambiguous. Without waiving objections, Walsh does not recall the specific details of Madison's Business Continuity Plan and the reasons it was unsatisfactory, but refers Madison to those documents themselves which have been produced by Kenco. See Kenco 1737-1837 for Kenco documents related to Madison's Business Continuity Plan.

5.    Describe in detail why you referred to Plaintiff, as a "crazy black bitch" to the HR Manager Leonard Szplett, after you terminated Plaintiff.

**RESPONSE:** Walsh never made the statement alleged in Interrogatory No. 5.

      6.     Describe in detail why it took weeks even months, to review the work Plaintiff submitted to Defendant, if it was reviewed at all.

**RESPONSE:** Defendant objects to Interrogatory No. 6 because it is overly broad, vague, and argumentative. Without waiving objections, Walsh does not recall when each assignment was submitted by Madison to Walsh, and when it was reviewed, but states that her work was reviewed and discussed with her throughout her employment. Madison received feedback throughout her employment, including in a Performance Improvement Plan, as well as regular email and verbal communications. See documents produced by Kenco, including but not limited to Kenco 1734-1864 for email communications related to Madison's work performance.

      7.     It was stated that Plaintiff often referred to lengthy governmental regulations, specifically cite, state and describe in detail the regulations that Plaintiff should have cited instead of the lengthy governmental regulations and the authority to which these alternative regulations are correlated too and their ability to bring compliance to company and federal mandates.

**RESPONSE:**   Defendant objects to Interrogatory No. 7 because it is vague, and incomprehensible.

      8.     Describe in detail: why you refused a meeting with Plaintiff because of allegedly having meetings with Mars all day long and turned around and accepted the same meeting request with a non-black just minutes later, as well as, why most times you would cancel scheduled and mandatory meetings with Plaintiff.

**RESPONSE:** Defendant objects to Interrogatory No. 8 because it is argumentative, vague, and incomprehensible.

9.    Describe in detail and state why you did not give Plaintiff an action plan to remediate Plaintiff's PIP, as well as, Plaintiff not being given feedback or at least one follow up meeting to the PIP.

**RESPONSE:** Defendant objects to Interrogatory No. 9 because it is argumentative, vague, and seeks information that is not relevant to any party's claims or defenses or proportional to the needs of the litigation. Without waiving objections, Walsh refers Madison to Kenco 24-40, her Performance Improvement Plan, which identifies the plan of action for her recommended improvement.

10.    Describe in detail and state why you instructed Plaintiff to provide additional remediation material for ServiceMaster and not provide Plaintiff with any resources and materials to remedy Plaintiff's alleged deficiencies that had never been mentioned prior to the PIP.

**RESPONSE:** Defendant objects to Interrogatory No. 10 because it is overly broad, argumentative, incomprehensible and vague. Without waiving objections, Walsh worked with Madison to identify and appropriately resolve issues related to ServiceMaster, in addition to other deficiencies noted in Madison's Performance Improvement Plan. See Kenco 24-40 for a copy of Madison's Performance Improvement Plan.

11.    Describe in detail and state why you chastised, berated, bullied and intimidated Plaintiff in public in a room of non-black and males, with regard to Plaintiff's requiring the outside vendor to comply with company and public policy as it relates to safety.

**RESPONSE:** Defendant objects to Interrogatory No. 11 because it is overly broad, argumentative, incomprehensible and vague. Without waiving objections, Walsh did not chastise, berate, bully or intimidate Madison.

12.    Describe in detail and state why you felt that Service Masters "pencil whipping"

essentially forging legal documents was acceptable and not a violation of company and public policy.

**RESPONSE:** Defendant objects to Interrogatory No. 12 because it is overly broad, vague, argumentative, and incomprehensible.

13.     Describe in detail and state specifically how was it that you came to admit that you had been in possession of the information that Plaintiff had sought to perform essential functions of Plaintiff's job since 2012.

**RESPONSE:**  Defendant objects to Interrogatory No. 13 because it is overly broad, vague, argumentative, and incomprehensible.

14.     Describe in detail and specifically state why you intentionally, willfully, maliciously and deliberately withheld information from Plaintiff that Plaintiff requested since Plaintiff's first day of work and intentionally interfered with Plaintiff's business relationships with Kenco and Mars.

**RESPONSE:**  Defendant objects to Interrogatory No. 14 because it is overly broad, vague, argumentative, and incomprehensible. Without waiving objections, Walsh never maliciously withheld information from Madison.

15.     Describe in detail your actions and reasoning for not placing Service Master on a ten (10) day remediation plan, as your boss, Paula Hise VP of Operations had instructed to be done and instead placing Plaintiff on a PIP.

**RESPONSE:** Defendant objects to Interrogatory No. 15 because it is overly broad, vague, argumentative, and incomprehensible. Without waiving objections, Walsh took appropriate steps, which were supported by Hise and Kenco, to identify and remedy any Service Master issues.

16.    Describe in detail why it was not a function of Plaintiff's job function to oversee

the cleanliness and sanitation of the facility, as well as, bring compliance in those and other areas

of workplace and public safety hazards and violations.

**RESPONSE:** Defendant objects to Interrogatory No. 16 because it is vague, argumentative, and incomprehensible. Without waiving objections, overseeing compliance and sanitation of the Kenco facility was part of Madison's job functions. See Madison's job description bates labeled Kenco 1731-33.

17.    Describe in specifics and detail the alternative ideas and/or ways of doing

things, that were never mentioned in detail, that you stated in Plaintiff's PIP that Plaintiff

should have been receptive too and how these alternative ideas and/or ways of doing

things complied with the various regulatory requirements, as well as, company and public

policy; in addition to, what authority and/or standard were these alternative ideas and/or

ways of doing things based upon, as well as, why they were better suited for the tasks at

hand.

**RESPONSE:** Defendant objects to Interrogatory No. 17 because it is overly broad, vague, argumentative, and incomprehensible. Without waiving objections, see Madison's PIP, bates labeled Kenco 24-40 for feedback provided to Madison.

18.    Describe in detail and specifically state why Defendant, Walsh, despite ongoing

employee complaints, thought that it was lawful and sanitary to spread human feces over

the warehouse, or allow cross-contamination in the warehouse, exposing employees to

various bacterial, viral and parasitic infections, including but not limited to: dysentery,

E.coli, Salmonella, Shingella, Rotavirus, norovirus, or Hepatitis.

**RESPONSE:** Defendant objects to Interrogatory No. 18 because it is overly broad, vague, argumentative, and not relevant to the claims and defenses in this lawsuit. Without

waiving objections, Walsh did not think that it was lawful and sanitary to spread human feces over the warehouse, or allow cross-contamination in the warehouse, exposing employees to various bacterial, viral and parasitic infections, including but not limited to: dysentery, E.coli, Salmonella, Shingella, Rotavirus, norovirus, or Hepatitis.

Dated: April 13, 2017

KELVIN WALSH

By: _____

One of His Attorneys

Jody Wilner Moran
Julia P. Argentieri
Jackson Lewis P.C.
150 N. Michigan Avenue, Suite 2500
Chicago, Illinois 60601
Phone: (312) 787-4949
Fax: (312) 787-4995
moranj@jacksonlewis.com
julia.argentieri@jacksonlewis.com

<u>**CERTIFICATE OF SERVICE**</u>

I, Julia P. Argentieri, the undersigned certifies that on April 13, 2017, I caused to

be served true and correct copy of the foregoing <u>**ANSWERS AND OBJECTIONS TO**</u>

<u>**PLAINTIFF'S FIRST SET OF INTERROGATORIES TO BE PROPOUNDED**</u>

<u>**UPON DEFENDANT WALSH**</u> by causing a copy to be placed in the U.S. Mail, first-

class postage prepaid, addressed as follows:

Mary Madison<br>
9758 South Charles<br>
Chicago, Illinois 60643

Julia P. Argentieri

# EXHIBIT E

# RELIABILITY: THE OTHER DIMENSION OF QUALITY

## W. J. Youden Memorial Address

*by William Q. Meeker*
*Department of Statistics*
*Iowa State University*



*William Q. Meeker*

**W. J. Youden.** It is a pleasure to be here today to give this address in remembrance of the life and the work of W.J. Youden. I was in my third year of college and in my first statistics course in the spring of 1971, when Jack Youden passed away. It was two years later, in a course on experimental design, where I first heard Youden's name. There, I learned about latin square designs and then about Youden square designs. Youden square designs is a term that was coined by R.A. Fisher to describe the results of Youden's novel ideas in the area of designing experiments with balanced incomplete blocks. Jack Youden is probably best known for this and his other work in experimental design. What is less well known is that this early work, like much of Fisher's work, was motivated by experimental work in the agricultural sciences. Jack Youden spent the early years of his career at Boyce Thompson Institute for Plant research in Yonkers, NY. Youden published his balanced incomplete block methods in a 1937 paper with the title "Use of incomplete block replications in estimating tobacco mosaic virus." Part of the message in my presentation today, which is elsewhere supported by similar historical evidence, is that most statistical research with impact and lasting value had its roots in the applied sciences, including engineering.

During his years at the National Bureau of Standards (now the National Institute of Standards and Technology) Jack Youden had a profound effect on the development of statistical methods. Among many other things, he developed and popularized statistical methods for conducting interlaboratory studies. These methods continue to be in wide use around the world. The American Statistical Association has an annual reward, in honor of Jack Youden, in the area of interlaboratory testing.

**Background.** A substantial amount of the practical experiences that I have had during my career has been in the area of Reliability. I have had the good fortune to have worked with a large number of outstanding industrial statisticians as well as other scientists and engineers.

During the three summers when I was a graduate student, I had an internship at General Electric Corporate Research and Development Center (Now General Electric Global Research Center), working on projects under the supervision of Gerry Hahn and Wayne Nelson. I have continued to benefit over the years from collaboration and interaction with Gerry, Wayne, Necip Doganaksoy, Roger Hoerl, and others at GE. From 1978 to 1992, I spent the better part of each summer working for the quality/reliability organization (the actual name of the department changed a number of times over this period of time) at Bell Laboratories, learning first hand about statistics, quality and reliability from such experts as Blan Godfrey, Jeff Hooper, Ramón León, Mike Tortorella, Vijay Nair, Michele Boulanger, Mike LuValle and various other scientists and engineers too numerous to mention here. My presentation today, based on these and other experiences, will describe the relationship between quality engineering, reliability engineering, and statistics. There will be some links to the life and work of Jack Youden.

**Reliability.** Today's manufacturers face intense global competition, pressure for shorter product-cycle times, stringent cost constraints, and higher customer expectations for quality and reliability. This combination raises some formidable engineering, managerial, and statistical challenges.

The usual textbook definition of reliability reads something like "the probability that a unit will survive until a given point in time under specified use conditions." A more appropriate definition is "the probability that a unit will survive until a specified point in time under encountered use conditions." The point is that the environment in which a product operates is a critical factor in evaluating a product's reliability.

Condra (2001) states "Reliability is product performance over time." This implies that good quality is necessary but not sufficient! One major difficulty and major contrast between quality and reliability is that reliability can be assessed directly only after a product has been in the field for some time; accurate reliability

*Continued on page 5*

# W.J. YOUDEN MEMORIAL ADDRESS

*Continued from page 4*

prediction presents a number of technical challenges.

Reliability is an engineering discipline. Statistical methods are, however, important tools for reliability engineering. Historically, most statistical effort has been on the development of methods for assessing reliability. Much engineering effort is (correctly) focused on reliability improvement. Only recently have statisticians begun to have an impact on improving reliability.

**Engineering functions that affect reliability.** In product design, engineers have the following responsibilities (among others):

- Define product requirements
- Design the product
- Verify product design
- Improve the design to assure product robustness.

Then there is a parallel set of steps for manufacturing process design. The ideas presented here will generally apply to both product engineering and process design. After manufacturing begins, there are generally on-going efforts to

- Improve quality and reliability through design changes
- Reduce costs through design changes
- Maintain quality in production (e.g., through process monitoring).

Collectively, these efforts might be called "continuous improvement."

**Robustness.** Robustness is an important, widely known (at least among statisticians working in the area of quality), but still under used, concept in quality and reliability. Robustness can be defined as the ability (for a product or a process) to perform its intended function under a variety of operating and environmental conditions (including long-term wear or other degradation). Operationally, the challenge is to design a product or process such that it will be robust to the expected environmental "noises" that a product/process will encounter in its manufacture or operation and to do this in a manner that is economically efficient.

The operational/technical ideas behind robustness derive from the important engineering ideas that were brought to us by Genichi Taguchi. Taguchi suggested a strategy, based on ideas of statistically designed experiments that can be used to improve product or process design by reducing the transmission of variability. The important concepts have been refined and explained by individuals and in places too numerous to mention here, but include the book-length treatments by Phadke (1989), Grove and Davis (1992), Wu and Hamada (2000), and Condra (2001).

Engineering design can be viewed as a complicated

optimization problem (although I am not sure how useful it is to do so, given our inability to quantify all of the inputs and especially intangible costs). Given this view, I have often wondered, in conversation with statisticians who work in industry, whether the tools of robustness would be useful for a product or process design that already had been very well engineered (and thus was already very close to optimum). I have been assured, almost uniformly, that few, if any, such designs exist, although clearly this must be product and industry specific.

**Quality and reliability.** Figures 1 through 4 illustrate one view of the relationship between quality and reliability. Suppose that the distributions represent some arbitrary product characteristic (e.g., the resistance of a resistor), which will cause degradation of customer-perceived performance (e.g., decreased signal-to-noise ratio) if the characteristic is near or outside either of the specification limits. Figure 1 reflects barely acceptable 3-sigma quality.



**Figure 1. Three-sigma quality**

Although the customers whose product is near the center of the distribution may be happy with their product's performance, those closer to the specification limits are less than fully pleased. Over time, as illustrated in Figure 2, there will be drift caused by wear, chemical change, or other degradation, moving more and more customers toward or outside of the specification limits--- causing serious reliability problems.

*Continued on page 6*

# W.J. YOUDEN MEMORIAL ADDRESS

*Continued from page 5*



**Figure 2. Drifting three-sigma quality**



**Figure 4. Drifting six-sigma quality**

Figure 3 contrasts good quality and poor quality.



**Figure 3. Good and bad quality**

As illustrated in Figure 4, with good quality, even with expected drift over time, customers will, generally, continue to have good performance---quality over time or high reliability.

As with quality, we see that variability is the enemy of reliability. Examples of important sources of variability are manufacturing (including raw materials), environmental conditions (e.g., stresses), and customer use rates. Reduction of input variability and reduction in the transferal of input variability to customer perceivable variability are important goals for engineering design.

**Reliability demonstration versus reliability assurance.** Managers, for example, need information about reliability before making product-release decisions. Potential customers need information reliability before deciding to purchase a product.

Traditional reliability demonstration is essentially a statistical hypothesis test. It answers the question "do the data provide enough evidence to reject the null hypothesis that reliability is less than the target." For example, using minimal assumptions (including a go no-go assessment), to demonstrate that reliability at time $t_0$ hours is 0.99, with 90% confidence, requires testing at least 230 units for $t_0$ hours with zero failures. To have just an 80% chance of passing the test requires that the true reliability be approximately .999! The required sample size can be reduced, to some degree, by making certain assumptions (e.g., about the form of the failure-time distribution).

It might be feasible to run such large tests for a material or a low-level component. For a complicated, expensive systems or subsystem, however, such traditional reliability demonstration tests are not practicable. Reliability assurance is the alternative.

*Continued on page 7*

# W.J. YOUDEN MEMORIAL ADDRESS

*Continued from page 6*

Reliability assurance is a procedure based on reliability modeling and combining information from various sources. Inputs to a reliability assurance procedure for a system would generally include knowledge of
- System structure (how components fit together and interrelate).
- Possible failure modes and their effect on system operation.
- Reliability of individual components and interfaces (including software).
- Knowledge of how the product will be used as well as the environment or environments in which the product will be used.
- Benchmark design information from similar, competing products.

**Structured programs for design for reliability.** The concept of reliability demonstration is not new. In 1990, a team at ATT Bell Laboratories published a handbook, ATT (1990), describing a suggested procedure for "Reliability by Design." More recently, Design for Six Sigma (or DFSS as implemented at GE) has the DMADV steps: Define, Measure, Analyze, Design, Verify. There are, of course, other similar company-specific reliability improvement programs that mandate the use of upfront analysis to provide a degree of assurance that a company's product will have the needed level of reliability. Simple web searches for "Design for Reliability" and "Reliability by Design" turned up hundreds of hits. Design for Reliability generally implies the use of up-front analysis and testing (as needed) in product and process design to eliminate problems before they occur. This is in contrast to the traditional Build, Test, Fix, Test, Fix... approach that is implied by the "reliability growth modeling" approach to reliability management.

**Failure modes and reliability prediction.** Design for Reliability requires careful consideration of product (process) failure modes. Broadly, failure modes can be classified as those that are anticipated and those that are unanticipated. Generally a reliability model will reflect only the anticipated failure modes and it is the anticipated failure modes that engineers focus on (although it can be argued that design for product robustness will help to prevent even unanticipated failure modes). Usually it is the unanticipated failure modes that cause the most serious reliability problems. It is for this reason that an important component of any reliability by design program should have as one of its goals to discover and eliminate potentially important failure modes as early as possible. Tools for identifying failure modes include engineering knowledge and previous experience, failure modes and effects analysis (FMEA) in up-front design, highly accelerated life testing (known as "HALT" tests wherein

prototype subassembly units or systems are subjected to higher than usual operating/environmental conditions in order to shake-out design weaknesses), and early feedback from the field. Some products undergo "beta testing," where early-production units of a product are released for use, preferably in a high-use, customer-friendly environment (e.g., testing washing machines in a laundromat).

Generally, the longer that it takes to identify a failure mode, the more expensive it is to fix it. This implies that it is poor practice to rely on data from the field to discover potential failure modes and that considerable effort in this direction is needed early in the design process.

In many applications, engineers try to use a predictive model that will provide at least a rough idea of a product's reliability in the field. Although widely practiced, the development and use of reliability models is controversial. To some degree this is because of numerous examples where such models were developed and trusted for making important decisions, but then were, in the end, proved to be seriously inaccurate. A more constructive view of these failures is that they are important parts of the learning process for an important task.

**Inputs to reliability models.** As described above, the inputs for a reliability model include
- An identification of failure modes
- A system structure model in which there is a "component" corresponding to each possible failure mode and providing a description on the effect that component failure has on system failure
- A probability or statistical model providing information about the reliability of the individual components, as a function of the use environment.

In many applications the use environment will be dynamic, changing over time. For example, jet engines experience different amounts of high, medium, and low levels of stress and the effect of such "spectra" of stresses needs to be part of the reliability model.

Determining the needed inputs under stringent time and economic constraints is always a challenge. Typical sources of information (roughly in order of cost) are
- Engineering knowledge (e.g., values that can be found in handbooks).
- Previous experience
- Analysis based physical/chemical models that relate to failure (e.g. chemical kinetic models of degradation or finite element models to describe the effect of stress distributions on failure)
- Physical experimentation and accelerated testing.

*Continued on page 8*

# W.J. YOUDEN MEMORIAL ADDRESS

*Continued from page 7*

When none of the usual sources of information provide the needed information to the desired degree of accuracy, engineers will typically build in conservative "factors of safety."

A major challenge in the use of information from a combination of sources is in the development of methods to quantify uncertainty. One promising approach to this problem is the use of "responsible Bayesian methods." I define "responsible Bayesian methods" to mean the use of Bayes methods in which only prior information with a firm basis is included in the analysis. An example of such a procedure is the Los Alamos National Laboratory PREDICT process. For more information, see www.stat.lanl.gov/projects/predict.shtml.

### Distinguishing features of reliability models.

For reliability data analysis, the standard statistical models used in basic statistics courses need to be extended in various directions.

- The normal distribution is rarely used as a model for failure times (instead we use distributions for positive responses such as the lognormal and Weibull distributions)
- Simple moments estimators (mean and variance) and ordinary least squares rarely provide appropriate methods of analysis (instead simple graphical methods combined with maximum likelihood estimation for fitting parametric models are used)
- Model parameters and regression coefficients are not of primary interest (instead, failure rates, quantiles, probabilities are needed)
- Extrapolation often required (e.g., have one year of data, but want proportion failing after three years or have data at high temperatures and need to estimate a failure-time distribution at low temperature).

### Reliability data.

Traditionally, most reliability data was failure time data, reporting the failure times for units that failed and the running times for the unfailed (censored) units. In many reliability studies of high reliability products, few or no failures are observed. In some applications it is possible to track degradation over time, providing useful information about reliability even if there are no failures. Meeker and Escobar (1998) illustrate and describe methods for analyzing both kinds of data. In other applications a sequence of recurrent events are observed on a sample of units (e.g., system repair or maintenance actions). Special "recurrence data analysis" methods have been developed for such data (see Nelson 2003).

### Use of physical/chemical models in reliability engineering.
As mentioned above, extrapolation is often required in reliability engineering/statistical analyses.

Extrapolation is always risky and the basis for extrapolation is generally large amounts of past experience or, preferably, the use of physical/chemical models that describe the physical failure mode mechanisms. Some failure models have been studied extensively over the past decades (for example fatigue in mechanical systems and many mechanisms that cause failures in microelectronics applications). Although the development of such models is challenging, expensive, and time consuming, once the models are available, they will often provide long-term benefits.

### Warranty and reliability.
Warranties are more related to marketing than reliability! In many industries (e.g., the automobile industry), warranty costs, relating to poor quality and reliability, are substantial. Warranty databases exist primarily for required financial reporting. More and more companies are beginning to recognize, however, that warranty data can be useful for:

- Feedback for the design of the next product generation
- Early warning of unanticipated field problems
- Establishing a connection with laboratory testing and environmental characterization.

Warranty data are messy and present serious challenges for proper interpretation and analysis. Warranty data directly reflect one important component of what is seen on a company's bottom line (another important component, which is more difficult to measure, is customers and goodwill lost when a product has a reliability problem).

### The role of the statistician on a reliability team.
Statisticians play an important role on a reliability team. For example, they

- Contribute to the understanding and modeling of variation
- Help fill in the gaps in engineering knowledge by designing experiments and interpreting results
- Help develop systems to ensure that the most meaningful information is obtained to assess reliability and proactively identify problems or potential problems.
- Use appropriate statistical methods to make the most effective use of field and warranty data
- Develop appropriate methods for combining information from different sources
- Develop methods for quantifying uncertainty (statistical and model)
- Develop methods (especially graphical methods) for the effective presentation of results.
- Work with other scientists and engineers in the development of appropriate deterministic or stochastic models for physical/chemical failure modes.

*Continued on page 9*

# W.J. YOUDEN MEMORIAL ADDRESS
*Continued from page 8*

**A current example: service life prediction for organic paints and coatings.** I thought that it would be useful to describe a current project where an interdisciplinary team is using a modern approach to tackle a difficult problem in reliability. The project is being conducted at the National Institute of Standards and Technology (NIST). I have been serving as an advisor to the project.

The standard method for testing paints and coatings for effects of outdoor exposure is to send specimens to outdoor testing facilities (notably in south Florida and Arizona, for sunny humid and sunny dry conditions, respectively) and to have them exposed for periods ranging from months to years. Outdoor tests are expensive and take too much time. Manufacturers of paints and coating have been trying for decades, with little success, to develop useful accelerated testing methods that allow the rapid screening and assessment of the service life of potential new products. The tests that have been run have tried to mimic outdoor environments by "speeding up the clock" (using increased temperature, increased UV intensity and cycling more rapidly than the usual diurnal cycle). These tests are not reliable and often lead to conclusions that differ from those derived from the data that are returned from the outdoor testing laboratories! Speed-up-the-clock tests do not follow the basic principles of experimental design and thus provide little or no information about the fundamental mechanism leading to degradation and failure.

Jon Martin with the Materials and Construction Research Division, Building and Fire Research Laboratory at NIST is the project leader. Jon is leading a NIST consortium with a number of industrial partners and his NIST scientific staff (which includes chemists, materials scientists, physicists, and engineers). More details about the project can be found at http://slp.nist.gov/coatings/cslpmain.html.

The approach is to use careful experimentation and physical/chemical theory to understand the degradation mechanisms that lead to failure of paints and coatings, starting out with focus on a particular important industrial application. The laboratory experimental setup is based on the NIST SPHERE (Simulated Photodegradation by High Energy Radiant Exposure) technology. This technology, developed by NIST scientists, uses a large integrating sphere to provide a controlled source of UV radiation. There are 32 separate chambers attached to the sphere and within each chamber it is possible to independently control UV intensity, the UV spectrum, temperature, and humidity. Carefully designed experiments will be used to check and refine various mechanistic models for material degradation.

As part of the model development/verification process, outdoor experiments are being conducted at sites in several different climates. At each site specimens are being exposed to actual outdoor conditions with monitoring of UV radiation intensity and spectrum, temperature, and humidity, and the resulting degradation (various physical and chemical measurements are being made for the specimens tested in both the indoor and outdoor exposure tests). Environmental realizations (time series of the environmental variables over time), when used to drive the physical/chemical model, should produce results similar to that seen in outdoor exposure.

Once physical/chemical model degradations are available for a product, it will be relatively inexpensive to obtain information needed to compare different proposed formulations and learn about the effect that different environments will have on reliability.

**Trends in the use of statistics in reliability.** The way in which statistical methods are used in reliability has been changing and will continue to do so. Some changes that we can expect to see in the future that will affect the use of statistics in the area of engineering reliability are

- More up-front problem definition and ensuring the most meaningful data are obtained during product/process design.
- More use of degradation data and models including stochastic models
- Increased use of statistical methods for producing robust product and process designs
- More use of computer models to reduce reliance on expensive physical experimentation
- Better understanding of the product environment (e.g., through the use of products outfitted with "smart chips")
- The availability (through remote monitoring using sensors and modern digital communications) of real-time information on the operational and environmental state of operating systems.
- More efforts to combine data from different sources and other information through the use of "responsible Bayes" methods for combining information from different sources.

**Academic involvement in manufacturing reliability problems.** Manufacturing industries have interesting, challenging, technical problems in reliability. There should be more academic involvement in these projects. It would be beneficial for all to hav  more professors and their students involved in solving these problems. The benefits of such involvement would be

- The quality of academic research will improve with access to real problems
- High probability of research impact

*Continued on page 10*

# W.J. YOUDEN MEMORIAL ADDRESS

*Continued from page 9*

- Cost-effective for industry
- Students and faculty will gain valuable experience
- Better industry/academic relationships.

It is possible (but sometimes challenging) to achieve these benefits while meeting the requirements of the academic institutions (that research should produce scholarly publications and that external funding is needed to support much of its research).

**Facilitating academic involvement in manufacturing reliability problems.** Academics will have to be anxious to get their hands dirty with the difficulties of real problems, including investment of time to learn the language and science of the relevant disciplines. Industrial sponsors (i.e., individuals) will have to invest the time needed to identify, help structure, and provide guidance for selected projects. In today's highly competitive environment, it is difficult for industry to commit time and money unless there is some reasonable expectation of benefits. Some possible approaches that can be used to develop fruitful partnerships between industry and academics include

- Student internships and opportunities for faculty visits to industry (Los Alamos National Laboratory has such a program) provide assistance to industry and valuable learning experiences for the visitors.
- The NSF GOALI (Grant Opportunities for Academic Liaison with Industry) program provides funding for academics (students or faculty) to visit industry and/or for industry employees to visit universities to participate in research projects.
- When benefits to industry are uncertain (as will often be the case), industrial funding for cooperative work may be difficult to obtain. In such cases it may be useful to academics to offer to do work for expenses only, at least until a track record has been established.

**Concluding remarks.** Statistical tools that were developed to control and improve quality (e.g., process monitoring and designed experiments) have been useful for improving both quality and reliability. Generally, however, special statistical tools that focus on reliability are needed. With continuing changes in technology, increasing scientific knowledge, and new sources of data and other information, many new interesting problems and challenges lie ahead. Statisticians will continue to have an essential role to play in the area of reliability.

**Acknowledgements.** I would like to thank Luis A. Escobar and Gerald J. Hahn for helpful comments on the slides for the original talk and this written version.

## *References*

ATT (1990) *Reliability by Design*, ATT: Indianapolis, IN.

Condra, L.W. (2001), *Reliability Improvement with Design of Experiments*, Second Edition, Marcel Dekker.

Grove, D.M., and Davis, T.P. (1992), *Engineering, Quality and Experimental Design*, Longman.

Meeker, W. Q. and Escobar, L. A. (1998), *Statistical Methods for Reliability Data*, John Wiley and Sons, New York.

Nelson, W.B. (2003), *Recurrent Events Data Analysis for Product Repairs, Disease Recurrences, and Other Applications*, (ASA-SIAM Series on Statistics and Applied Probability), ASA-SIAM.

Phadke, M.S. (1989), *Quality Engineering Using Robust Design*, Prentice Hall.

Wu, C.F.J. and Hamada, M. (2000) *Experiments: Planning, Analysis, and Parameter Design Optimization*, Wiley.

# EXHIBIT F

# James W. Kolka PhD/JD Attorney-at-Law
## International Legal Consultant
## Curriculum Vitae

**Education**

- BS University of Wisconsin – Eau Claire, Major (Political Science) Minors (Chemistry/Economics)
- JD University of Wisconsin – Madison Law School, Admitted to State Bar of Wisconsin
- PhD University of Kansas Political Science and International Affairs

**Work Experience**

- University of Wisconsin – Green Bay Assistant Professor/Associate Professor Executive Asst. to the Vice Chancellor, Green Bay, WI 1969-1974

- University of Wisconsin System Administration, Madison, WI Professor/Senior Budget Planner/Senior Academic Planner, Developer & Director University of Wisconsin Adult Extended Degree Programs on Five Campuses 1974-1980

- Drake University, Des Moines, IA Professor/Vice President for Academic Affairs 1980-1983

- Kennesaw State University, Marietta, GA Professor/Vice President for Academic Affairs 1983-1987

- Visiting Professor of International Studies, Georgia Institute of Technology, Atlanta, GA 1987-1989

- Research Grants Development Administrator, Georgia Tech Research Institute, Atlanta, GA 1989-1991

- International Legal Consultant, President Kolka & Associates, Marietta, GA 1991-2013/Senior Consultant Excel Partnership, Sandy Hook, CT/London, UK 1994-2006/Senior Consultant SAI Global, Cleveland OH/Sidney, AU 2006/2009) for ISO 9001, ISO 13485, ISO 14001, FDA-s Quality System Regulation CE Marking for Machinery and CE Marking for Medical Devices Directives

- Attorney/Legal Expert for Law Firms involved in Law Suits in the US & UK involving ISO 9001, FDA's QSR & CE Marking for the Machinery Directive 2000-2013 Little Rock AK, Austin & Houston TX, Baltimore MA & Los Angeles CA, Detroit, MI, Chicago, IL, Portland, OR, London UK

**Training**

- Led team of faculty & students at the University of Kansas & University of Costa Rica & to develop written Spanish language materials (including training materials) to support Baccalaureate Degree Programs in Public Administration 1967-1968

- Developed curricula and interdisciplinary training materials for new Baccalaureate Degree programs, in collaboration with faculty colleagues at UW Green Bay 1969-1974

- Presented a Paper on Interdisciplinary Education to Seminar on Interdisciplinary Teaching and Research at Vigo Galicia & the Universidad Santiago Compostela sponsored by the Ministry of Education in Spain preparing for Higher Education in the year 2000.

- Supervised & wrote materials training faculty on five campuses in the University of Wisconsin System to assess prior learning, place degree programs in a competency based format and develop materials to complete a Baccalaureate Degree 1974-1980

- Governing Board Member on the American Council on Education, Commission on Education Credit and Credentials which oversees National Educational Training Programs 1978-1981

- Developed and delivered Public & On-site Training Programs on CE Marking for complying with the EU Machinery Directive and Related Directives (EMC, Low Voltage, Explosive Atmospheres ATEX, Pressure Vessels) including, EU Medical Devices Directives and related Quality Management Systems (ISO 9001, ISO 13485) 1991- 2011: Georgia Tech Atlanta GA, Houston, TX, San Francisco CA, Danbury CT, Orlando FL, Loyola Marymount University CA, Ventura CA, Newport Beach CA, Edison NJ, Minneapolis MN, University of Wisconsin Madison, WI New Orleans LA, Newport Beach CA, Boston MA, Waltham MA, Chicago Il, Seattle WA, Cincinnati OH, San Antonio TX, Mystic CT, Miami FL, Indianapolis IN 1991-2013

- Developed and delivered training courses for FDA's Quality System Regulation (QSR) for Excel Partnership & SAI Global in the US, UK & Australia

- Developed and delivered Staff Training Programs on CE Marking for the Machinery Directive, related Directives and the Medical Devices Directives for the California Manufacturing Technology Centers (CMTC) Los Angeles, Ontario, Ventura, Fresno

- Developed and delivered Public & On-site Training Programs on CE Marking for complying with the EU Machinery Directive and Related Directives, CE Marking for the Medical Devices Directive and Related Quality Management Systems for Excel Partnership, Inc. and SAI Global 1994-2014

2

- Developed and delivered Public & On-site Training Programs on ISO 9001, ISO 13485, ISO 14001, CE Marking Machinery & Related Directives (Low Voltage, EMC, Pressure Vessels, Explosive Atmospheres ATEX) and Product Liability Exposure 1991-2013, CE Marking Medical Devices
- Developed and delivered Public & On-site Training Programs on Preventive Law, Product Liability Audits, Product Safety Audits to reduce Product Liability Exposure 1991-2013

- Developed and delivered Public & On-site Training Programs on Product Liability Exposure and Loss Control for Medical Device Insurance Companies 1994-2013

  Developed and delivered Public and On-site Training Programs for Corporate Counsel, Defense Counsel and Trial Attorneys concerning Medical Device Manufacturers and Product Liability Exposure 1994-2017

3

**EXHIBIT G**



# ISO quality

## Quality management

## principles



This document introduces seven quality management principles (QMPs). ISO 9000, ISO 9001 and related ISO quality management standards are based on these seven QMPs.



One of the definitions of a "principle" is that it is a basic belief, theory or rule that has a major influence on the way in which something is done. "Quality management principles" are a set of fundamental beliefs, norms, rules and values that are accepted as true and can be used as a basis for quality management.

The QMPs can be used as a foundation to guide an organization's performance improvement. They were developed and updated by international experts of ISO/TC 176, which is responsible for developing and maintaining ISO's quality management standards.

This document provides for each QMP:
- **Statement**: Description of the principle
- **Rationale**: Explanation of why the principle is important for the organization
- **Key benefits**: Examples of benefits associated with the principle
- **Actions you can take**: Examples of typical actions to improve the organization's performance when applying the principle

The seven quality management principles are:

QMP 1 – Customer focus

QMP 2 – Leadership

QMP 3 – Engagement of people

QMP 4 – Process approach

QMP 5 – Improvement

QMP 6 – Evidence-based decision making

QMP 7 – Relationship management

These principles are not listed in priority order. The relative importance of each principle will vary from organization to organization and can be expected to change over time.

# QMP

## **Customer** focus

**Statement**

The primary focus of quality management is to meet customer requirements and to strive to exceed customer expectations.

**Rationale**

Sustained success is achieved when an organization attracts and retains the confidence of customers and other interested parties. Every aspect of customer interaction provides an opportunity to create more value for the customer. Understanding current and future needs of customers and other interested parties contributes to sustained success of the organization.

**Key benefits**

- Increased customer value
- Increased customer satisfaction
- Improved customer loyalty
- Enhanced repeat business
- Enhanced reputation of the organization
- Expanded customer base
- Increased revenue and market share



**Actions you can take**

- Recognize direct and indirect customers as those who receive value from the organization.
- Understand customers' current and future needs and expectations.
- Link the organization's objectives to customer needs and expectations.
- Communicate customer needs and expectations throughout the organization.
- Plan, design, develop, produce, deliver and support goods and services to meet customer needs and expectations.
- Measure and monitor customer satisfaction and take appropriate actions.
- Determine and take actions on interested parties' needs and expectations that can affect customer satisfaction.
- Actively manage relationships with customers to achieve sustained success.



# QMP
# Leadership



## Statement

Leaders at all levels establish unity of purpose and direction and create conditions in which people are engaged in achieving the organization's quality objectives.

## Rationale

Creation of unity of purpose and direction and engagement of people enable an organization to align its strategies, policies, processes and resources to achieve its objectives.

## Key benefits

- Increased effectiveness and efficiency in meeting the organization's quality objectives
- Better coordination of the organization's processes
- Improved communication between levels and functions of the organization
- Development and improvement of the capability of the organization and its people to deliver desired results



**Actions you can take**

- Communicate the organization's mission, vision, strategy, policies and processes throughout the organization.
- Create and sustain shared values, fairness and ethical models for behaviour at all levels of the organization.
- Establish a culture of trust and integrity.
- Encourage an organization-wide commitment to quality.
- Ensure that leaders at all levels are positive examples to people in the organization.
- Provide people with the required resources, training and authority to act with accountability.
- Inspire, encourage and recognize people's contribution.



# QMP

# **Engagement** of people

## Statement

Competent, empowered and engaged people at all levels throughout the organization are essential to enhance its capability to create and deliver value.

## Rationale

To manage an organization effectively and efficiently, it is important to involve all people at all levels and to respect them as individuals. Recognition, empowerment and enhancement of competence facilitate the engagement of people in achieving the organization's quality objectives.



**Key benefits**

- Improved understanding of the organization's quality objectives by people in the organization and increased motivation to achieve them
- Enhanced involvement of people in improvement activities
- Enhanced personal development, initiatives and creativity
- Enhanced people satisfaction
- Enhanced trust and collaboration throughout the organization
- Increased attention to shared values and culture throughout the organization

**Actions you can take**

- Communicate with people to promote understanding of the importance of their individual contribution.
- Promote collaboration throughout the organization.
- Facilitate open discussion and sharing of knowledge and experience.
- Empower people to determine constraints to performance and to take initiatives without fear.
- Recognize and acknowledge people's contribution, learning and improvement.
- Enable self-evaluation of performance against personal objectives.
- Conduct surveys to assess people's satisfaction, communicate the results, and take appropriate actions.





# QMP

# **Process** approach

## Statement

Consistent and predictable results are achieved more effectively and efficiently when activities are understood and managed as interrelated processes that function as a coherent system.

## Rationale

The quality management system consists of interrelated processes. Understanding how results are produced by this system enables an organization to optimize the system and its performance.

## Key benefits

- Enhanced ability to focus effort on key processes and opportunities for improvement
- Consistent and predictable outcomes through a system of aligned processes
- Optimized performance through effective process management, efficient use of resources, and reduced cross-functional barriers
- Enabling the organization to provide confidence to interested parties as to its consistency, effectiveness and efficiency

**Actions you can take**

- Define objectives of the system and processes necessary to achieve them.
- Establish authority, responsibility and accountability for managing processes.
- Understand the organization's capabilities and determine resource constraints prior to action.
- Determine process interdependencies and analyse the effect of modifications to individual processes on the system as a whole.
- Manage processes and their interrelations as a system to achieve the organization's quality objectives effectively and efficiently.
- Ensure the necessary information is available to operate and improve the processes and to monitor, analyse and evaluate the performance of the overall system.
- Manage risks that can affect outputs of the processes and overall outcomes of the quality management system.





# QMP
# Improvement

### Statement
Successful organizations have an ongoing focus on improvement.

### Rationale
Improvement is essential for an organization to maintain current levels of performance, to react to changes in its internal and external conditions and to create new opportunities.



### Key benefits

- Improved process performance, organizational capabilities and customer satisfaction
- Enhanced focus on root-cause investigation and determination, followed by prevention and corrective actions
- Enhanced ability to anticipate and react to internal and external risks and opportunities
- Enhanced consideration of both incremental and breakthrough improvement
- Improved use of learning for improvement
- Enhanced drive for innovation

### Actions you can take

- Promote establishment of improvement objectives at all levels of the organization.
- Educate and train people at all levels on how to apply basic tools and methodologies to achieve improvement objectives.
- Ensure people are competent to successfully promote and complete improvement projects.
- Develop and deploy processes to implement improvement projects throughout the organization.
- Track, review and audit the planning, implementation, completion and results of improvement projects.
- Integrate improvement considerations into the development of new or modified goods, services and processes.
- Recognize and acknowledge improvement.





# QMP
# Improvement

**Statement**

Successful organizations have an ongoing focus on improvement.

**Rationale**

Improvement is essential for an organization to maintain current levels of performance, to react to changes in its internal and external conditions and to create new opportunities.



**Key benefits**

- Improved process performance, organizational capabilities and customer satisfaction
- Enhanced focus on root-cause investigation and determination, followed by prevention and corrective actions
- Enhanced ability to anticipate and react to internal and external risks and opportunities
- Enhanced consideration of both incremental and breakthrough improvement
- Improved use of learning for improvement
- Enhanced drive for innovation

**Actions you can take**

- Promote establishment of improvement objectives at all levels of the organization.
- Educate and train people at all levels on how to apply basic tools and methodologies to achieve improvement objectives.
- Ensure people are competent to successfully promote and complete improvement projects.
- Develop and deploy processes to implement improvement projects throughout the organization.
- Track, review and audit the planning, implementation, completion and results of improvement projects.
- Integrate improvement considerations into the development of new or modified goods, services and processes.
- Recognize and acknowledge improvement.



## QMP

# Evidence-based decision making

### Statement

Decisions based on the analysis and evaluation of data and information are more likely to produce desired results.

### Rationale

Decision making can be a complex process, and it always involves some uncertainty. It often involves multiple types and sources of inputs, as well as their interpretation, which can be subjective. It is important to understand cause-and-effect relationships and potential unintended consequences. Facts, evidence and data analysis lead to greater objectivity and confidence in decision making.

### Key benefits

- Improved decision-making processes
- Improved assessment of process performance and ability to achieve objectives
- Improved operational effectiveness and efficiency
- Increased ability to review, challenge and change opinions and decisions
- Increased ability to demonstrate the effectiveness of past decisions



**Actions you can take**

- Determine, measure and monitor key indicators to demonstrate the organization's performance.
- Make all data needed available to the relevant people.
- Ensure that data and information are sufficiently accurate, reliable and secure.
- Analyse and evaluate data and information using suitable methods.
- Ensure people are competent to analyse and evaluate data as needed.
- Make decisions and take actions based on evidence, balanced with experience and intuition.



## QMP

### PRINCIPLE 8

### RELATIONSHIP MANAGEMENT

**Statement**

For sustained success, an organization manages its relationships with interested parties, such as suppliers.

**Rationale**

Interested parties influence the performance of an organization. Sustained success is more likely to be achieved when the organization manages relationships with all of its interested parties to optimize their impact on its performance. Relationship management with its supplier and partner networks is of particular importance.



**Key benefits**

- Enhanced performance of the organization
  and its interested parties through responding
  to the opportunities and constraints related to each
  interested party
- Common understanding of goals and values among
  interested parties
- Increased capability to create value for interested
  parties by sharing resources and competence
  and managing quality-related risks
- A well-managed supply chain that provides a stable
  flow of goods and services

**Actions you can take**

- Determine relevant interested parties
  (such as suppliers, partners, customers,
  investors, employees, and society as a whole)
  and their relationship with the organization.
- Determine and prioritize interested party relationships
  that need to be managed.
- Establish relationships that balance short-term gains
  with long-term considerations.
- Pool and share information, expertise and resources
  with relevant interested parties.
- Measure performance and provide performance
  feedback to interested parties, as appropriate,
  to enhance improvement initiatives.
- Establish collaborative development and improvement
  activities with suppliers, partners and other interested
  parties.
- Encourage and recognize improvements
  and achievements by suppliers and partners.



**The next step**

This document provides a general perspective on the quality management principles underlying ISO's quality management standards. It gives an overview of these principles and shows how, collectively, they can form a basis for performance improvement and organizational excellence.

There are many different ways of applying these quality management principles. The nature of the organization and the specific challenges it faces will determine how to implement them. Many organizations will find it beneficial to set up a quality management system based on these principles.

Further information on ISO 9000, ISO 9001 and related ISO quality management standards is available from ISO's national member bodies or from the **www.iso.org**.







**International Organization
for Standardization**

ISO Central Secretariat
Chemin de Blandonnet 8
Case Postale 401
CH – 1214 Vernier, Geneva
Switzerland

**iso.org**

© ISO, 2015
All rights reserved
ISBN 978-92-67-10650-2